2023-1354, 2023-1361, 2023-1384, 2023-1407

# United States Court of Appeals
# For the Federal Circuit

HONEYWELL INTERNATIONAL INC., TCL COMMUNICATION
TECHNOLOGY HOLDINGS LIMITED, TCT MOBILE INTERNATIONAL
LIMITED, TCT MOBILE, INC., TCT MOBILE (US) INC., TCT MOBILE (US)
HOLDINGS, INC., TELIT CINTERION DEUTSCHLAND GMBH, fdba Thales
DIS AIS Deutschland GmbH, SIERRA WIRELESS, INC.,
*Appellants*

v.

3G LICENSING, S.A.,
*Appellee*

Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2021-00908

## APPELLANTS' OPENING BRIEF

July 7, 2023

Benjamin Weed
Brian Bozzo
K&L GATES LLP
70 W. Madison St., Suite 3100
Chicago, IL 60602
Phone: (312) 781-7166
E-mail: benjamin.weed@klgates.com
        brian.bozzo@klgates.com

**COUNSEL FOR APPELLANT**
**HONEYWELL INTERNATIONAL, INC.**

*[additional counsel on inside cover]*

Amanda Tessar
Roderick O'Dorisio
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, Colorado
Phone: (303) 291-2388
E-mail: atessar@perkinscoie.com
        RODorisio@perkinscoie.com

**COUNSEL FOR APPELLANT
SIERRA WIRELESS, INC.**

Jeremy D. Peterson
Bradford A. Cangro
PV LAW, LLP
5335 Wisconsin Ave.
Washington, DC 20015
Phone: (202) 371-6861

**COUNSEL FOR APPELLANTS TCL
COMMUNICATION TECHNOLOGY
HOLDINGS LIMITED, TCT MOBILE
INTERNATIONAL LIMITED, TCT
MOBILE, INC., TCT MOBILE (US)
INC., TCT MOBILE (US) HOLDINGS,
INC. (COLLECTIVELY, "TCL")**

Guy Yonay
Kyle Auteri
Pearl Cohen Zedek Latzer Baratz LLP
7 Times Square, 19th Floor
New York, NY 10036
Phone: (646) 878-0800
Email : GYonay@PearlCohen.com
        KAuteri@PearlCohen.com

**COUNSEL FOR APPELLANT TELIT
CINTERION DEUTSCHLAND GMBH,
FDBA THALES DIS AIS
DEUTSCHLAND GMBH**

***Exemplary Claim of U.S. Patent No. 7,319,718 ("'718 patent")***

Claims 1, 2, 4-7, 9-13, and 15-23 of the '718 patent were challenged. None of claims

1, 2, 4-7, 9-13, and 15-23 were found unpatentable. Claim 1 is exemplary and is shown

below:

> 1.    A method of coding channel quality information (CQI), comprising
> the steps of:
>> providing information bits, $a_0$, $a_1$, $a_2$, $a_3$, and $a_4$;
>> providing five basis sequences $M_{i,n}$ for a (20,5) CQI code;
>> encoding the information bits by combining the information bits with
> the basis sequences; and
>> generating a 20-bit codeword, wherein the basis sequences $M_{i,n}$ are
> defined as:

| I | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| 1 | 0 | 1 | 0 | 0 | 1 |
| 2 | 1 | 1 | 0 | 0 | 1 |
| 3 | 0 | 0 | 1 | 0 | 1 |
| 4 | 1 | 0 | 1 | 0 | 1 |
| 5 | 0 | 1 | 1 | 0 | 1 |
| 6 | 1 | 1 | 1 | 0 | 1 |
| 7 | 0 | 0 | 0 | 1 | 1 |
| 8 | 1 | 0 | 0 | 1 | 1 |
| 9 | 0 | 1 | 0 | 1 | 1 |
| 10 | 1 | 1 | 0 | 1 | 1 |
| 11 | 0 | 0 | 1 | 1 | 1 |
| 12 | 1 | 0 | 1 | 1 | 1 |
| 13 | 0 | 1 | 1 | 1 | 1 |
| 14 | 1 | 1 | 1 | 1 | 1 |
| 15 | 0 | 0 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 | 1 |
| 17 | 0 | 0 | 0 | 0 | 1 |
| 18 | 0 | 0 | 0 | 0 | 1 |
| 19 | 0 | 0 | 0 | 0 | 1. |

Appx60, 12:29-58.

FORM 9. Certificate of Interest                                                    Form 9 (p. 1)
                                                                                   March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---:|:---|
| **Case Number** | 2023-1354, 2023-1361, 2023-1384, 2023-1407 |
| **Short Case Caption** | Honeywell International Inc. v. 3G Licensing, S.A. |
| **Filing Party/Entity** | Honeywell International Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/07/2023                    Signature:    /s/ Benjamin E. Weed

                                    Name:         Benjamin E. Weed

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Honeywell International Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑     None/Not Applicable          ☐     Additional pages attached

|  |  |  |
|--|--|--|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)     ☐   No     ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable          ☐     Additional pages attached

|  |  |  |
|--|--|--|
|  |  |  |
|  |  |  |

### CERTIFICATES OF INTEREST

Counsel for Appellants  TCL Communication Technology Holdings Limited, TCT Mobile (US) Holdings, Inc., TCT Mobile (US) Inc., TCT Mobile International Limited and TCT Mobile, Inc. certifies:

1. **Represented Entities.**  Provide the full names of all entities represented by undersigned counsel in this case.  Fed. Cir. R. 47.4(a)(1).

   TCL Communication Technology Holdings Limited
   TCT Mobile International Limited
   TCT Mobile, Inc.
   TCT Mobile (US) Inc.
   TCT Mobile (US) Holdings Inc.

2. **Real Party in Interest.**  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

   None/Not Applicable

3. **Parent Corporations and Stockholders.**  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10 percent or more of the stock of the entities:

   TCL Electronics Holdings Limited
   TCT Mobile Worldwide Limited
   TCT Mobile (US) Holdings Inc.
   TCT Mobile (US) Holdings Inc.
   Winning Synergy Limited

4. **Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court. Fed. Cir. 4. 47.4(a)(4).

   None/Not applicable

5. **Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47.4(a)(5) and 47.5(b).

- *Sisvel Int'l SA et al. v. Honeywell International, Inc.*, Case No. 1:20-cv-00652 (D. Del.);

- *Sisvel Int'l SA et al. v. TCL Comm. Tech. Holdings Ltd. et al.*, Case No. 1:20-cv-00654 (D. Del.)

- *Sisvel Int'l SA et al. v. Verifone Sys., Inc.*, Case No. 19-cv-01144 (D. Del.);

- *Sisvel Int'l SA v. Xirgo Techs.*, Case No. 19-cv-01145 (D. Del.); and

- *Sisvel Int'l SA v. HMD Am., Inc.*, 1:20-cv-22051 (S.D. Fla.).

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). *See* Fed. Cir. R. 47.4(a)(6).

    **None/Not Applicable**


Dated:  July 7, 2023                      By: /s/ Jeremy D. Peterson
                                              Jeremy D. Peterson

## CERTIFICATES OF INTEREST

Counsel for Appellant Sierra Wireless, Inc. certifies:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

   **Sierra Wireless, Inc.**

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

   **Sierra Wireless America, Inc.**

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10 percent or more of the stock of the entities:

   **None**

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. 4. 47.4(a)(4).

   (a)  **None/Not applicable**
   (b)  **None/Not applicable**

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

   **Yes**

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). *See* Fed. Cir. R. 47.4(a)(6).

   **None/Not Applicable**


Dated:  July 7, 2023          By: */s/ Amanda Tessar*
                                  Amanda Tessar

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2023-1354, 2023-1361, 2023-1384, 2023-1407 |
| **Short Case Caption** | Honeywell International Inc. v. 3G Licensing, S.A. |
| **Filing Party/Entity** | Telit Cinterion Deutschland GmbH |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/07/2023

Signature: /s/ Guy Yonay

Name: Guy Yonay

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☐ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Telit Cinterion Deutschland GmbH | Telit Cinterion USA LLC | Thales S.A. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

FORM 9. Certificate of Interest

Form 9 (p. 3)
March 2023

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable      ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)    ☐   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable      ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

**Page(s)**

I.    Statement of Related Cases .................................................................1

II.   Jurisdiction ...........................................................................................2

III.  Introduction ...........................................................................................3

IV.   Statement of the Issues .........................................................................6

V.    Statement of the Case ...........................................................................7

    A. Technical Background...................................................................7

        1. Encoding CQI to Provide Error Protection ..........................9

        2. The Importance of Encoding CQI ......................................10

        3. Optimizing Throughput Was a Known Consideration for Encoding CQI .................................................................11

    B. Prior Art Encoding Schemes for CQI.........................................13

    C. Summary of 3GPP Proceedings .................................................14

    D. The Purported Invention of the '718 Patent ...............................21

    E. The PTAB Proceedings ..............................................................23

VI.   Summary of the Argument ...................................................................30

VII.  Argument ..............................................................................................35

    A. Legal Standards .........................................................................35

    B. The Board Committed Legal Error in Determining that the Challenged Claims Are Non-Obvious.........................................36

        1. The Board Committed Legal Error by Misapplying the Standard for Obviousness Under 35 U.S.C. § 103.................................37

        2. The Board Committed Legal Error by Relying on the Truth of the Matter Asserted in the 3GPP Meeting Minutes Without an Evidentiary Basis to Do So ....................................................48

    C. The Board Erred Because Its FWD Is Not Supported By Substantial Evidence ...................................................................51

        1. Dr. Smith's Declaration Testimony Factually Distorts the Actual Text of the 3GPP Meeting Minutes.............................52

        2. Dr. Smith's Deposition Testimony Contradicts the Board's Finding of Nonobviousness.................................................56

**TABLE OF CONTENTS**
(continued)

3.  The Board's Factual Determination Contradicts the Evidence of Record.................................................................................................58

VIII.  Conclusion .................................................................................................69

# TABLE OF AUTHORITIES

## CASES

*Belden Inc. v. Berk-Tek LLC*,
  805 F.3d 1064 (Fed. Cir. 2015)............................................................35

*Biestek v. Berryhill*,
  139 S. Ct. 1148, 203 L.Ed.2d 504 (2019)............................................52

*Bosch Automotive Serv. Sols., LLC v. Matal*,
  878 F.3d 1027 (Fed. Cir. 2017)............................................................51

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197, 59 S. Ct. 206, 83 L.Ed. 126 (1938)..............................52

*DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*,
  464 F.3d 1356 (Fed. Cir. 2006)...................................................... 40, 54

*EmeraChem Holdings, LLC v. Volkswagen Grp. of Am., Inc.*,
  859 F.3d 1341 (Fed. Cir. 2017)............................................................47

*Freeman v. Minnesota Min. and Mfg. Co.*,
  675 F. Supp. 877 (D. Del. 1987)..................................................... 36, 50

*Graham v. John Deere Co. of Kansas City*,
  383 U.S. 1 (1966).............................................................................. 3, 48

*Harmonic Inc. v. Avid Tech., Inc.*,
  815 F.3d 1356 (Fed. Cir. 2016)............................................................52

*In re Applied Materials, Inc.*,
  692 F.3d 1289 (Fed. Cir. 2012)............................................................25

*In re Corkill*,
  771 F.2d 1496 (Fed. Cir. 1985)...................................................... 59, 69

*In re Coutts*,
  726 F. App'x 791 (Fed. Cir. 2018) ......................................................39

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*,
676 F.3d 1063 (Fed. Cir. 2012).................................................................47

*In re Kubin*,
561 F.3d 1351 (Fed. Cir. 2009)................................................ 35, 38, 44

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016).................................................................47

*In re O'Farrell*,
853 F.2d 894 (Fed. Cir.1988)....................................................................44

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398, 82 USPQ2d 1385 (2007) ........... 4, 6, 30, 35, 38, 39, 41, 43, 44, 45

*M & K Holdings, Inc. v. Samsung Elecs. Co., Ltd.*,
985 F.3d 1376 (Fed. Cir. 2021)..................................................................47

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
520 F.3d 1358 (Fed. Cir. 2008)................................................ 5, 37, 46

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007)................................................ 48, 59, 69

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
566 F.3d 989 (Fed. Cir. 2009)...................................................................45

*Redline Detection, LLC v. Star Envirotech, Inc.*,
811 F.3d 435 (Fed. Cir. 2015)...................................................................35

*TQ Delta, LLC v. Cisco Sys., Inc.*,
942 F.3d 1352 (Fed. Cir. 2019).................................................................35

*Ultratec, Inc. v. CaptionCall, LLC*,
872 F.3d 1267 (Fed. Cir. 2017).................................................................35

iv

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**STATUTES**

28 U.S.C. § 1295(a)(4)(A) ...................................................................2

35 U.S.C. § 102 ...............................................................................47

35 U.S.C. § 102(b) .............................................................. 32, 36, 49

35 U.S.C. § 103 ............................................... 30, 31, 36, 40, 46, 48, 54

35 U.S.C. § 142 .................................................................................2

35 U.S.C. § 314 .................................................................................7

35 U.S.C. § 318(a) ............................................................................2

35 U.S.C. § 6 .....................................................................................2

35 U.S.C. §§ 311-319 ........................................................................2


**RULES**

Fed. Cir. R. 15(a)(1) ..........................................................................2

Fed. R. Evid. 801(c) ............................................................... 36, 49

Fed. R. Evid. 802 .............................................................................36

Fed. R. Evid. 901 .............................................................................50

Fed. R. Evid. 902 .............................................................................50


**REGULATIONS**

37 C.F.R. § 90.3(a)(1) .......................................................................2

# I.    STATEMENT OF RELATED CASES

This appeal concerns the final written decision ("FWD") issued by the United States Patent and Trademark Office ("PTO") Patent Trial and Appeal Board ("PTAB" or the "Board") in Case No. IPR2021-00908, finding none of claims 1, 2, 4-7, 9-13, and 15-23 (the "Challenged Claims") of U.S. Patent No. 7,319,718 (the "'718 patent") unpatentable.  Appx44.

No other appeal in or from that same proceeding was previously before this Court or any other appellate court.  Except for the following matters that also concern the '718 patent, counsel is unaware of any other case pending in this Court or any other court or agency that will directly affect or be directly affected by this Court's decision:

*Sisvel Int'l S.A. v. Honeywell Int'l, Inc.*, No. 20-cv-0652 (D. Del.);

*Sisvel Int'l S.A. v. Xirgo Techs.*, No. 20-cv-00659 (D. Del.);

*Sisvel Int'l S.A. v. VeriFone, Inc.*, No. 20-cv-00656 (D. Del.); and

*3G Licensing SA v. TCL Commc'n Tech. Holdings Ltd.*, No. 20-cv-00654 (D. Del.).

## II.    JURISDICTION

The Board had jurisdiction under 35 U.S.C. §§ 6, 311-319 and issued its final written decision under 35 U.S.C. § 318(a) on November 14, 2022.   Appx1. Honeywell International, Inc. timely filed its notice of appeal on January 4, 2023, under 35 U.S.C. § 142, 37 C.F.R. § 90.3(a)(1), and Fed. Cir. R. 15(a)(1).  Appx757-Appx761.   TLC, Sierra Wireless, Inc., and Telit Cinterion Deutschland GmbH timely filed their notices of appeal under the same statutes on January 6th, 9th, and 10th respectively.  Appx809-Appx917.

This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

2

## III.   INTRODUCTION

The law of obviousness acknowledges that not all differences between a claimed invention and the prior art are patentable differences.  *See Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).  In IPR2021-00908, there was never a dispute as to the scope of the '718 patent or about the fact that there are only extremely minor differences between its claims and the primary prior art reference, R1-02-0046, 3GPP TSG RAN WG1 #23 ("Philips46").  Nor was there a dispute that Philips46 is, in fact, prior art.

The Challenged Claims here implicate basic principles of matrix algebra that have been taught to high school students for decades.  Appellants, Appellee, and the Board all agreed that the Challenged Claims only differed from the teachings of Philips46 in that two bits of a claimed one-hundred bit matrix are swapped.  *See* Appx12-Appx15.



R1-02-0046 (Philips) Proposal
Reproduction of Table 1
(Ex. 1004, at 2).

'718 Patent Claim 1

Appx513.  There were, admittedly, *no* other differences between each and every claimed element of the Challenged Claims and Philips46.

Notwithstanding this minor difference, the Board committed legal error and concluded that swapping the position of those last two bits constitutes a non-obvious invention worthy of patent protection.  The Board's determination was premised on both legal and factual errors, and should be reversed.

For example, the Board violated the Supreme Court's mandate in *KSR International Co. v. Teleflex Inc.* by requiring a "teaching, suggestion, or motivation" in its obviousness analysis and failing to even mention other rationales that must be considered in a proper obviousness analysis, including whether a claimed solution would have been obvious to try.  550 U.S. 398, 82 USPQ2d 1385 (2007).  Resultantly, the Board effectively foisted upon Appellants an anticipation-like standard.

The Board also committed legal error through its undue reliance on *post hoc* 3GPP meeting minute documents for the truth of the matter contained therein without identifying an applicable hearsay exception or considering the evidentiary underpinnings.  Instead of relying on permissible evidence of record, including testimonial evidence from Appellant's witnesses, the Board constructed its own narrative about supposed confusion among 3GPP members as to the technology—a narrative that is unsupported by the meeting minutes in question, which never should

have been considered in the first place. Even ignoring the Board's mistaken analysis, the meeting minute documents were published **after** the application that issued as the '718 patent was filed and are, therefore, legally irrelevant to the obviousness issues raised by the Petition. *See Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008) (explaining that a proper inquiry evaluates whether the Challenged Claims "would have been obvious at the time the invention was made").

Finally, the Board erred in weighing the evidence. Even if the *post hoc* 3GPP documentation is given credence, it does not demonstrate *non-obviousness*. Simply because one of the few obvious to try modifications to Philips46 was memorialized as the "best" (at least by some metric and/or in some self-interested 3GPP member's opinion) after the '718 patent was filed does not mean the '718 patent claims were not obvious. The Board's decision of patentability was demonstrably unsubstantiated by evidence.

The Board relied on faulty evidence from Appellee and its declarant, Dr. Smith, to erroneously conclude that a minor modification to a prior art matrix used in a common matrix algebra equation would have yielded an unpredictable result. This cannot stand. In view of the Board's legal error and flawed factual findings, its FWD should be overturned or, at a minimum, remanded for further consideration.

## IV.    STATEMENT OF THE ISSUES

1. Did the Board commit legal error by requiring a "teaching, suggestion, or motivation" to find obviousness, in violation of the Supreme Court's guidance in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 82 USPQ2d 1385 (2007), which mandates consideration of other obviousness rationales, including whether the claims would have been obvious to try?

2. Did the Board commit legal error by relying on *post hoc* evidence to support a finding of non-obviousness?

3. Did the Board commit legal error when it relied on meeting minute documents for the truth of the matter contained therein, absent an applicable hearsay exception (or even considering the evidentiary underpinnings thereof)?

4. Was the Board's FWD supported by substantial evidence, or did the Board erroneously weigh the facts by overstating the differences between the Challenged Claims and the Philips46 prior art reference?

## V.    STATEMENT OF THE CASE

On May 12, 2021, Appellants filed an IPR petition challenging claims 1, 2, 4, 5, and 15-23 of the '718 patent as unpatentable over Philips46, and claims 6, 7, and 9-13 as unpatentable over the combination of Philips46 and R1-02-0019, 3GPP TSG RAN WG1#23, Espoo, Finland, January 8-11, 2002 ("Nokia") (the "Petition"). Appx139-Appx223.  The Board granted institution of the Petition under 35 U.S.C. § 314 on November 15, 2021.  Appx349-Appx382.  On November 14, 2022, the Board issued a final written decision ("FWD"), finding that none of the Challenged Claims were unpatentable over Philips46, or Philips46 and Nokia in combination. Appx1-Appx47.  In doing so, the Board committed several legal errors and came to a determination that was not supported by substantial evidence.

### A.    Technical Background

The '718 patent describes a mathematical scheme for encoding channel quality information ("CQI") in cellular communications.  Appellants' expert, Dr. Paul C. Clark, provided a detailed summary of the technology in his declaration, and Appellants briefly summarize the same, here.  *See* Appx926-Appx1028.

The CQI is a 5-bit binary representation of an integer between 0 and 30 that a mobile device sends to a base station indicating the quality of the device's connection.  Appx938-Appx940, ¶¶ 38-39, 42.  A base station uses such CQI to optimize communications with the mobile device.  Appx938-Appx939, ¶ 39.  For

this optimization process to function as intended, the CQI transmitted by the mobile device must be received accurately by the base station.  Appx935, ¶ 32.  The information is protected by "encoding" it into a longer form such that, even if errors occur during transmission, the recipient can still recover the original message. Appx935-Appx936, ¶¶ 32-34.

The '718 patent describes and claims a method of encoding a 5-bit CQI by employing an admittedly known mathematical equation featuring a so-called basis sequence.  In the case of the '718 patent, the basis sequence is a 20-row table that is used to generate a 20-bit codeword representative of the CQI.  Appx56, 3:50-4:9, 4:16-21.  The basis sequences claimed in the '718 patent are designed to provide extra protection (*i.e.*, redundancy) for the most significant bit of the CQI.  Appx58, 7:33-35.  That is, the most significant bit of the CQI is represented more heavily in the 20-bit codeword than the less significant bits of the CQI to ensure that it is correctly received by the base station.

There is nothing inventive about the mathematical method of encoding CQI claimed by the '718 patent.  In fact, aside from the relative position of the last two bits of the basis sequences, it is undisputed that the mathematical operations recited by the Challenged Claims are identical to the mathematical operations taught by Philips46.  *See* Appx12-Appx15.

### 1. *Encoding CQI to Provide Error Protection*

According to the '718 patent, its method of encoding CQI (*i.e.*, the basis sequence claimed) protects against errors being inadvertently transmitted. Appx58, 7:41-49. In telecommunications, information sent from one machine to another is generally susceptible to degradation from random errors, interference, and based on distance and obstructions, among other factors. Appx935, ¶ 32. These errors can cause a message received by the transmission recipient to differ from the message originally sent. *Id*. This is undesirable, as the intent in telecommunications is typically for the message recipient to receive the original message the sender intended, or at least a close approximation of the original message. *Id*.

To ensure that the message recipient receives the message as sent, or at least a close approximation of it, it is common technique for the transmission to be an *encoding* of the message, rather than the original message itself. Appx936, ¶ 33. The message is encoded to another form such that, even if errors occur during the transmission, the recipient, after decoding the received message, will still have a relatively high likelihood of recovering the sender's original message, or a close approximation thereof, despite any transmission errors. *Id*. The encoding permits the recognition and, in many cases, correction of transmission errors. For example, a simple form of such encoding would be merely to repeat the transmission signal three times. *See id.* ¶ 34. Repeating the signal introduces redundancy, which in turn

increases the likelihood that the signal is correctly received. *See id*. In this example, the sender sends the signal three times, and the receiver knows that the three signals are merely repetitions of one message. *See id*. If part of the message is changed or lost in transit, the lost data can be filled in using the repeated information. *Id*.

### 2.    *The Importance of Encoding CQI*

In cellular communications—the field of the '718 patent—the *magnitude* of error in a received CQI has a significant practical impact on the system's performance. Appx944-Appx948, ¶¶ 50, 56. A relatively large difference between the CQI value sent by the UE and the CQI value received by the base station (*i.e.*, indicating the CQI has a *much* higher or lower value than it really does, indicating that the quality is much better or worse than it really is) has a greater impact on the system than a relatively small difference between the CQI value sent and the CQI value received (*i.e.*, a received value indicating the CQI has only a *slightly* higher or lower value, falsely indicating the quality is only slightly better or worse than it is in reality). Appx945-Appx946, ¶ 52.

For a binary number, the magnitude of an error depends on which bit is erroneous. Take, for example, a CQI of 6, which corresponds to the 5-bit sequence of (0, 1, 1, 0, 0).[1] Appx947, ¶ 55. An error in receiving the "most significant bit"

---

[1]    The convention used for expressing a binary number in the '718 patent, as well as in relevant prior art, is for the bits to increase in relative significance when the number is read from left to right. Thus, the bit position with the highest relative

(the right-most bit in this notation), such that the base station receives the bits (0, 1, 1, 0, **1**) instead of (0, 1, 1, 0, **0**), changes the value of the CQI from 6 to 22. Appx946-Appx947, ¶¶ 53-55.  This would be a relatively large error and would cause the base station to allocate far too high of a data rate to the UE.  Appx945-Appx946, ¶ 52.  By contrast, an error in receiving the "least significant bit" (the left-most bit in this notation), such that the base station receives the bits (**1**, 1, 1, 0, 0) instead of (**0**, 1, 1, 0, 0), would change the value of the CQI from 6 to 7 (on the scale of 0 to 30), which would have minimal practical impact on transmission performance.  Appx945-Appx947, ¶¶ 52-55.  Analogous to a number expressed in decimal form, mistaking 9721 for 8721 is an error of 1,000; whereas mistaking 9721 for 9722 is a difference of only 1.  *See* Appx948, ¶ 56.  In this example, the thousands digit is the "most significant" and the ones digit is the "least significant." *See* Appx946-Appx947, ¶¶ 53, 55.

### 3.   *Optimizing Throughput Was a Known Consideration for Encoding CQI*

The base station relies on feedback from UEs to determine channel conditions so that it can optimize throughput.  Appx55, 2:32-36; Appx937-Appx939, ¶¶ 36, 40. The CQI is one such form of feedback from a UE to a base station about channel

---

value (referred to as the "most significant bit") is at the right-hand side of the binary number.  Appx946, ¶ 54.  For consistency with the '718 patent, this Brief (as well as the Petition below) uses this convention.

conditions.    Appx938-Appx939,    ¶¶    37-39.    Specifically, the CQI is control information in the form of an integer between 0 and 30, represented by five bits of binary data where each bit has a value "1" or "0." Appx938-Appx939, ¶ 39. If a UE has a weak received signal (indicating poor channel conditions), the UE reports a CQI having a relatively smaller integer value (*e.g.*, 0 or 1, encoded as five bits of binary data), and the base station responds by assigning the UE a lower data rate. *Id*. By contrast, if the UE has a strong received signal (indicating favorable channel conditions), the UE reports a CQI having a relatively larger integer value (*e.g.*, 29 or 30, encoded as five binary bits), and the base station responds by assigning the UE a higher data rate. *Id*.

To provide effective Adaptive Modulation and Coding, the base station must accurately receive the CQI transmitted by the UE. *See* Appx935, ¶ 32. If the base station does not have the correct understanding of the CQI value transmitted by the UE, then the data rate for the transmission of data from the base station to the UE will be suboptimal for the UE's given channel conditions (*e.g.*, received signal strength). Appx938-Appx939, ¶ 39. In some instances, the resulting data rate can be too low, leading to an unnecessarily reduced, or slow, data rate when, in fact, a higher data rate could have been supported. *See id*. Alternatively, the resulting data rate could be too high, in which case the UE will be less likely to successfully receive and decode all the data the base station transmits to it. *See id*.

12

**B.    Prior Art Encoding Schemes for CQI**

As the '718 patent acknowledges, it was known in the prior art to encode a 5-bit CQI into a 20-bit "codeword" for transmission by the UE.  Appx56, 3:39-44; Appx939-Appx943, ¶¶ 41-48.  Because the CQI in the prior art is transmitted as 20 encoded bits, rather than in its original 5-bit form, transmission errors are less likely to prevent the base station from receiving the actual CQI value.  Appx945-Appx946, ¶¶ 51-52.  The 20-bit codeword is received by the base station, which attempts to decode the 20 bits to ascertain the original 5-bit CQI.  Appx945-Appx946, ¶ 52.  The base station uses the codeword's redundant bits to correct errors that may occur during transmission due to various reasons (*e.g.*, noise, interference, incidentally flipped bits, etc.).  Appx935-Appx947, ¶¶ 32-34, 54-55.

An encoding scheme that inputs a 5-bit message and outputs a 20-bit codeword is referred to as a (20,5) code.  Appx942-Appx943, ¶ 48.  Such schemes (in particular Philips' proposal to use 20-bit basis sequences to encode 5 bits) were known before the filing of the '718 patent.  Appx960-Appx978, ¶¶ 76-78, 81-82, 108.  Prior art cellular systems relied on 31 different CQI values (*i.e.*, each of the 31 integer values between 0 and 30, coded in binary using 5 bits) to indicate connection quality.  *See* Appx935-Appx954, ¶¶ 32-33, 39, 63.  In, for example, the Philips approach described in Philips46, each different CQI value (*i.e.*, each different 5-bit

input sequence) produces a different 20-bit codeword that the UE transmits to the base station.

It is undisputed that those of skill in the art were well aware, at the time of the '718 patent, that different encoding schemes could be used to introduce redundancy in different manners. Appx942-Appx945, ¶¶ 48-51. One technique known at the time, called "unequal error protection," involved introducing different amounts of redundancy depending on the relative importance of each input bit. Appx945-Appx946, ¶ 52. With "unequal error protection," certain input bits (*e.g.*, when "unequal error protection" techniques are applied to a 5-bit CQI) are provided more protection against transmission errors than other bits, as redundancy is applied more heavily to some bits over others. Appx945-Appx946, ¶¶ 52-53. For example, the fundamental "unequal error protection" approach involves representing more important input bits more often in the output codeword than less important ones. Appx945-Appx948, ¶¶ 52, 56.

## C.    Summary of 3GPP Proceedings

Central to this case is the development of a particular 3GPP standard for encoding CQI and the considerations and contributions of various 3GPP stakeholders to that standard. Many months before the application for the '718 patent was filed, a 3GPP working group had already defined most of the key parameters for coding the CQI. *See* Appx949, ¶ 58. The '718 patent admits that the

3GPP standards at that point already defined a (16,5) "Transmit Format Combination Indicator" ("TFCI") code that was used to encode other control information. Appx939-Appx940, ¶ 41. However, by November 2001 (*i.e.*, four months before LGE filed the application that became the '718 patent), the 3GPP had reconsidered, determining that the CQI would "consist[] of 5 information bits" that would be "coded into 20 bits" for transmission to the base station. Appx960-Appx961, ¶ 76; Appx1741. By this point, it had also been recommended to optimize the CQI codeword "to minimise [sic] errors in the MSB's [most significant bits] of CQI." Appx1711. The primary issue remaining for the 3GPP working group was to decide how to encode the 5 information bits into a 20-bit codeword. Appx948-Appx961, ¶¶ 56, 76. Thus, several 3GPP partners proposed modifying existing codewords that were not (20,5) into the agreed upon (20,5) format.

In essence, the 3GPP stakeholders were fine-tuning the basis sequence employed by the coding process to be memorialized by their standard, experimenting with the prioritization of different parameters using known matrix algebra that reflects the various possible prioritizations.

For example, before the application that issued as the '718 patent was filed, there were at least three relevant proposals publicly presented to and considered by the 3GPP working group. These proposals are discussed in 3GPP submissions and

are acknowledged in the background section of the '718 patent. Appx55-Appx58, 1:1-7:53.

First, understanding that the 20-bit codeword framework would be mandatory, Ericsson proposed extending an existing (16,5) code by simply adding four additional bits to the 16-bit codeword. Appx57, 5:65-6:36. Ericsson proposed appending the "four least reliable information bits" to the 16-bit TFCI codeword to form a 20-bit codeword. *Id.* In Ericsson's estimation, the four least reliable information bits were the first four bits of the CQI (*i.e.*, $a_0$, $a_1$, $a_2$, and $a_3$). Appx1741. This proposal is illustrated in Figure 4 of the '718 patent.

Second, Nokia submitted TDoc R1-02-0019, the secondary reference of Ground 2 of the Petition (i.e., "Nokia"), which proposed a mechanism similar to Ericsson, where a (16,5) code was used to create a 16-bit codeword with additional information bits appended to it. Appx1739, Fig.1. Specifically, Nokia appended four of the five information bits to an intermediate 16-bit codeword to arrive at a final 20-bit codeword. Appx186-Appx187; Appx1739; Appx966, ¶ 89.

Third, Samsung proposed another modest deviation: using an existing (32,5) code and puncturing (or removing bits from) it to create a 20-bit codeword. Appx57, 6:37-41; Appx1590-Appx1591. Specifically, the existing 3GPP standards defined a (32,5) TFCI code for other purposes. Appx1591. Samsung's proposal was to reuse the existing (32,5) TFCI code, which generated a 32-bit codeword, and then puncture

(or remove) 12 of the bits from the codeword, resulting in 20 coded bits.  Appx1591; *see also* Appx965-Appx966, ¶ 87.  This proposal is illustrated in Figure 5a of the '718 patent.

Fourth, and most importantly here, Philips proposed extending the existing (16,5) TFCI code, like Ericsson.  Instead of repeating the least reliable bits, however, Philips proposed "giv[ing] significant extra protection to the MSB [most significant bit], and a little more robustness to the next most significant bit."  Appx58, 7:15-35; Appx1423; Appx961-Appx962, ¶¶ 78-79.  Philips' proposal thus reflected, in a very tangible way, what a person of ordinary skill in the art ("POSITA"), or even a lay person, would have understood:  protecting more significant bits is more important than protecting less significant bits.  Appx963-Appx964, ¶ 82.  Philips' proposal identified that "$M_{i,4}$ *is the most significant bit*" and expressly taught and called attention to the benefit of protecting the most significant bit:  "[I]t is also *desirable that if possible the most significant bits of the data are better protected* than the least significant bits."  Appx1423 (emphasis added); *see also* Appx960-Appx961, ¶ 76.  "This would reduce the probability that transmission errors would result in large errors in the received channel quality value."  Appx1423; *see also* Appx960-Appx961, ¶ 76.  Thus, Philips' proposal, which echoes the mindset of a POSITA, was to start with the known 16-bit TFCI codeword and then append the most significant bit of the CQI *three times* ($M_{16,4}$-$M_{18,4}$) and the next most significant bit

17

once ($M_{19,3}$), as illustrated in the figure below.  Appx1423-Appx1424; Appx970-Appx978, ¶¶ 97, 108.

| i | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ | |
|---|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 | |
| 1 | 0 | 1 | 0 | 0 | 1 | |
| 2 | 1 | 1 | 0 | 0 | 1 | |
| 3 | 0 | 0 | 1 | 0 | 1 | |
| 4 | 1 | 0 | 1 | 0 | 1 | |
| 5 | 0 | 1 | 1 | 0 | 1 | |
| 6 | 1 | 1 | 1 | 0 | 1 | |
| 7 | 0 | 0 | 0 | 1 | 1 | Historical (16,5) TFCI basis sequence |
| 8 | 1 | 0 | 0 | 1 | 1 | |
| 9 | 0 | 1 | 0 | 1 | 1 | |
| 10 | 1 | 1 | 0 | 1 | 1 | |
| 11 | 0 | 0 | 1 | 1 | 1 | |
| 12 | 1 | 0 | 1 | 1 | 1 | |
| 13 | 0 | 1 | 1 | 1 | 1 | |
| 14 | 1 | 1 | 1 | 1 | 1 | |
| 15 | 0 | 0 | 0 | 0 | 1 | |
| 16 | 0 | 0 | 0 | 0 | 1 | Most Significant Bits ($M_{16,4}$-$M_{18,4}$) |
| 17 | 0 | 0 | 0 | 0 | 1 | |
| 18 | 0 | 0 | 0 | 0 | 1 | |
| 19 | 0 | 0 | 0 | 1 | 0 | Next Most Significant Bit ($M_{19,3}$) |

Appx1424, Table 1 (annotated).  Philips explained:  "[t]his extra protection for the MSB results in . . . improved performance."  Appx1425; *see also* Appx962-Appx963, ¶ 79.

Fifth, approximately one month after Philips presented Philips46, during a meeting that began on February 18, 2002, LGE proposed the basis sequence recited

by the Challenged Claims.  Appx2604.  Just like Philips, LGE started with the known 16-bit TFCI codeword and then appended the most significant bit of the CQI three times ($M_{16,4}$-$M_{18,4}$).   However, instead of extending protection to the next most significant bit ($M_{19,3}$) in row 18, LGE took the next logical step and proposed protecting the most significant bit ($M_{19,4}$), as identified by Philips, one last time— i.e., four times total.

| I | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ | |
|---|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 | |
| 1 | 0 | 1 | 0 | 0 | 1 | |
| 2 | 1 | 1 | 0 | 0 | 1 | |
| 3 | 0 | 0 | 1 | 0 | 1 | |
| 4 | 1 | 0 | 1 | 0 | 1 | |
| 5 | 0 | 1 | 1 | 0 | 1 | |
| 6 | 1 | 1 | 1 | 0 | 1 | |
| 7 | 0 | 0 | 0 | 1 | 1 | Historical (16,5) TFCI basis sequence |
| 8 | 1 | 0 | 0 | 1 | 1 | |
| 9 | 0 | 1 | 0 | 1 | 1 | |
| 10 | 1 | 1 | 0 | 1 | 1 | |
| 11 | 0 | 0 | 1 | 1 | 1 | |
| 12 | 1 | 0 | 1 | 1 | 1 | |
| 13 | 0 | 1 | 1 | 1 | 1 | |
| 14 | 1 | 1 | 1 | 1 | 1 | |
| 15 | 0 | 0 | 0 | 0 | 1 | |
| 16 | 0 | 0 | 0 | 0 | 1 | Most Significant Bits ($M_{16,4}$-$M_{18,4}$) |
| 17 | 0 | 0 | 0 | 0 | 1 | |
| 18 | 0 | 0 | 0 | 0 | 1 | |
| 19 | 0 | 0 | 0 | 0 | 1 | |

Next Most Significant Bit ($M_{19,3}$) Unprotected in Favor of Protecting the Most Significant Bit ($M_{19,4}$) once more

19

Appx60, 12:29-58.  Accordingly, LGE's basis sequence provided an incremental amount of additional protection to the Philips' identified most significant bit ($M_{i,4}$), in accordance with Philips' teaching to "give[] significant extra protection to the MSB [most significant bit]."  Appx1423.  *See* Appx58, 7:14-35; Appx961-Appx962, ¶¶ 78-79.  LGE accompanied its proposal with another technical document detailing a simulated the bit error rate, unequal error protection, and system throughput performance of its proposed basis sequence in comparison to the basis sequences of Philips46, Samsung, and Ericsson.  Appx2604.  When presented with these simulation results, the 3GPP stated that "the performance differences of the [LGE Proposal] are ***very small***."  Appx1482, *26 (emphasis added).

In summary, Philips identified the most significant bit ($M_{i,4}$) and the next most significant bit ($M_{i,3}$), as well as the theory that "extra protection for the MSB results in . . . improved performance."  Appx1423-Appx1425; Appx962, ¶ 79.  Following Philips' playbook, LGE took the common sense next step of providing even more protection to Philips' most significant bit ($M_{i,4}$) at the expense of the next most significant bit ($M_{i,3}$) in row 19.

Although Siemens, Panasonic, and Sony preferred Philips46 (Appx1482, *28), Philips eventually supported the LGE proposal.  Appx1482, *29.  Philips and LGE worked together to present R1-02-0654 in April 2002, which simulated the performance of LGE's proposed modification to Philips' basis sequence and inspired

20

the ultimate adoption of LGE's proposal into the 3GPP standard. Appx2610-Appx2611; Appx2612, TSGR1#25-02-0653, 1, 4. Predictably, in the simulations described above, Philips46 closely tracked LGE's proposed basis sequence in bit error rate, unequal error protection, and system throughput performance.

## D.    The Purported Invention of the '718 Patent

On February 16, 2002, two days before LGE submitted its proposed modification to Philips46, LGE filed Korean Patent Application No. 20020008350A, which constitutes the earliest possible priority date available to the '718 patent. The '718 patent proposes three methods for generating a (20,5) code that, like the Ericsson proposal and Philips46, are based on the (16,5) TFCI coding scheme. Appx56, 3:42-44; Appx949-Appx968, ¶¶ 60-65, 90. The third proposed scheme of the '718 patent—the subject of the Challenged Claims—simply extends the prior art (16,5) TFCI code such that the most significant bit of the CQI (*i.e.*, bit $a_4$) is repeated four times at the end to arrive at the final 20-bit codeword. Appx60, 11:33-37 ("[T]he channel quality information (CQI) coding method comprises (a) encoding 5 information bits into (16,5) TFCI codes using (16,5) basis sequences (b) repeating the [most significant bit] of information bits 4 times."); Appx954-Appx957, ¶¶ 65, 68.

The basis sequence of Philips46 and the '718 patent encoding generate identical bits for 19 of the 20 output codeword bits in the resulting 20-bit codeword

for any given 5-bit input CQI value.  Appx970-Appx978, ¶¶ 97-98, 107-109.  The only difference is in the 20th bit of the 20-bit codeword; in Philips46, the resulting codeword has a final digit that is equal to $a_3$ (*i.e.*, the second-most significant bit of the 5-bit CQI), whereas in the '718 patent scheme, the resulting codeword has a final digit that is equal to $a_4$ (*i.e.*, the most significant bit of the five-bit CQI.)  Appx970-Appx977, ¶¶ 97, 107.  However, if $a_3$ and $a_4$ are identical (*i.e.*, if both are 0 or both are 1, which statistically should be the case 25% of the time), this variation causes no difference for even that 20th bit of the 20-bit codeword, meaning that in those 25% of instances, the 20-bit codeword would be identical under both the Philips46 and '718 patent approaches.  Appx966-Appx969, ¶¶ 90-93.

Thus, the 20-bit output codewords generated by Philips46 and the '718 patent claims are *identical* except for the value of the final bit, and even that final bit will sometimes be identical.  Appx966-Appx978, ¶¶ 90-93, 98, 109.  The final bit of the '718 patent codeword is always the most significant bit of the CQI ($a_4$), and the final bit of the Philips46 codeword is always the next-most-significant bit ($a_3$).  This is because in the final row of the basis sequences in Philips46, the "1" is in the fourth basis sequence (4th column), causing the fourth information bit ($a_3$) to be the final output of the codeword; conversely, in the final row of the basis sequences in the

'718 proposal, the "1" is in the fifth basis sequence (5th column), causing the fifth

information bit ($a_4$) to be the final output of the codeword. *See* Appx969, ¶¶ 92-93.[2]

## E.    The PTAB Proceedings

In the Petition, Appellants argued that Philips46 provides a table (Table 1) for

its (20,5) basis sequence, with 5 basis sequences $M_{i,0}$ to $M_{i,4}$ for a (20,5) TFCI code

extended from a (16,5) TFCI code. Appx1424. Appellants rightfully noted that the

only difference between the basis sequences of Philips46 and the Challenged Claims

is the relative position of the two bits highlighted below, which is undisputed.

| I | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |   | I | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 | | 0 | 1 | 0 | 0 | 0 | 1 |
| 1 | 0 | 1 | 0 | 0 | 1 | | 1 | 0 | 1 | 0 | 0 | 1 |
| 2 | 1 | 1 | 0 | 0 | 1 | | 2 | 1 | 1 | 0 | 0 | 1 |
| 3 | 0 | 0 | 1 | 0 | 1 | | 3 | 0 | 0 | 1 | 0 | 1 |
| 4 | 1 | 0 | 1 | 0 | 1 | | 4 | 1 | 0 | 1 | 0 | 1 |
| 5 | 0 | 1 | 1 | 0 | 1 | | 5 | 0 | 1 | 1 | 0 | 1 |
| 6 | 1 | 1 | 1 | 0 | 1 | | 6 | 1 | 1 | 1 | 0 | 1 |
| 7 | 0 | 0 | 0 | 1 | 1 | | 7 | 0 | 0 | 0 | 1 | 1 |
| 8 | 1 | 0 | 0 | 1 | 1 | | 8 | 1 | 0 | 0 | 1 | 1 |
| 9 | 0 | 1 | 0 | 1 | 1 | | 9 | 0 | 1 | 0 | 1 | 1 |
| 10 | 1 | 1 | 0 | 1 | 1 | | 10 | 1 | 1 | 0 | 1 | 1 |
| 11 | 0 | 0 | 1 | 1 | 1 | | 11 | 0 | 0 | 1 | 1 | 1 |
| 12 | 1 | 0 | 1 | 1 | 1 | | 12 | 1 | 0 | 1 | 1 | 1 |
| 13 | 0 | 1 | 1 | 1 | 1 | | 13 | 0 | 1 | 1 | 1 | 1 |
| 14 | 1 | 1 | 1 | 1 | 1 | | 14 | 1 | 1 | 1 | 1 | 1 |
| 15 | 0 | 0 | 0 | 0 | 1 | | 15 | 0 | 0 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 | 1 | | 16 | 0 | 0 | 0 | 0 | 1 |
| 17 | 0 | 0 | 0 | 0 | 1 | | 17 | 0 | 0 | 0 | 0 | 1 |
| 18 | 0 | 0 | 0 | 0 | 1 | | 18 | 0 | 0 | 0 | 0 | 1 |
| 19 | 0 | 0 | 0 | [1] | [0] | | 19 | 0 | 0 | 0 | [0] | [1] |

Prior Art                                              '718 patent

---

[2] Other than that sole difference, the claims of the '718 patent are identical to
Philips46. *See* Appx971-Appx983, ¶¶ 98, 109, 115. The result is that for any CQI,
the first 19 bits of the 20-bit codeword are ***always identical*** between Philips46 and
LGE's '718 patent. Appx971, ¶ 98. Indeed, even for the final bit, there are only
sometimes differences between the two. *See id*. This was not disputed.

Appx154-Appx155.  Appellants further observed that "Philips46 notes that the most significant bit is the final bit of the five information bits ($a_0$, $a_1$, $a_2$, $a_3$, **$a_4$**) and attempts to provide 'significant extra protection to the MSB [most significant bit].'" Appx188 (citing Appx961-Appx962, ¶¶ 78-79; Appx1423).  In view of Philips46's teachings, Appellants argued a POSITA attempting to maximize the protection for the most significant bit would extend the last bit from the $M_{i,4}$ basis sequence of the (16,5) code of Philips46 through the remainder of the extended basis sequence to the 20th bit, as opposed to stopping at the 19th bit, and by providing a 1 for the last four entries in the $M_{i,4}$ basis sequence and a 0 for the last four entries of $M_{i,0}$ through $M_{i,3}$, the resulting codeword will simply repeat the $a_4$ value four times in the final four places of the 20-bit codeword.  *See* Appx189 (citing Appx987-Appx979, ¶¶ 108-109).

Appellants further argued that allocating the protection of the last four rows to the MSB or the highest next-order bit is merely a matter of design variation appropriately selected by a POSITA.    Appx189-Appx190 (citing Appx979-Appx980, ¶¶ 111-12); Appx1711 ("The CQI is protected by a block code").  The Petition was accompanied by admissible evidence in the form of declaration testimony from Appellants' expert, Dr. Clark, who summarized calculations that illustrate the predictable, mathematical result of using the claimed basis sequence in lieu of the basis sequence of Philips46.  Appx966-Appx969, ¶¶ 90-93.  It was known

that by adjusting the position of the "1" in the 16-20th rows of the basis sequences of the code, the bit afforded the protection changes.   Appx189-Appx190 (citing Appx980, ¶ 112).  Effectively, the placement of this "1" is a result-effective variable (*id.*; *see also In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012)), with a very limited number of potential variations or combinations.  A POSITA would have known that the placement of this "1" directly impacts which bit receives protection.  Appx190 (citing Appx979-980, ¶¶ 111-12).  In other words, a POSITA would have understood that adjusting the position of the "1" would adjust which CQI bit is appended as the 20th bit of the codeword, as the known relationship between basis sequences and coding equation make such results entirely finite and predictable.  *Id.*

In the Patent Owner Response, Appellee attempted to complicate the technology, arguing that the "'718 patent is concerned with maximizing the entire system throughput, not minimizing the Root-Mean-Square ('RMS') error of the code, minimizing bit error rate ('BER') of the code, nor maximizing the protection of the MSBs, as disclosed by Philips."   Appx456 (original emphasis omitted).  According to Appellee, "the '718 patent teaches that efforts to minimize RMS error and to minimize BER produce conflicting, incompatible results."   *Id.* (emphasis omitted).  Thus, Appellee asserted, "Philip's pursuit of protecting the MSBs would

not influence a POSITA to act in a manner that would maximize system throughput." Appx457.

Appellee further argued that, although "[Appellants] have focused on the protection of the MSB," the "amount of protection assigned to each bit using unequal error protection ('UEP') is a coincidental result of optimizing the code for system throughput" as taught by the '718 patent, "not a metric that necessarily optimizes system throughput." *Id*. According to Appellee, a "desire to optimize BER, RMS error, UEP, or protection of just the MSB of the code" is opposed to the '718 patent's goal of "optimiz[ing] system throughput." *Id*.

Finally, Appellee and its declarant, Dr. Smith, argued that "the 3GPP Temporary Documents ('TDocs') and meeting reports (or minutes) confirm that even experts in mobile communications disagreed on optimal basis sequences even on the eve of the '718 patent's February 16, 2002 priority date." Appx458.

In reply, Appellants argued that the "near co-extensiveness" between claim 1 of the '718 patent and Philips46 renders claim 1 obvious and that, "as of the priority date of the '718 patent[,] there was extensive industry analysis underway evaluating ways to accurately convey CQI representations by providing the requisite level of protection for the various bits representing that CQI," an example of which is found in Philips46. Appx512-Appx514 (citing Appx58, 7:33-34; Appx1423, 1; Appx970-Appx1010). One of ordinary skill, Appellants contended, would have appreciated

that "[t]he benefits of providing additional protection to the MSB," were known to persons of ordinary skill. Appx514-Appx515 (citing Appx968-Appx969, ¶¶ 91-92; Appx1746, 1:50-53; Appx1761-Appx1762, 10-11). In short, the question for patentability is not what basis sequence is "optimal," but whether what is claimed was obvious.

Appellants, in reply, further noted that "[t]he '718 patent does not claim or describe any throughput advantages commensurate in scope with the claimed process," and that "[t]he '718 patent does not describe how its claimed matrix of basis sequences provides any change in throughput" and "provides no evidence that any throughput differences between Philips46 and the claimed basis sequences matters." Appx515-Appx517. Appellants further argued that optimizing Philips46's base sequences "is nothing more than modifying a result effective variable to arrive at the optimal arrangement for providing the most protection for the MSB," and that "Dr. Smith's 'throughput' analysis actually shows that the proposal in Philips46 provides better throughput using Dr. Smith's own metrics." Appx515-Appx519 (citing Pet., 37-38).

In sur-reply, Appellee continued to focus on the "optimal" sequence, reiterating that one of ordinary skill "could not knowingly and reliably create or find an optimal CQI code by simply switching two digits in the tables" because "[t]he mathematical relationship between the basis sequences in the tables and their

27

resulting codewords was not demonstrated until ***over a decade*** after the filing of the '718 patent." Appx534-Appx535 (emphasis in original). Appellee further took issue with Appellants' argument that Dr. Smith's analysis shows Philips46 has better throughput than the LGE proposal embodied in the '718 patent. Appx535-Appx541.

In support of these points, Appellee relied on a supplemental declaration from Dr. Smith, which, itself, relied on five 3GPP meeting minute documents that Appellee submitted for the very first time and that Dr. Smith admitted were "not currently present as Exhibits." Appx2534. Dr. Smith further opined that the mathematical relationships implicated by the CQI codes discussed in the 3GPP meetings were not properly understood until more than a decade later, with the publication of "Rademacher Functions and Their Applications to 3GPP Mobile Communication Systems" in 2016. Appx2545, ¶ 48. Appellants had no opportunity to respond to this new declaration, evidence, and argument.

In its FWD, the Board found that Petitioner had not proven by a preponderance of the evidence that claim 1 would have been obvious over Philips46 for two reasons. Appx26. ***First***, the Board found that "[Appellants] [have] not sufficiently shown that one of ordinary skill would have been motivated to swap the last two bits in the last row of the Philips46 table in order to provide more protection to the most significant bit (MSB)." Appx26-Appx27. ***Second***, the Board "rel[ied] on and [found] credible Dr. Smith's testimony that the early proposals to 3GPP in

January 2002 for selecting the optimal CQI coding scheme 'were significant departures into unknown territory in the field' with 'several new types of codes ha[ving] been proposed, with the mathematical relationship between them being unknown.'" Appx27.

## VI.   SUMMARY OF THE ARGUMENT

The Board committed legal error *en route* to its conclusion that swapping the position of those last two bits constitutes a non-obvious and inventive step worthy of patent protection. These errors distorted the Board's analysis under 35 U.S.C. § 103 and tainted its conclusion of non-obviousness, which should be overturned for the following reasons.

**First**, the Board violated the Supreme Court's mandate in *KSR International Co. v. Teleflex Inc.* by requiring a "teaching, suggestion, or motivation" in its obviousness analysis. 550 U.S. 398, 82 USPQ2d 1385 (2007). In *KSR*, the Supreme Court cautioned against such a requirement and provided other obviousness rationales that must be considered in a proper obviousness analysis, including whether a claimed solution would have been obvious to try. The Board, however, failed to mention a single *KSR* rationale beyond "teaching, suggestion, or motivation," which was legal error. At the time of the alleged invention, the 3GPP was considering several known solutions, including those presented in Philips46 and the Challenged Claims, and would have inevitably arrived at the claimed solution because it would have been obvious to try swapping the last two bits.

**Second**, the Board facially purported to conduct an obviousness analysis under 35 U.S.C. § 103, but committed legal error by relying heavily on Dr. Smith's testimony regarding 3GPP meeting minutes from April and May 2002 (*e.g.*, TSGR1-

02-0791, TSGR1-02-0927), which published *after* the February 2002 priority date of the '718 patent.  Appx27 (citing Appx2545-Appx2546, ¶¶ 47-48).  The Board, therefore, relied on *post hoc* evidence to conclude that the Challenged Claims were non-obvious over Philips46 and/or Philips46 and Nokia.  This is legal error because obviousness must be assessed at the time the invention was made.  The Board essentially required Appellants to have conducted an anticipation-like analysis under 35 U.S.C. § 102, finding that the *post hoc* documentation demonstrated that no modification of the matrix, whatsoever, would have been within the grasp of a POSITA before the filing of the '718 patent.

*Third*, The Board's legal error in applying the law of obviousness under 35 U.S.C. § 103 was at least partially driven by undue reliance on Dr. Smith's testimony regarding certain 3GPP meeting minute documents—including TSGR1-01-1354, TSGR1-02-0356, TSGR1-02-0628, TSGR1-02-0791, TSGR1-02-0927, R1-02-0139, R1-02-0164, R1-02-0362, R1-02-0354, R1-02-0653, and R1-02-0354—for the truth of the matter contained within them, without identifying an applicable hearsay exception or considering the evidentiary underpinnings of such evidence. Dr. Smith admitted that he had no experience with the 3GPP and no personal knowledge of the meetings that were central to his declaration testimony, rendering his testimony unreliable for the truth of the matter he asserted.  Appx2038:20-Appx2039:3.   Nonetheless, the Board relied on Dr. Smith's testimony and the

documents themselves to conclude that the claimed basis sequence represents one of several "significant departures into unknown territory in the field" with an "'unknown' mathematical relationship." *Id.*; Appx22 (citing Appx2545-Appx2546, ¶ 48); Appx2534-Appx2535.

By contrast, Appellants properly relied on TSGR1-02-0356 (Appx1430-Appx1459), TSGR1-02-0628 (Appx1460-Appx1504), TSGR1-02-0791 (Appx1505-Appx1527), and TSGR1-02-0927 (Appx1528-Appx1564) as publications that published on their respective dates—that is, as prior art—and not for the truth of that content. *See* 35 U.S.C. § 102(b) (requiring only that the invention be described in a printed publication, not that the description be true). Dr. Clark relied on the extensive 3GPP experience of Mr. Bishop, who provided an evidentiary basis for Appellants' use of meeting minute documents as prior art, including a detailed outline of the process, procedure, and public availability of the 3GPP documents. Appx1660-Appx1663, ¶¶ 9-16.

***Fourth***, the evidence of record indicates that the 3GPP was trying various matrices, that the inferences and creative steps necessary to modify the basis sequence of Philips46 were minimal, and that the claimed basis sequences, therefore, would have been obvious to try. The Board, however, erred in weighing the facts, overstating the differences in simulated performance of the claimed basis sequences relative to the basis sequence of Philips46, which resulted in a conclusion of non-

obviousness that is both unsound and unsupported by substantial evidence. Philips46 teaches a virtually identical solution to that of the Challenged Claims, and a POSITA would have easily employed "common knowledge" and "common sense" to make the inferences and take the creative steps necessary to swap the relative position of two bits and arrive at the basis sequence recited by the Challenged Claims.

Aside from an isolated concern raised by Samsung, the 3GPP meeting minutes indicate that there was not much dispute or pushback regarding the adoption of the claimed basis sequence into the 3GPP standard. Appx1482, *28-29. Additionally, the Board's conclusion that Appellants "[had] not sufficiently shown that one of ordinary skill would have been motivated to swap the last two bits in the last row of the Philips46" (Appx26-Appx27), ignores the express teachings of Philips46, which teaches the provision of "significant extra protection to the most significant bit." Appx1423. Finally, the Board significantly focused on the throughput benefits allegedly provided by the claimed basis sequence (Appx 6; Appx58, 7:50-54, 59-61, 7:64-8:5), but ignored that basis sequence proposed by Philips46 closely tracked the performance of the claimed basis sequence. The notion that it would have been non-obvious to prioritize system throughput is incorrect: the '718 patent itself admits that it was "well known" to "adapt[] the transmission parameters in a wireless

system" in an effort to "increase[] the average throughput of a cell … based on [such] variations in the modulating/coding scheme."  Appx55, 2:27-47.

The Board erred in weighing the facts and, absent these errors, would have recognized that the purported invention of the '718 patent is nothing more than a matter of routine experimentation and optimization stemming from Philips46.

# VII.  ARGUMENT

## A.    Legal Standards

This Court reviews legal questions *de novo* and underlying factual determinations for substantial evidence. *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1357 (Fed. Cir. 2019) (citing *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015)).  The Board abuses its discretion if its Final Written Decision ("FWD"): (1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact findings; or (4) involves a record that contains no evidence on which the Board could rationally base its decision. *See Ultratec, Inc. v. CaptionCall, LLC*, 872 F.3d 1267, 1272 (Fed. Cir. 2017) (citing *Redline Detection, LLC v. Star Envirotech, Inc.*, 811 F.3d 435, 442 (Fed. Cir. 2015)).

"Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress." *KSR*, 550 U.S. at 419.  "Were it otherwise[,] patents might stifle, rather than promote, the progress of useful arts." *Id*. at 427; *see also In re Kubin*, 561 F.3d 1351, 1361 (Fed. Cir. 2009).  Thus, "[t]he obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents." *KRS Int'l Co.*, 550 U.S. at 419.

"Hearsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress". Fed. R. Evid. 802. "'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). However, it is well established that, while dates of an asserted prior art document are submitted for their truth, the substance of a printed publication, whether factually true or not, is generally not hearsay when used for prior art purposes. *See* 35 U.S.C. § 102(b) (requiring only that the invention be described in a printed publication, not that the description be true); *see also Freeman v. Minnesota Min. and Mfg. Co.*, 675 F. Supp. 877, 884 (D. Del. 1987) ("[T]he Protocol is being introduced, not for the truth of the matter asserted, i.e., that 150 lenses were made or 24 implanted, but only for the fact that it was indeed written and filed before March 15, 1975. Thus, it cannot be hearsay.").

## B.     The Board Committed Legal Error in Determining that the Challenged Claims Are Non-Obvious

The Board committed several legal errors by failing to properly assess obviousness under 35 U.S.C. § 103 and relying on inadmissible evidence for the truth of the matter asserted in determining that the Challenged Claims were non-obviousness. For example, the Board exclusively required a "teaching, suggestion, or motivation" to modify the basis sequence of Philips46 and failed to consider the

knowledge, creativity, and common sense of an ordinarily skilled artisan, among other obviousness rationales, in clear violation of the Supreme Court's instruction in *KSR*. Additionally, although the Board purported to consider the obviousness of the Challenged Claims, it actually required Appellants to prove ***anticipation***, essentially ignoring the obviousness grounds raised in the Petition.

The Board also committed legal error by unexpectedly relying on meeting minute documents that issued after the filing date of the '718 patent for the truth of the matter contained therein, without identifying an applicable hearsay exception. Even if the meeting minute documents are deemed admissible, they were published after the application that issued as the '718 patent was filed and, thus, constitute *post hoc* evidence that is irrelevant to the determination of obviousness. *See Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008) (explaining that the proper inquiry is whether the Challenged Claims "would have been obvious ***at the time the invention was made***.") (emphasis added). Each of these legal errors is an independent basis to overturn the Board's FWD.

### 1.    The Board Committed Legal Error by Misapplying the Standard for Obviousness Under 35 U.S.C. § 103

It was legal error for the Board to require a "teaching, suggestion, or motivation" to modify the basis sequence of Philips46 and conclude that the Challenged Claims were obvious, as this approach violated the instructions of the Supreme Court in *KSR*.

Additionally, although the Board purported to consider the obviousness of the Challenged Claims, it based its findings on *post hoc* evidence and, in so doing, essentially required Appellants to prove ***anticipation*** for invalidation. The Board effectually ignored the actual obviousness grounds raised in the Petition by considering whether Philips46 taught the exact basis sequence recited by the Challenged Claims.

a.    The Board Erred by Applying the Teaching-Suggestion-Motivation Test in an Overly Rigid and Formalistic Way

According to the Board, Appellants "failed to sufficiently show that one of ordinary skill would have been ***motivated to modify*** Philips46 to achieve the table in claim 1." Appx35 (emphasis added). This single statement perfectly illustrates the Board's violation of *KSR*, in which the Supreme Court mandated that a strict application of the teaching, suggestion, or motivation test is not the appropriate way to approach obviousness. Here, in express contradiction to the Supreme Court's caution, the Board applied the teaching-suggestion-motivation test in an "overly rigid" and "formalistic" way. *KSR Int'l Co.*, 550 U.S. at 419.

In *KSR*, the Supreme Court emphasized that "[g]ranting patent protection to advances that would occur in the ordinary course without real innovation retards progress." *Id*. "Were it otherwise[,] patents might stifle, rather than promote, the progress of useful arts." *Id*. at 427; *see also In re Kubin*, 561 F.3d 1351, 1361 (Fed. Cir. 2009). For these reasons, the Supreme Court explicitly renounced a "rigid

application of the teaching, suggestion, or motivation test." *KRS Int'l Co.*, 550 U.S. at 419 ("The obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents.").

The Supreme Court further criticized a rigid approach to determining obviousness based on the disclosures of individual prior-art references, with little recourse to the ***knowledge***, ***creativity***, and ***common sense*** that an ordinarily skilled artisan would have brought to bear when considering combinations or modifications. *Id*. at 415-22 (emphasis added). Indeed, it is black letter law that obviousness is an inquiry made from the perspective of a POSITA, and such POSITAs are of ordinary creativity and are not "an automaton." *Id*.; *see also In re Coutts*, 726 F. App'x 791, 796 (Fed. Cir. 2018).

Rejecting a blinkered focus on individual documents, the Court required an analysis that reads the prior art in context, taking account of "demands known to the design community," "the background knowledge possessed by a person having ordinary skill in the art," and "the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR Int'l Co.*, 550 U.S. at 418.

The "expansive and flexible approach" required by *KSR* (*id*. at 415), is consistent with this Court's pre-*KSR* decisions, which acknowledged that the inquiry "not only permits, but requires, consideration of common knowledge and common

sense." *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1367 (Fed. Cir. 2006).  A proper obviousness analysis under 35 U.S.C. § 103, in this case, would have required more than just a consideration as to whether one of ordinary skill would have been motivated to modify Philips46 to achieve the table in claim 1.

In spite of the Supreme Court's instructions in *KSR*, the Board erred by exclusively considering whether Appellants "sufficiently show[ed] that one of ordinary skill would have been ***motivated to modify*** Philips46 to achieve the table in claim 1."  Appx35 (emphasis added).  The Board only mentioned *KSR* twice throughout its forty-seven page FWD, which is completely silent on the inferences and creative steps necessary to switch two of the bits in the basis sequence taught by Philips46.  Appx9-Appx10.  A proper analysis under 35 U.S.C. § 103 would have considered such inferences and creative steps, especially in view of the 3GPP discussions and proposals that gave rise to the '718 patent.  The evidentiary record indicates that those with skill in the art were actively fine-tuning and tinkering with basis sequences for inclusion in the 3GPP standard.  Given these discussions, the Board should have considered how small the inferences and creative steps would have been to make the Phillips46 basis sequence identical to the Challenged Claims' basis sequence.

The Board, however, made no mention of the inferences or creative steps necessary to modify Philips46 and arrive at the Challenged Claims and, therefore, afforded "little recourse to the knowledge, creativity, and common sense that an ordinarily skilled artisan would have brought to bear when considering combinations or modifications." *KSR Int'l Co.*, 550 U.S. at 415-22. The inferences are small and, thus, the knowledge, creativity, and common sense required of a POSITA would have been minimal. Philips46 expressly explains that "***$M_{i,4}$ is the most significant bit***" and suggests "***giv[ing] significant extra protection to the [most significant bit]***." Appx1423 (emphasis added). As depicted below, the only most significant bit—identified by Philips46 as "$M_{i,4}$,"—that is unprotected by the basis sequence of Philips46, is $M_{19,4}$.

| i | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| 1 | 0 | 1 | 0 | 0 | 1 |
| 2 | 1 | 1 | 0 | 0 | 1 |
| 3 | 0 | 0 | 1 | 0 | 1 |
| 4 | 1 | 0 | 1 | 0 | 1 |
| 5 | 0 | 1 | 1 | 0 | 1 |
| 6 | 1 | 1 | 1 | 0 | 1 |
| 7 | 0 | 0 | 0 | 1 | 1 |
| 8 | 1 | 0 | 0 | 1 | 1 |
| 9 | 0 | 1 | 0 | 1 | 1 |
| 10 | 1 | 1 | 0 | 1 | 1 |
| 11 | 0 | 0 | 1 | 1 | 1 |
| 12 | 1 | 0 | 1 | 1 | 1 |
| 13 | 0 | 1 | 1 | 1 | 1 |
| 14 | 1 | 1 | 1 | 1 | 1 |
| 15 | 0 | 0 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 | 1 |
| 17 | 0 | 0 | 0 | 0 | 1 |
| 18 | 0 | 0 | 0 | 0 | 1 |
| 19 | 0 | 0 | 0 | 1 | 0 |

Appx1424, Table 1 (emphasis added). A POSITA would merely have to take Philips46 on its face, accepting its suggestion and prioritization by changing $M_{19,4}$ from a "0" to a "1," giving even more "protection to the [most significant bit]" (Appx1423), to arrive at the claimed basis sequence. In questioning whether "one of ordinary skill would have understood that swapping the last two bits would have provided more protection to the MSB" or "believed that such a change would be desirable" (Appx27), the Board failed to consider the knowledge, creativity, and common sense of an ordinarily skilled artisan. Indeed, even if a POSITA was devoid of creativity, they need only apply common sense to follow the advice of Philips46 and arrive at the claimed basis sequence. For the same reasons, the Board failed to

address Appellants' actual argument, which was not limited to a finding of a teaching, suggestion, or motivation: "[T]he purported invention of the '718 patent, thus, is nothing more than a matter of routine experimentation and optimization stemming from *Philips46*." Appx155.

The Board also failed to acknowledge that, according to *KSR*, the teaching, suggestion, or motivation test is only ***one*** of ***several considerations*** suggested by the Supreme Court to arrive at a conclusion of obviousness. According to *KSR*, the Board should have further considered: (a) whether the claimed solution would have been obvious to try; (b) whether the claimed solution was chosen from a finite number of identified, predictable solutions, with a reasonable expectation of success; (c) whether the claimed solution represents a simple substitution of one known element for another to obtain predictable results; (d) whether the claimed solution applied a known technique to a known device ready for improvement; (e) whether the claimed solution constitutes known work in one field of endeavor that prompted variations of it for use in either the same field or a different one based on design incentives or market forces; and (f) whether the claimed solution combined prior art elements according to known methods to yield predictable results. *See generally KSR Int'l Co.*, 550 U.S. 415-22.

The FWD makes scarce mention of *KSR* and, beyond a cursory mention of "[w]hether a combination of prior art elements would have produced a predictable

43

result," none of the additional considerations instructed by the Supreme Court are acknowledged, let alone analyzed.  Appx35 (citing 550 U.S. at 418,416-17).  The Board's emphasis on whether Appellants sufficiently showed a motivation to modify Philips46, without discussing any other considerations suggested by *KSR*, indicates that the Board expressly contradicted the Supreme Court's warning not to rigidly apply the teaching, suggestion, or motivation test in an overly formalistic way.

A proper analysis of obviousness, including a holistic consideration of all of the *KSR* rationales, would have evidenced that the Challenged Claims were, at least, ***obvious to try***.  Philips46 provides a method of coding CQI that is nearly identical to the methods recited by the Challenged Claim and a viable rationale to arrive at the Challenged Claims: protection of the most significant bit ($M_{i,4}$).  In this regard, Philips46 is distinguished from prior art that gives "no direction as to which of many possible choices is likely to be successful" or "only general guidance as to the particular form of the claimed invention or how to achieve it."  *In re O'Farrell*, 853 F.2d 894, 903 (Fed. Cir. 1988).  Rather, Philips46 provides a "reasonable expectation of success" for obtaining the claimed basis sequence, which, "[f]or obviousness under § 103 [is] all that is required."  *In re Kubin*, 561 F.3d 1351, 1361 (Fed. Cir. 2009) (citing *O'Farrell*, 853 F.2d at 903).

Additionally, *KSR* required the Board to consider whether the claimed basis sequence would have been obvious to try or whether the claimed basis sequence

represented a ***simple substitution of one known element for another*** to obtain predictable results.   At a minimum, the Board should have considered these rationales given the '718 patent's admission that the 3GPP was actively experimenting with basis sequences.[3]   For example, the Board might have found that it was obvious to take the basis sequence of Philips46 and substitute the "1" bit of $M_{19,3}$ with the "0" bit of $M_{19,4}$.   The Board might have found that such a simple substitution would produce a codeword that is algebraically predictable.   *See, e.g.*, Appx968-Appx969, ¶¶ 91-93.   The Board, however, did not consider other *KSR* rationales in its analysis and, therefore, did not afford itself an opportunity to draw such conclusions.

Had the Board performed a proper analysis of obviousness in view of *KSR*, it would have been evident that the alleged invention of the '718 patent "is likely the product not of innovation but of ordinary skill and common sense."   *KSR Int'l Co.*, 550 U.S. at 419-22; *see also Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 996 (Fed. Cir. 2009).   But the Board ignored the substantial arguments in

---

[3] Ericsson proposed appending the "four least reliable information bits" to the 16-bit TFCI codeword to form a 20-bit codeword.  Appx57, 5:65-6:36.  Samsung proposed another modest deviation: using an existing (32,5) code and puncturing (or removing bits from) it to create a 20-bit codeword.  Appx57, 6:37-41.  Like Ericsson, Philips proposed extending the existing (16,5) TFCI code but, instead of repeating the least reliable bits, Philips proposed giving significant extra protection to the MSB [most significant bit], and a little more robustness to the next most significant bit.  Appx58, 7:15-35.

the Petition (and throughout the proceedings) that the claims are obvious under the governing standards in *KSR*, not that they are solely obvious because of some teaching, suggestion, or motivation.

> b.  The Board's Reliance on *Post Hoc* Evidence of Nonobviousness Impermissibly Altered Its Application of the Standard for Obviousness Under 35 U.S.C. § 103

The Board relied on Dr. Smith's testimony regarding 3GPP meeting minutes from April and May 2002 (*e.g.*, TSGR1-02-0791, TSGR1-02-0927), after the February 2002 filing date of the corresponding Korean application, to conclude that the Challenged Claims were non-obvious over Philips46 and/or Philips46 and Nokia. *See* Appx27 (citing Appx2545-Appx2546, ¶ 48). Although these meeting minutes document the adoption of the claimed basis sequence into the standard, they were published ***after*** the filing date of the underlying application for the '718 patent and, thus, constitute *post hoc* evidence that is irrelevant to the obviousness inquiry under 35 U.S.C. § 103. The proper inquiry is whether the Challenged Claims "would have been obvious ***at the time the invention was made***." *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008) (emphasis added). The Board placed undue weight on the evidence of the claimed basis sequence's adoption to bias its analysis under 35 U.S.C. § 103, which improperly influenced its conclusion of non-obviousness. In short, the Board performed an inappropriate hindsight analysis that should be reversed or remanded because obviousness must

46

be assessed at the time the invention was made. *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*, 676 F.3d 1063, 1073 (Fed. Cir. 2012).

It appears that the Board was so persuaded by the *post hoc* evidence of the claimed basis sequence's adoption into the 3GPP standard (as if the standards used by the 3GPP mirror the patentability standards of U.S. law) that it would have only been convinced that the Challenged Claims were unpatentable had Philips46 taught the exact basis sequence recited by the claims. This error was compounded by requiring a teaching, suggestion, or motivation to reconcile that minor difference. In effect, this error was a *de facto* application of the anticipation standard under 35 U.S.C. § 102.

The Petition did not raise grounds of invalidity for anticipation under 35 U.S.C. § 102 and, therefore, by considering whether Philips46 disclosed the table recited in claim 1 of the '718 patent, "the Board deviated impermissibly from the invalidity theory set forth in [Appellants]' petition." *M & K Holdings, Inc. v. Samsung Elecs. Co., Ltd.*, 985 F.3d 1376, 1385 (Fed. Cir. 2021); *see also In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016); *see also EmeraChem Holdings, LLC v. Volkswagen Grp. of Am., Inc.*, 859 F.3d 1341, 1348 (Fed. Cir. 2017) ("The Board must base its decision on arguments that were advanced by a party.").

Persuaded by Dr. Smith's testimony regarding the *post hoc* meeting minute documents, the Board failed to perform a proper *KSR* analysis for ***obviousness*** under 35 U.S.C. § 103 and found that, because Phillips46's recited basis sequence did not exactly match the claimed basis sequence, Philips46 could not render the claims obvious. This is an error. The law of obviousness accommodates differences between the prior art and the claimed invention, while acknowledging that ***not all differences*** between a claimed invention and the prior art ***are patentable differences***. *See Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966); *see also Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007).

> 2. *The Board Committed Legal Error by Relying on the Truth of the Matter Asserted in the 3GPP Meeting Minutes Without an Evidentiary Basis to Do So*

In determining that none of the Challenged Claims are unpatentable, the Board "rel[ied] on and [found] credible" Dr. Smith's testimony that "the early proposals to 3GPP in January 2002 for selecting the optimal CQI coding scheme 'were significant departures into unknown territory in the field' with 'several new types of codes having been proposed, with the mathematical relationship between them being unknown." Appx27 (citing Appx2545-Appx2546, ¶ 48). These statements establish that the Board impermissibly and unexpectedly relied on Dr. Smith's testimony for the truth of the matter asserted by the 3GPP meeting minutes—including TSGR1-01-1354, TSGR1-02-0356, TSGR1-02-0628, TSGR1-

02-0791, TSGR1-02-0927, R1-02-0139, R1-02-0164, R1-02-0362, R1-02-0354, R1-02-0653, and R1-02-0354—for the truth of the matter contained therein, but never once endeavored to find a hearsay exception that would permit those documents to be considered in that way.[4]  Fed. R. Evid. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement.").

In contrast, Appellants' use of the 3GPP proposals and meeting minute documents as prior art does not constitute inadmissible hearsay.  It is well established that, while dates of an asserted prior art document are submitted for their truth, the substance of a printed publication, whether factually true or not, is generally not hearsay when used for prior art purposes.  *See* 35 U.S.C. § 102(b) (requiring only that the invention be described in a printed publication, not that the description be true); *see also  Freeman v. Minnesota Min. and Mfg. Co.*, 675 F. Supp. 877, 884 (D.

---

[4] Dr. Smith relied on TSGR1-01-1354, which comprises meeting minutes from November 2001, TSGR1-02-0356, which comprises meeting minutes from January 2002, TSGR1-02-0628, which comprises meeting minutes from February 2002, TSGR1-02-0791, which comprises meeting minutes from April 2002, TSGR1-02-0927, which comprises meeting minutes from May 2002, R1-02-0139 is a paper submitted by Sony at the January 2002 meeting, R1-02-0164 is a paper submitted by Samsung at the January 2002 meeting, R1-02-0362 is a paper submitted by LGE at the February 2002 meeting, R1-02-0354 is a paper submitted by Philips at the February 2002 meeting, and R1-02-0653 is a paper submitted by Philips and LGE at the April 2002 meeting.

Del. 1987) ("[T]he Protocol is being introduced, not for the truth of the matter asserted, i.e., that 150 lenses were made or 24 implanted, but only for the fact that it was indeed written and filed before March 15, 1975.  Thus, it cannot be hearsay.").  Furthermore, the declaration testimony of Mr. Bishop authenticated the 3GPP proposals and meeting minute documents in compliance with Federal Rules of Evidence 901 and 902.  Mr. Bishop worked extensively with the 3GPP to develop standards and provided a detailed testimony outlining the process, procedure, and public availability of the 3GPP process, document generation and storage, and meeting minutes.  Appx1660-Appx1663, ¶¶ 9-16.  Dr. Clark relied on the extensive 3GPP experience of Mr. Bishop in formulating his opinions, Appx959-Appx960, ¶ 74, whereas Dr. Smith had nothing analogous on which to rely.

Moreover, by his own admission, Dr. Smith was not present during any of the meetings memorialized via the meeting minutes he relied upon to inform the opinion that ultimately persuaded the Board.  Appx2038:20-Appx2039:3.  In fact, Dr. Smith has never attended any 3GPP meetings, let alone the meetings in late 2001 and early 2002 surrounding the filing of the application that issued as the '718 patent.  *Id.* at Appx2095:4-6.  Dr. Smith even admitted that his declaration testimony depended on 3GPP meeting minutes that were not formally admitted as part of the evidentiary

record.[5]  Appx2533-Appx2535, ¶ 0005.  This back-door attempt to circumvent the hearsay rules, as well as the Board's evidentiary procedures, is impermissible.  *See Bosch Automotive Serv. Sols., LLC v. Matal*, 878 F.3d 1027, 1037 (Fed. Cir. 2017) (affirming a finding that a Quick Start Guide that was not filed as an exhibit violates the rule against hearsay and lacks evidentiary foundation).

The Board nevertheless afforded substantial weight to the addenda of Dr. Smith's belated supplemental declaration at the expense of the proper evidence— the expert opinions of Dr. Clark, Mr. Bishop, and Dr. Smith.  Indeed, the FWD relies on the opinion of Dr. Smith, who commented on documents that memorialized meetings without personal knowledge, as a cornerstone piece of evidence supporting the Board's determination of non-obviousness.  The Board relied on the documents themselves for the truth of the matter asserted.  Accordingly, the Board's determination of non-obviousness relied on inadmissible hearsay and, at a minimum, necessitates a remand for reconsideration of the evidentiary record.

### C.    The Board Erred Because Its FWD Is Not Supported By Substantial Evidence

---

[5] Dr. Smith expressly identified several references, including TSG RAN RI-22, R1-02-0139 #23, R1-02-0164 #23, R1-02-0362 #24, R1-02-0653 #25, as "meeting minutes that discuss CQI coding [that] are ***not currently present as Exhibits***." Appx2534, ¶ 0005.  Furthermore, although Dr. Smith asserts to have presented Exhibits A-I in his supplemental declaration, only identified Exhibits A-C and F are properly labeled, leaving the Board and Appellants to sort through pages of "evidence" that were neither identified nor sequentially numbered.  *See* Appx2532, ¶ 0004; *see also* Appx2550; Appx2598; Appx2601; Appx2614.

This Court reviews the Board's ultimate obviousness determination *de novo* and underlying factual findings for substantial evidence. *See Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016). Substantial evidence is "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154, 203 L.Ed.2d 504 (2019) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938)). Here, even if the evidence the Board relied upon was admissible, no reasonable mind would have accepted the Board's factual conclusions regarding what a POSITA was thinking as of the filing date of the '718 patent.

### 1.    *Dr. Smith's Declaration Testimony Factually Distorts the Actual Text of the 3GPP Meeting Minutes*

Dr. Smith convinced the Board that there was a great dispute amongst the members of the 3GPP, who—according to Dr. Smith—were flailing helplessly before LGE submitted its proposal. *See* Appx2547, ¶ 0053 ("[W]hen confronted with the '718 patent's solution, that solution met with ***disagreement*** and ***protest***. Indeed, 3GPP only adopted the '718 patent's methods after ***much debate***, ***uncertainty***, and requests for more test results from LGE.") (emphasis added). According to Dr. Smith, the meeting minutes evidence "***significant departures*** into ***unknown*** territory." Appx2545, ¶ 0048 (emphasis added).

However, Dr. Smith's melodramatic narrative is unsupported by the meeting minutes themselves.  Read fairly, the meeting minutes actually indicate little dispute at all among the 3GPP, much less confusion or uncertainty.  For example, the minutes state that, although "Samsung [the proponent of a competing proposal] raised a concern … there was no support for this concern from the floor."  Appx1482, *29.  There seems to have been agreement among all other 3GPP members.

Dr. Smith, himself, cannot even keep his story straight.  He first opined that LGE's proposal was "ultimately met with pushback from those same experts before being adopted as the new standard,"  later contradicting himself, stating that "the innovations of the '718 patent into the standard met with minimal pushback." Appx2547-Appx2548, ¶¶ 0054-0055.

He had it right the second time because the meeting minutes do not indicate "pushback."  For example, they state that "Siemens, Panasonic and Sony preferred unequal error protection (Philips proposal)."  Appx1482, *28.  Moreover, the revised minutes of R1#24.doc (R1-02-0362) expressly note that "Philips [authors of Philips46] supported this [LGE] paper" as soon as LGE presented its proposal. Appx1482, *29.  This makes sense because the LGE proposal was virtually identical to the Philips' own, aside from the flip-flop of the final two bits of the 100-bit basis sequence to further effectuate the suggestion made by Philips, itself, about the importance of protecting the MSB.

In other words, Philips was essentially supporting its own proposal—already favored by Siemens, Panasonic, and Sony—with a minor alteration to the final two bits of the basis sequence. These minor differences are exactly the matter of "common knowledge" and "common sense" that the Board was required to consider when analyzing obviousness under 35 U.S.C. § 103. *See DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co*., 464 F.3d 1356, 1367 (Fed. Cir. 2006). Nevertheless, the Board was persuaded by Dr. Smith's unsubstantiated extrapolations of the meeting minutes.

The meeting minutes and testimony from Dr. Clark similarly dispel Dr. Smith's notion that the LGE proposal (embodied by the Challenged Claims) implicates an "***unknown***" mathematical relationship. Dr. Smith alleges that the mathematical relationships implicated by the CQI codes being discussed during the 3GPP meetings was memorialized via the relied-upon meeting minutes until the publication of "Rademacher Functions and Their Applications to 3GPP Mobile Communication Systems" more than a decade later, in 2016. Appx2545, ¶ 0048. Dr. Smith does not point to any specific excerpt from the meeting minutes in support of this assertion and offers no first-hand testimony regarding the resources available to those participating in the 3GPP meetings at issue.

Contradicting Dr. Smith's cursory and unsupported assertions regarding the allegedly revelatory publication of "Rademacher Functions and Their Applications

to 3GPP Mobile Communication Systems" in 2016, Dr. Clark provided several calculations to illustrate how the claimed encoding methods employ ***simple matrix algebra operations*** to generate predictable codewords.  Appx966-Appx969, ¶¶ 90-93).

The claimed CQI encoding is identical to Philips46, except the patented scheme involves swapping the last two bits of the last row of the basis sequences from "1" to "0" and "0" to "1."  *Id*.  Each encoding scheme results in an output codeword with identical bits for 19 of the 20 bits of that codeword for any given 5-bit input CQI value, regardless of whether Philips46 or the claimed basis sequence is used.  Appx970-Appx979, ¶¶ 97-98, 107-109.

The only (and according to the Board, patentable) difference is in the 20th bit of the resulting 20-bit codeword.  In Philips46, the resulting codeword has a final digit that is equal to $a_3$ (*i.e.*, the second-most significant bit of the 5-bit CQI), whereas in the '718 patent scheme, the resulting codeword has a final digit that is equal to $a_4$ (*i.e.*, the most significant bit of the five-bit CQI).  *Id*.  However, when $a_3$ and $a_4$ are identical (*i.e.*, if both are 0 or both are 1, which statistically should be the case 25% of the time), all 20 bits of the resulting 20-bit codeword are identical.  In other words, 25% of the time, both Philips46 and the '718 patent produce the exact same 20-bit codeword.  *Id*.  The notion that "[the] mathematical relationship remained unknown until 2016" is, frankly, absurd.  Both Philips46 and the Challenged Claims involve

basic matrix algebra operations that would have been well within the grasp of the POSITA at the time the application that issued as the '718 patent was filed.

Additionally, the delta in mathematical understanding needs to be assessed from the admitted prior art—Philips46—which teaches the exact same mathematical operations performed using a virtually identical basis sequence to the claimed basis sequence proposed by the LGE Proposal. The notion that a POSITA would not understand how to mathematically accommodate these differences defies common sense and is unsupported. In fact, differences between Philips46 and the LGE Proposal would require a simple and obvious mathematical modification that would have resulted in a predictable codeword, as illustrated by the calculations of Dr. Clark. *See* Appx515 (citing Appx966-Appx969, ¶¶ 90-93).

### 2. *Dr. Smith's Deposition Testimony Contradicts the Board's Finding of Nonobviousness*

In determining that none of the Challenged Claims are unpatentable, the Board explained that "Petitioner has not sufficiently shown that one of ordinary skill would have been motivated to swap the last two bits in the last row of the Philips46 table in order to provide more protection to the most significant bit (MSB)." Appx26-Appx27. But Philips46 expressly teaches that "$M_{i,4}$ *is the most significant bit*," and the provision of "significant *extra protection to the [most significant bit]*." Appx1423, 1 (emphasis added). In other words, Philips46 on its face provides the

motivation and suggestion for the minor modification captured in the '718 patent. Both Dr. Smith and the Board simply ignored the express teachings of Philips46.

Dr. Smith admitted that the only difference between the codeword from Philips46 and the codeword from the LGE proposal (embodied by the Challenged Claims) is whether the most significant bit is a "1" as opposed to a "0." Appx2008:2-8. And Philips46 expressly teaches a modification of the position of bits to "give[] ***significant extra protection to the MSB***, and a little more robustness to the next most significant bit."  Appx1423 (emphasis added).  Nevertheless, Dr. Smith testified as follows:

> When you use system simulation, you find that you get an unexpected result. The unexpected result is you basically throw away all the protection on the other bits, except for the most significant bit.  That's a completely unexpected result.  It's totally non-obvious.  And it's clearly non-obvious to everyone else in the 3GPP working groups.

Appx2048:5-12.  But Dr. Smith offers no explanation as to why protection of the MSB was unexpected, nor does he grapple with the fact that his testimony is at odds with thePhilips46 disclosures.  Philips was not "groping in the dark" (Appx2047:22), because it presented a nearly identical solution to the later LGE proposal and provided a specific motivation to modify its basis sequence to achieve exactly the functional solution presented by the LGE proposal: to "give[] ***significant extra protection to the MSB***."  Appx1423 (emphasis added).  Although LGE published its proposal and the system simulations after the publication of Philips46, Dr. Smith

insisted that protection of the MSB was "completely unexpected." Appx2048:5-12. The evidentiary record disproves this statement.

Philips46 teaches a virtually identical solution to that of the Challenged Claims, as well as the exact motivation and benefit to modify its basis sequence to arrive at the exact solution of the Challenged Claims. A POSITA would have easily employed "common knowledge" and "common sense" to make inferences and take the creative steps necessary to swap the relative position of two bits, thereby arriving at the basis sequence recited by the Challenged Claims.

Dr. Smith admitted that the non-obvious aspect of the Challenged Claims is the protection of the MSB. Appx2048:5-12. Philips46 discloses a substantially similar basis sequence to those required by the Challenged Claims and expressly suggests modifications to protect a MSB. Appx1423. Accordingly, the Board's determination that "Petitioner has not sufficiently shown that one of ordinary skill would have been motivated to swap the last two bits in the last row of the Philips46 table in order to provide more protection to the most significant bit (MSB)" is unsubstantiated by the evidence of record and directly contradicted by Dr. Smith's deposition testimony. Appx26-Appx27.

### 3. The Board's Factual Determination Contradicts the Evidence of Record

"[O]bviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of

success." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007) (citing *In re Corkill*, 771 F.2d 1496, 1500 (Fed. Cir. 1985)).  The Board held that, "prior to the critical date, there existed in the field significant uncertainty and disagreement about what CQI coding scheme would be best and what criteria should be used to evaluate the different schemes."  Appx28.  But the Board was simply incorrect in characterizing the degree of uncertainty and disagreement as "significant." Although there may have been some degree of disagreement about which basis sequence was "best" at the time of filing, the evidence of record proves that there was a reasonable probability of success in arriving at the basis sequence required by the Challenged Claims.  And the evidence plainly supports obviousness, under *KSR*, as of the time the '718 patent was filed.

The FWD focused heavily on the throughput benefits allegedly provided by the basis sequence recited by the Challenged Claims.  *See e.g.*, Appx6; Appx48, 7:50-54, 59-61, 7:63-8:5.  The Board was persuaded by the Patent Owner's assertion that "the '718 patent is concerned with maximizing the entire system throughput, not minimizing the Root-Mean-Square error of the code, minimizing the bit error rate of the code, nor maximizing the protection of the MSBs, as disclosed by Philips." Appx465 (Patent Owner's Response); Appx18 (Final Written Decision).  As an initial matter, this assertion stands in express contradiction to Dr. Smith's deposition testimony, where he confessed that the basis sequence of the Challenged Claims did,

in fact, maximize protection of the MSB, proving that the hypothesis presented by the '718 patent regarding performance variable prioritization is incorrect.

Moreover, the Petition exclusively challenged the '718 patent on grounds of obviousness over Philips46, and the evidence of record indicates that the basis sequence proposed by Philips46 tracked the performance of the basis sequence recited by the Challenged Claims in terms of Root-Mean-Square, bit error rate, and system throughput, resulting in a substantially similar unequal error protection. To the extent that LGE's later-conducted simulations, described in TSGR1#24-02-0362, contemplated "tradeoffs between bit error rate and unequal error protection" (Appx2604), or Dr. Smith and the '718 patent discuss "tradeoffs between bit error rate and [Root-Mean-Square]" (Appx60, 11:38-44; Appx2537-Appx2544, ¶¶ 13, 43), the simulations also indicate that Philips46 optimizes these performance variables similar to the Challenged Claims. Although other proposals considered by the 3GPP may have represented "efforts to minimize Root-Mean-Square error and to minimize bit error rate [that] produce[d] conflicting and incompatible results," the simulations actually establish that the performance of Philips46 closely tracked the performance of Challenged Claims.

For example, as evidenced below, the simulated performance of the Philips46 offered the next best solution to the LGE proposal (embodied by the Challenged Claims) in terms of MSB error protection.[6]

<Table 2> Various CQI coding schemes

| CQI coding scheme | Ericsson / Samsung | Case 1 | Case 2 | Philips | Case 3 |
|---|---|---|---|---|---|
| Basis Sequence Table | See<Fig.4> | See<Table3> | See<Table4> | See<Fig.3> | See<Table5> |
| Minimum distance | 9 | 8 | 8 | 8 | 8 |
| MSB error protection | Low | | ⟶ | | High |

Appx2606.   Although a proposal submitted by Ericsson and Samsung provided a lesser amount of protection of the MSB, Philips presented the second best protection of the MSB.  As previously noted, Philips46, which preceded the LGE proposal by approximately one month, explained that "$M_{i,4}$ is the most significant bit," and taught the provision of "significant extra protection to the MSB."  Appx1423 (emphasis added).  It stands to reason that LGE simply made an obvious inference based on the advice provided by Philips46, shifting the relative position of the "1" bit in $M_{19,3}$ to $M_{19,4}$, thereby providing additional protection to what Philips46 expressly teaches to be the MSB, "$M_{i,4}$."

---

[6] In Exhibit C of Dr. Smith's Supplemental Declaration, "Philips" is the Philips Proposal, or Philips46, and "Case 3" is the LG Proposal, embodied by the Challenged Claims.



R1-02-0046 (Philips) Proposal
Reproduction of Table 1
(Ex. 1004, at 2).

'718 Patent Claim 1

Appx513.

As expected, this simple modification provided substantially similar, albeit, incrementally improved results in terms of bit error rate and Root-Mean-Square, as evidenced below.



<Fig 5> BER performance of CQI coding schemes

Appx2607.



<Fig 6> Normalized RMS error of CQI coding schemes

Appx2607.  In each of these pre-'718 patent simulations, Philips46 tracks Case 3 (the LGE proposal), which the LGE simulations use to identify the claimed basis sequences, in substantially the same way.  As would be expected given the substantial similarities between Philips46 and the claimed basis sequences, none of the other basis sequences performed better than Philips46.  For each of the simulated performance variables, Philips46 and Case 3 are the highest performing basis sequences, with each providing a relatively high performance in terms of MSB, bit error rate, and Root-Mean-Square without being subject to the alleged tradeoffs or compromises hypothesized by the '718 patent and Dr. Smith.

The same is true for system throughput, which LGE claims to have prioritized in its proposal.  As evidenced below, Philips46 once again tracks throughput

performance of Case 3 and, at certain points along the domain, provides exactly the same, if not improved, system throughput performance relative to Case 3.



<Fig 7> System Level Simulation Results of CQI coding schemes

Appx2608.  In the above chart, the X-axis constitutes a normalized signal-to-noise ratio, such that the quality of the signal improves from left to right.  Appx2062:15-17.  Here, it is visibly evident that Philips46 and Case 3 are providing a substantially similar throughput performance.   The difference between the patented basis sequence and the prior art, in terms of the throughput metric the Board found so persuasive, is highest when the signal-to-noise relationship is lowest, meaning the channel quality is the lowest, and there was record evidence—which the Board ignored—to support this.  However, even the greatest delta between the two basis sequences appears to be approximately 1.5E+04 or less.  In other words, according to the evidence of record, Case 3 provides, at best, an approximate one percent

difference in throughput performance compared to Philips46, which only decreases as the signal-to-noise ratio improves.[7]   In fact, at a signal-to-noise ratio of approximately 6 EbNo/Sbt, the simulation indicates that Philips46 actually provides a better (or equal) system throughput compared to Case 3.



Appx521.

Dr. Smith somehow persuaded the Board into thinking these performance differences were more significant than the 3GPP, itself, believed.  According to Dr. Smith, "[t]his is the world phone system.  This is how people make money.  Any difference is significant."  Appx2063:21-Appx2064:1.  Dr. Smith offered this testimony despite that, when presented with the simulation results of TSGR#24-02-

---

[7] Case 3 appears to provide a throughput performance of approximately 1.48E+06 bits per second (Bps) and Philips appears to provide a throughput performance of approximately 1.465E+06 Bps, a difference of 1.50E+04 Bps, which equates to an approximate one percent difference in performance between the two proposals when divided by the original 1.48E+06 of Case 3.  Appx2608.

0362, the 3GPP stated that "the performance differences of the [LGE Proposal] are *very small*." Appx1482, *26 (emphasis added).

Additionally, the notion that it would have been non-obvious to prioritize system throughput is also unsubstantiated by evidence and warrants little consideration. In his initial declaration, Dr. Clark testified about the use of higher and lower data rates and acknowledged that POSITAs recognized that protection of a MSB would have affected the throughput. Appx938-Appx939, ¶¶ 39, 40; *see also* Appx161 (Petition arguing that "CQI is used for…a process by which a base station adapts its downlink transmission parameters (such as the amount of bandwidth allocated, data rate, or the specific coding technique used) for individual UEs based on the UE's current wireless channel conditions, in order to optimize the overall throughput of communications."). Indeed, the '718 patent admits that it was "well known" to "adapt[] the transmission parameters in a wireless system" in an effort to "increase[] the average throughput of a cell…based on [such] variations in the modulating/coding scheme." Appx55, 2:27-47.

The evidence of record, both intrinsic and extrinsic alike, indicate that the relationship between protection of the MSB and throughput performance was understood and that a POSITA would have, of course, been motivated to optimize the overall throughput of communications by varying transmission parameters of a coding scheme. *Id*. A complete review of the evidence of record indicates that the

3GPP was merely fine-tuning the basis sequences to adopt into its standard, making common sense inferences to standard matrix algebra operations to attenuate several known variables and generate predictable results. According to the Board, "[t]he 3GPP history shows that these experts had difficulty agreeing on what criteria to use and prioritize in coming up with a CQI coding scheme, with Samsung and Nokia focusing on reusing prior codes and bit error rate, Philips focusing on Root-Mean-Square, and LGE focusing on system throughput." Appx32. But not every disagreement is grounds for a non-obvious, patentable invention.

The facts indicate substantial similarities between the basis sequences of the Philips46 and the LGE Proposal (embodied by the Challenged Claims). *See* Appx966-Appx969; *see also* Appx2007:19-Appx2008:8. It is undisputed that Philips46 was available to LGE prior to the submission of the LGE Proposal and that the LGE Proposal presented a minor modification to Philips46 in accordance with the suggestion to extend the MSB protection. Dr. Smith characterized protection of the MSB as the "unexpected result" of the LGE Proposal (embodied by the Challenged Claims), despite the express teachings of Philips46 to do exactly that: protect the MSB. Appx2048:5-12. The 3GPP characterized the differences in performance provided via the LGE Proposal (embodied by the Challenged Claims) as "very small," which is further evidenced by the simulations appended to the Supplemental Declaration of Dr. Smith. Appx1482, *26; *see also* Appx2608, 6.

Additionally, since the method of coding CQI taught by Philips46 and the '718 patent implicates the same matrix algebra, which would have been well within the grasp of a POSITA at the time of filing, the minor modification of Philips46 required to arrive at the basis sequence of the Challenged Claims would have resulted in a predictable codeword, evidenced by Dr. Clark's calculations. *See* Appx175; Appx966-Appx969, ¶¶ 90-93). The motivation provided by Philips46 to perform a very simple modification of its basis sequence and the predictability of the codeword resulting from that modification strikes at the very heart of the Supreme Court's holding in *KSR*. Philips46 is express in its teaching that such a modification would "give[] significant extra protection to the MSB, and a little more robustness to the next most significant bit," and, therefore, a POSITA would simply have to take Philips46 on its face. Appx1423. The proposed modification would have been a "predictable variation" of the basis sequence taught by Philips46, using basic matrix algebra techniques well-known to a POSITA. 3GPP was facing a simple design choice between a finite number of known, predictable solutions in the Ericsson, Samsung, and Philips46 Proposals. These proposals provided a technical foundation upon which LGE offered its solution, which is nearly identical in form and function to Philips46.

When properly weighed, the facts indicate that the Challenged Claims are obvious over Philips46. The Court should overturn the Board's erroneous decision.

*Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007) (citing *In re Corkill*, 771 F.2d 1496, 1500 (Fed. Cir. 1985)) ("[O]bviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success.").

## VIII.  CONCLUSION

The judgment of the Board should be reversed or, at a minimum, remanded to the Board for further consideration.

Dated: July 7, 2023

Respectfully submitted,

/s/ Benjamin E. Weed
Benjamin Weed
Brian Bozzo
K&L GATES LLP
70 W. Madison St., Suite 3100
Chicago, IL 60602
Phone: (312) 781-7166
Email: benjamin.weed@klgates.com
      brian.bozzo@klgates.com

**COUNSEL FOR APPELLANT**
**HONEYWELL INTERNATIONAL, INC.**

/s/ Amanda Tessar
Amanda Tessar
Roderick O'Dorisio
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, Colorado
Phone: (303) 291-2388
E-mail: atessar@perkinscoie.com
      RODorisio@perkinscoie.com

**COUNSEL FOR APPELLANT**
**SIERRA WIRELESS, INC.**

/s/ Jeremy D. Peterson
Jeremy D. Peterson
Bradford A. Cangro
PV LAW, LLP
5335 Wisconsin Ave.
Washington, DC 20015
Phone: (202) 371-6861

**COUNSEL FOR APPELLANTS TCL**
**COMMUNICATION TECHNOLOGY**
**HOLDINGS LIMITED, TCT MOBILE**
**INTERNATIONAL LIMITED, TCT**

**MOBILE, INC., TCT MOBILE (US)
INC., TCT MOBILE (US) HOLDINGS,
INC. (COLLECTIVELY, "TCL")**

/s/ Guy Yonay
Guy Yonay
Kyle Auteri
Pearl Cohen Zedek Latzer Baratz LLP
7 Times Square, 19th Floor
New York, NY 10036
Phone: (646) 878-0800
Email : GYonay@PearlCohen.com
         KAuteri@PearlCohen.com

**COUNSEL FOR APPELLANT TELIT
CINTERION DEUTSCHLAND GMBH,
FDBA THALES DIS AIS
DEUTSCHLAND GMBH**

## **CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitations of Federal Circuit Rule 32(b) because this brief contains 13,995 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word in 14-point Times New Roman font.

Dated:  July 7, 2023                    By:    /s/ Benjamin E. Weed
                                               Benjamin Weed

## CERTIFICATE OF AUTHORITY

I certify under penalty of perjury under the laws of the United States that I have the authority of Amanda Tessar, counsel for Appellant Sierra Wireless, Inc., Jeremy Peterson, counsel for Appellants TCL Communication Technology Holdings Limited, TCT Mobile International Limited, TCT Mobile, Inc., TCT Mobile (US) Inc., TCT Mobile (US) Holdings, Inc., and Guy Yonay, counsel for Appellant Telit Cinterion Deutschland GmbH, fdba Thales DIS AIS Deutschland GmbH, to file this document with their electronic signatures.

Dated: July 7, 2023            By:    /s/ Benjamin E. Weed
                                      Benjamin Weed

# ADDENDUM

## INDEX TO ADDENDUM

| Date | Description | Appendix Nos. |
|---|---|---|
| 11/14/2022 | Final Written Decision | Appx1 |
| - | U.S. Patent No. 7,319,718 | Appx48 |

Trials@uspto.gov                                          Paper 54
571-272-7822                                 Entered: November 14, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————————

HONEYWELL INTERNATIONAL, INC., TCT MOBILE (US) INC., TCT
MOBILE (US) HOLDINGS INC., TCL COMMUNICATION
TECHNOLOGY HOLDINGS LIMITED, TCT MOBILE
INTERNATIONAL LIMITED, TCT MOBILE, INC., DELL INC., SIERRA
WIRELESS, INC., and THALES DIS AIS DEUTSCHLAND GMBH,
Petitioner,

v.

3G LICENSING S.A.,
Patent Owner.

————————————————

IPR2021-00908
Patent 7,319,718 B2

————————————————

Before MONICA S. ULLAGADDI, AARON W. MOORE, and
RUSSELL E. CASS, *Administrative Patent Judges.*

CASS, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2021-00908
Patent 7,319,718 B2

## I.    INTRODUCTION

### A.  Background

In this *inter partes* review, Honeywell International, Inc., TCT Mobile (US) Inc., TCT Mobile (US) Holdings Inc., TCL Communication Technology Holdings Limited, TCT Mobile International Limited, TCT Mobile, Inc., Sierra Wireless, Inc., and Thales DIS AIS Deutschland GMBH ("Petitioner") challenge the patentability of claims 1, 2, 4–7, 9–13, and 15–23 (the "challenged claims") of U.S. Patent No. 7,319,718 B2 (Ex. 1001, "the '718 patent"), which is assigned to 3G Licensing SA ("Patent Owner").

We have jurisdiction under 35 U.S.C. § 6.  This Final Written Decision, issued pursuant to 35 U.S.C. § 318(a), addresses issues and arguments raised during the trial in this *inter partes* review.  For the reasons discussed below, Petitioner has not proven by a preponderance of the evidence that claims 1, 2, 4–7, 9–13, and 15–23 are unpatentable.

### B.  Procedural History

In this proceeding, Petitioner relies upon the following references:

> TDoc R1-02-0046 submitted to 3GPP TSG RAN WG1#23 by Philips, titled "Coding of Channel Quality Information" (Ex. 1004, "Philips46"); and

> TDoc R1-02-0019 submitted to TSG RAN WG1 #23 by Nokia, titled "Channel coding and error detection for uplink QI signaling" (Ex. 1021, "Nokia").

Pet. iii–v, 29.

Petitioner submits the Declaration of Dr. Paul C. Clark (Ex. 1002). Petitioner also submits the Declaration of Craig Bishop, which discusses the public availability of 3GPP technical specifications and other documents (Ex. 1015).  Patent Owner submits declarations from Dr. Michael Smith (Exs. 2001, 2006).

2

**Appx2**

IPR2021-00908
Patent 7,319,718 B2

Petitioner challenges the patentability of claims 1, 2, 4–7, 9–13, and 15–23 of the '718 patent based on the following grounds:

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 4, 5, 15–23 | 103(a)[1] | Philips46 |
| 6–7, 9–13 | 103(a) | Philips46, Nokia |

Pet. 29.

Patent Owner filed a Preliminary Response. Paper 16 ("Prelim. Resp."). We instituted trial on all grounds of unpatentability. Paper 32 ("Inst. Dec."), 41.

During the trial, Patent Owner filed a Response (Paper 33, "PO Resp."), Petitioner filed a Reply (Paper 39, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 40, "PO Sur-reply").

An oral hearing was held on August 18, 2022, a transcript of which appears in the record. Paper 50 ("Tr.").

*C. Real Parties in Interest*

Petitioner states that the real parties in interest are Cradlepoint, Inc.,[2] Dell, Inc., Dell Marketing L.P., Dell Products L.P., Dell Technologies Inc., Denali Intermediate Inc., Ericsson Inc., Honeywell International, Inc., Sierra Wireless, Inc., Sierra Wireless America, Inc., Telefonaktiebolaget LM

---

[1] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), included revisions to 35 U.S.C. § 103 that became effective after the filing of the application that led to the '718 patent. Therefore, we apply the pre-AIA version of 35 U.S.C. § 103.

[2] On November 3, 2022, the parties filed a motion to terminate Cradlepoint Inc. from the proceeding due to a settlement reached between Cradlepoint and Patent Owner. Paper 51. We granted the motion and terminated Cradlepoint from this proceeding on November 7, 2022. Paper 53.

3

IPR2021-00908
Patent 7,319,718 B2

Ericsson, TCL Communication Technology Holdings Ltd., TCT Mobile
International Ltd., TCT Mobile Inc., TCT Mobile (US) Inc., TCT Mobile
(US) Holdings Inc., Thales DIS AIS USA, LLC, Verifone, Inc., Wiko SAS,
Wiko USA, Inc., ZTE Corporation, and ZTE (USA) Inc.[3]  Pet. vii–viii;
Paper 21, 1.  Patent Owner states that 3G Licensing S.A. is the real party in
interest.  Paper 11, 1.

### D.  Related Proceedings

The parties identify multiple district court cases asserting the '718
patent in the U.S. District Courts for the District of Delaware and the
Northern District of Texas, including cases brought against Cradlepoint,
Inc., Dell Inc., Honeywell International, Inc., TCL Communication
Technology Holdings Ltd., and Wiko SAS.  Pet. viii–ix; Paper 11, 1.

### E.  The '718 Patent (Ex. 1001)

The '718 patent describes a scheme for encoding channel quality
information ("CQI") in a wireless communication system, and specifically
for use in an uplink High Speed Dedicated Physical Control Channel (HS-
DPCCH) in a High Speed Data Packet Access (HSDPA) system.  Ex. 1001,
1:6–9, 2:20–22.  The CQI is a 5-bit binary value (a binary representation of
an integer between 0 and 30) that a mobile device sends to a base station
indicating the quality of the device's connection.  Ex. 1002 ¶¶ 38–39, 42.
The '718 patent explains that, in channel coding for CQI, "a number of
uplink CQI coding methods have been proposed and most proposals assume

---

[3] On August 24, 2021, ZTE Corporation and ZTE (USA) Inc. filed a motion
to terminate these two ZTE entities from the proceeding due to a settlement
reached between the ZTE entities and Patent Owner.  Paper 17.  We granted
the motion and terminated the ZTE entities from this proceeding on
September 8, 2021.  Paper 20.

4

IPR2021-00908
Patent 7,319,718 B2

that the CQI is to be coded into 20 channel bits." Ex. 1001, 3:38–42. The

patent further states that "CQI coding methods are based on the Transmit

Format Combination Indicator (TFCI) coding method of [the] 3GPP

specification." *Id.* at 3:42–44.

The '718 patent discloses two exemplary 3GPP encoders, a (16, 5)

TFCI encoder and a (32,10) TFCI encoder. Ex. 1001, 3:43–48. These

encoders take each information bit of the codeword, multiply it by a

corresponding basis sequence ($M_{i,n}$), sum the results, and convert the answer

to a binary bit. *Id.* at 3:50–4:9; Ex. 1002 ¶¶ 47, 91. The (16,5) TFCI

encoder uses five information bits and the (32,10) TFCI encoder uses ten

information bits. *Id.* at 3:45–65. Each base sequence $M_{i,n}$ is a series of

numbers, as shown in the table below for a (16,5) TFCI encoder:

TABLE 1a

| i | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| 1 | 0 | 1 | 0 | 0 | 1 |
| 2 | 1 | 1 | 0 | 0 | 1 |
| 3 | 0 | 0 | 1 | 0 | 1 |
| 4 | 1 | 0 | 1 | 0 | 1 |
| 5 | 0 | 1 | 1 | 0 | 1 |
| 6 | 1 | 1 | 1 | 0 | 1 |
| 7 | 0 | 0 | 0 | 1 | 1 |
| 8 | 1 | 0 | 0 | 1 | 1 |
| 9 | 0 | 1 | 0 | 1 | 1 |
| 10 | 1 | 1 | 0 | 1 | 1 |
| 11 | 0 | 0 | 1 | 1 | 1 |
| 12 | 1 | 0 | 1 | 1 | 1 |
| 13 | 0 | 1 | 1 | 1 | 1 |
| 14 | 1 | 1 | 1 | 1 | 1 |
| 15 | 0 | 0 | 0 | 0 | 1 |

Table 1a above is a table for a (16,5) TFCI encoder with five base sequences
$M_{i,0}$ to $M_{i,4}$. Ex. 1001, 3:50–54, 4:40–65.

5

**Appx5**

The '718 patent discloses that conventional TFCI coding methods can be used to modify (16,5) TFCI and (32,10) TFCI encoders to "fit the required number of bits for CQI coding" for a "5 information bits and 20 coded bits, i.e. (20, 5) CQI code." Ex. 1001, 4:15–20. To accomplish this, the '718 patent teaches extending the (16,5) TFCI code by adding four bits to each basis sequence. *Id.* at 4:21–22. The '718 patent also teaches a two-step process for generating a (20,5) CQI code from a (32,10) TFCI code: (1) expurgating the (32, 10) TFCI code to the (32, 5) modified TFCI code by deleting last 5 basis sequences, and (2) puncturing and repeating the (32, 5) expurgated TFCI code to meet the (20, 5) CQI code. *Id.* at 4:24–30.

The '718 patent discloses that the performance of conventional CQI coding schemes may vary depending on the extended parts of their basis sequence table. Ex. 1001, 7:36–38. "[S]ince the HSDPA system has been designed in order to increase the system throughput," the '718 patent explains, "it is desirable to use the system throughput as one of the criteria in order to select [an] optimum CQI coding scheme." *Id.* at 7:50–53. Thus, the invention of the '718 patent seeks to "provide a method for generating basis sequences for CQI coding capable of maximizing a system throughput." *Id.* at 7:59–61.

To address this issue, the '718 patent teaches CQI encoding methods based on both (16,5) TFCI codes and (32,10) TFCI codes. Ex. 1001, 7:62–66, 8:53–56. For the (32,10) TFCI code, the '718 patent teaches: (a) "creating first basis sequences for generating [a] (32,5) expurgated TFCI code from [a] (32,10) TFCI code"; (b) "puncturing each of the (32,5) expurgated TFCI codes in a predetermined bit pattern in order to maximize system throughput"; (c) "repeating a predetermined bit of each (32,5)

IPR2021-00908
Patent 7,319,718 B2

expurgated TFCI code for predetermined times in order to maximize system throughput"; and (d) "encoding 5 information bits into CQI codes using . . . second basis sequences generated through (b) and (c)." *Id.* at 7:64–8:5.

For a (16,5) TFCI code, the '718 patent teaches: "(a) "obtaining first basis sequences from [a] (16, 5) TFCI code"; (b) "extending basis sequences to [a] (20, 5) CQI code in a predetermined pattern in order to maximize system throughput"; and (c) "encoding 5 information bits into CQI codes using . . . second basis sequences generated through (a) and (b)." Ex. 1001, 8:53–61.

In both cases, the '718 patent discloses, "[t]he second basis sequences are as in [the] following table:"

| i | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| 1 | 0 | 1 | 0 | 0 | 1 |
| 2 | 1 | 1 | 0 | 0 | 1 |
| 3 | 0 | 0 | 1 | 0 | 1 |
| 4 | 1 | 0 | 1 | 0 | 1 |
| 5 | 0 | 1 | 1 | 0 | 1 |
| 6 | 1 | 1 | 1 | 0 | 1 |
| 7 | 0 | 0 | 0 | 1 | 1 |
| 8 | 1 | 0 | 0 | 1 | 1 |
| 9 | 0 | 1 | 0 | 1 | 1 |
| 10 | 1 | 1 | 0 | 1 | 1 |
| 11 | 0 | 0 | 1 | 1 | 1 |
| 12 | 1 | 0 | 1 | 1 | 1 |
| 13 | 0 | 1 | 1 | 1 | 1 |
| 14 | 1 | 1 | 1 | 1 | 1 |
| 15 | 0 | 0 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 | 1 |
| 17 | 0 | 0 | 0 | 0 | 1 |
| 18 | 0 | 0 | 0 | 0 | 1 |
| 19 | 0 | 0 | 0 | 0 | 1 |

Ex. 1001, 8:12–34, 8:59–61. The above table includes five base sequences $M_{i,0}$ to $M_{i,4}$, each with 20 bits. *Id.*

### F.   Illustrative Claims

Of challenged claims 1, 2, 4–7, 9–13, and 15–23, claims 1, 6, 15, and 19 are independent. For purposes of the issues addressed in this decision, claims 1 and 6 are illustrative and are reproduced below.

7

IPR2021-00908
Patent 7,319,718 B2

1. [1.1] A method of coding channel quality information (CQI), comprising the steps of,

[1.2] providing information bits $a_0$, $a_1$, $a_2$, $a_3$, and $a_4$;

[1.3] providing five basis sequences $M_{i,n}$ for a (20,5) CQI code;

[1.4] encoding the information bits by combining the information bits with the basis sequences;

[1.5] generating a 20-bit codeword;

[1.6] wherein the basis sequences $M_{i,n}$ are defined as:

| I | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| 1 | 0 | 1 | 0 | 0 | 1 |
| 2 | 1 | 1 | 0 | 0 | 1 |
| 3 | 0 | 0 | 1 | 0 | 1 |
| 4 | 1 | 0 | 1 | 0 | 1 |
| 5 | 0 | 1 | 1 | 0 | 1 |
| 6 | 1 | 1 | 1 | 0 | 1 |
| 7 | 0 | 0 | 0 | 1 | 1 |
| 8 | 1 | 0 | 0 | 1 | 1 |
| 9 | 0 | 1 | 0 | 1 | 1 |
| 10 | 1 | 1 | 0 | 1 | 1 |
| 11 | 0 | 0 | 1 | 1 | 1 |
| 12 | 1 | 0 | 1 | 1 | 1 |
| 13 | 0 | 1 | 1 | 1 | 1 |
| 14 | 1 | 1 | 1 | 1 | 1 |
| 15 | 0 | 0 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 | 1 |
| 17 | 0 | 0 | 0 | 0 | 1 |
| 18 | 0 | 0 | 0 | 0 | 1 |
| 19 | 0 | 0 | 0 | 0 | 1. |

6. [6.1] A method of coding channel quality information (CQI), comprising the steps of,

[6.2] providing information bits $a_0$, $a_1$, $a_2$, $a_3$, and $a_4$;

[6.3] providing five basis sequences $M_{i,n}$ for a TFCI code;

[6.4] encoding the information bits by combining the information bits with the basis sequences;

[6.5] generating an intermediate codeword;

[6.6] adding a further bit repeated four times to generate a 20-bit codeword.

Ex. 1001, 12:29–58, 13:11–19 (bracketed paragraph identifiers added).

8

**Appx8**

IPR2021-00908
Patent 7,319,718 B2

## II.    DISCUSSION

### A.  *Claim Construction*

A claim "shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b)." 37 C.F.R. § 42.100(b) (2020).  Neither party proposes a construction of any claim terms.  Pet. 29; PO Resp. 15.  We determine that it is not necessary to provide an express interpretation of any claim terms for purposes of this Decision.  *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017); *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.").

### B.  *Principles of Law*

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, objective evidence of non-obviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re*

IPR2021-00908
Patent 7,319,718 B2

*Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).  Whether a combination of prior art elements would have produced a predictable result weighs in the ultimate determination of obviousness.  *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity why each challenged claim is unpatentable.  *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b) (2020).  The burden of persuasion never shifts to Patent Owner.  *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

*C.  Level of Ordinary Skill in the Art*

In our Institution Decision, we adopted Petitioner's assessment of the level of skill in the art as including a Bachelor's degree in electrical engineering, computer engineering, or a similar discipline with approximately two years of signal processing experience, which is supported by the declaration of Dr. Clark and the prior art of record.  Inst. Dec. 12 (citing Ex. 1002 ¶¶ 70–72).  We also agreed with Patent Owner that a combination of more experience in the field and less education or more education and less experience in the field may also suffice.  *Id.*  In its Patent Owner Response, Patent Owner states that it does not object to the level of ordinary skill we adopted in the Institution Decision.  PO Resp. 9.  For purposes of this Final Written Decision, we adhere to the level of ordinary skill adopted in our Institution Decision, which is consistent with the disclosures of the '718 patent and the asserted prior art.

10

IPR2021-00908
Patent 7,319,718 B2

D. *Ground 1: Obviousness of Claims 1, 2, 4–5, and 15–23 Based on Philips46*

Petitioner contends that claims 1, 2, 4–5, and 15–23 are obvious over Philips46.  Pet. 29, 35–55.  Patent Owner disagrees.  PO Resp. 9–24.

1. *Overview of Philips46 (Ex. 1004)*

Relying on the testimony of Mr. Bishop, Petitioner asserts that Phillips46 "is a Temporary Document ('TDoc') titled 'Coding of Channel Quality Information' that was submitted to 3GPP TSG RAN WG1#23 in Espoo, Finland, on January 8th–11th 2002."  Pet. 33 (citing Ex. 1015 ¶ 48; Ex. 1004, 1; Ex. 1002 ¶¶ 74–75).  According to Petitioner and Mr. Bishop, "Philips46 was distributed via the TSG RAN WG1 email list and, on January 12, 2002, it was uploaded to the 3GPP public file repository."  *Id.* (citing Ex. 1015 ¶¶ 52–53).  Thus, Petitioner contends, Philips46 "was publicly available as of January 7 and/or 12, 2002," and "is prior art under 35 U.S.C. § 102(b)."  *Id.*  Patent Owner does not contest the prior art status of Philips46.  PO Resp. 9–23.  Based on the full trial record, we find that Petitioner has shown by a preponderance of the evidence that Philips46 qualifies as prior art.

Phillips46 explains that "in the coding of CQI in HSDPA," the "current working assumption is that 5 information bits will be transmitted in a 20 bit data field."  Ex. 1004, 1.  To carry this out, Phillips46 explains, "[t]he most promising proposals are" (1) "[t]o take the (16,5) bi-orthogonal TFCI code and append 4 of the 5 data bits to make a 20 bit code word" or "suitably extend[] the basis vectors to 20 bits," and (2) "[t]o take 5 basis vectors from a (32, 10) Reed-Muller code and puncture to 20 bits."  *Id.*  According to Phillips46, "it is also desirable that if possible the most significant bits of the data are better protected than the least significant bits,"

11

IPR2021-00908
Patent 7,319,718 B2

which "would reduce the probability that transmission errors would result in large errors in the received channel quality value." *Id.* Therefore, Phillips46 "propose[s] to extend the basis vectors of the (16,5) TFCI code as shown in Table 1," which "gives significant extra protection to the MSB, and a little more robustness to the next most significant bit." *Id.* Table 1 is reproduced below:

**Table 1: Basis sequences for (20,5) code as an extended (16,5) TFCI code**

| i | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| 1 | 0 | 1 | 0 | 0 | 1 |
| 2 | 1 | 1 | 0 | 0 | 1 |
| 3 | 0 | 0 | 1 | 0 | 1 |
| 4 | 1 | 0 | 1 | 0 | 1 |
| 5 | 0 | 1 | 1 | 0 | 1 |
| 6 | 1 | 1 | 1 | 0 | 1 |
| 7 | 0 | 0 | 0 | 1 | 1 |
| 8 | 1 | 0 | 0 | 1 | 1 |
| 9 | 0 | 1 | 0 | 1 | 1 |
| 10 | 1 | 1 | 0 | 1 | 1 |
| 11 | 0 | 0 | 1 | 1 | 1 |
| 12 | 1 | 0 | 1 | 1 | 1 |
| 13 | 0 | 1 | 1 | 1 | 1 |
| 14 | 1 | 1 | 1 | 1 | 1 |
| 15 | 0 | 0 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 | 1 |
| 17 | 0 | 0 | 0 | 0 | 1 |
| 18 | 0 | 0 | 0 | 0 | 1 |
| 19 | 0 | 0 | 0 | 1 | 0 |

Ex. 1004, 2. Philips46's Table 1 lists the 5 basis sequences $M_{i,0}$ to $M_{i,4}$ for a (20,5) TFCI code extended from a (16,5) TFCI code. *Id.*

2. *Analysis of Independent Claim 1*

a) *[1.1]: "[a] method of coding channel quality information (CQI), comprising the steps of:"*

Petitioner asserts that, to the extent the preamble of claim 1 is limiting, Philips46 discloses this limitation. Pet. 42. Petitioner points to Philips46's disclosure that the "channel quality information is coded using a (16,5) bi-orthogonal code," and argues that one of ordinary skill in the art

12

**Appx12**

"would understand that this is a method of coding CQI." *Id.* (citing Ex. 1004, 4; Ex. 1002 ¶ 101; Ex. 1001, 4:15–39).

Patent Owner does not present arguments regarding the preamble. *See* PO Resp. 9–24; PO Sur-reply 2–11.

We agree with Petitioner that the cited disclosures of Philips46 teach a method of coding channel quality information (CQI), as recited in the preamble.[4]

> b) *[1.2]: "providing information bits $a_0$, $a_1$, $a_2$, $a_3$, and $a_4$;"*

Petitioner argues that "Philips46 provides information bits $a_0$, $a_1$, $a_2$, $a_3$, and $a_4$ (where $a_0$ is least significant bit ('LSB') and $a_4$ is MSB.)." Pet. 43. Relying on the testimony of Dr. Clark, Petitioner asserts that providing these information bits "as explicitly set forth in Philips46, would be obvious to" one of ordinary skill in the art. *Id.* (citing Ex. 1002 ¶ 102).

Patent Owner does not present arguments regarding this limitation. *See* PO Resp. 9–24; PO Sur-reply 2–11.

We agree with Petitioner that Philips46 teaches this limitation. Specifically, we agree that Philips46 discloses providing information bits $a_0$, $a_1$, $a_2$, $a_3$, and $a_4$, where $a_0$ is the least significant bit and $a_4$ is the most significant bit.

> c) *[1.3]: "providing five basis sequences $M_{i,n}$ for a (20,5) CQI code;"*

Petitioner argues that Philips46 "describes five basis sequences, $M_{i,0}$ through $M_{i,4}$ for a (20,5) code," pointing to Table 1 of Philips46. Pet. 43

---

[4] Because we are persuaded that Petitioner has shown that Philips46 teaches the subject matter recited in the preamble, we need not decide whether the preamble is limiting.

IPR2021-00908
Patent 7,319,718 B2

(citing Ex. 1004, Table 1, 4–5). Petitioner asserts that one of ordinary skill "would understand that, as part of the coding of channel quality information, five basis sequences for a (20,5) CQI code would be provided," and "would thus find this element explicitly disclosed by Philips46." *Id.* at 43–44 (citing Ex. 1002 ¶ 103; Ex. 1001, 4:9, 4:21–22, Table 1a).

Patent Owner does not present arguments regarding this limitation. *See* PO Resp. 9–24; PO Sur-reply 2–11.

We agree with Petitioner that Philips46 teaches this limitation. Specifically, we agree that Philips46 discloses five basis sequences, $M_{i,0}$ through $M_{i,4}$ for a (20,5) CQI code in Table 1. Pet. 43; Ex. 1004, Table 1, 4–5.

    d)   [1.4]: *"encoding the information bits by combining the information bits with the basis sequences;"*

Petitioner argues that Philips46 "describes encoding by linearly combining the information bits with the basis sequences of the code according to a specific equation." Pet. 44 (citing Ex. 1004, 5). According to Petitioner, "[t]his linear combination encodes the information bits by combining them with the basis sequences to generate a codeword," as described further for element 1.5 below. *Id.* Thus, Petitioner asserts, one of ordinary skill in the art would understand Philips46 to explicitly disclose this element. *Id.* (citing Ex. 1002 ¶¶ 104–105; Ex. 1001, 7:15–20, 3:51–62, Figs. 5–6).

Patent Owner does not present arguments regarding this limitation. *See* PO Resp. 9–24; PO Sur-reply 2–11.

We agree with Petitioner that Philips46 teaches this limitation. Specifically, we agree that Philips46 discloses encoding the information bits by linearly combining them with the basis sequences of the code to generate

IPR2021-00908
Patent 7,319,718 B2

a codeword, as described further below with respect to element 1.5.  Pet. 44; Ex. 1004, 5.

### e)    [1.5]:  "generating a 20-bit codeword;"

Petitioner argues that "Philips46 'describes mak[ing] a 20-bit codeword' as part of its proposal," and "further specifies that the codeword bits ($b_i$) are generated" by a specific equation.  Pet. 44 (citing Ex. 1004, 1, 5).  In this equation, according to Petitioner, $b_i$ is the output bit, $a_n$ is a given information bit, and $M_{i,n}$ is the basis sequence of the code.  *Id.*  Petitioner contends that one of ordinary skill "would understand this this outputs a codeword of length *i*, such that, for Philips46, the output is a 20-bit codeword."  *Id.* at 45 (citing Ex. 1002 ¶ 106; Ex. 1001, 3:50–4:8; Ex. 1004, 5).

Patent Owner does not present arguments regarding this limitation.  *See* PO Resp. 9–24; PO Sur-reply 2–11.

We agree with Petitioner that Philips46 discloses generating a 20-bit codeword, as required by this limitation.  Pet. 44–45; Ex. 1004, 1, 5; Ex. 1002 ¶ 106).

### f)    [1.6]:  "wherein the basis sequences $M_{i,n}$ are defined as . . . ."

The parties' dispute as to claim 1 focuses on this limitation.  We will discuss the parties' contentions below, followed by our analysis and findings.

### (1)  The Parties' Arguments

Petitioner argues that Philips46 provides a table (Table 1) for its (20,5) basis sequence, which is reproduced below with annotations by Petitioner:

15

IPR2021-00908
Patent 7,319,718 B2

Table 1: Basis sequences for (20,5) code as an extended (16,5) TFCI code

| i | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| 1 | 0 | 1 | 0 | 0 | 1 |
| 2 | 1 | 1 | 0 | 0 | 1 |
| 3 | 0 | 0 | 1 | 0 | 1 |
| 4 | 1 | 0 | 1 | 0 | 1 |
| 5 | 0 | 1 | 1 | 0 | 1 |
| 6 | 1 | 1 | 1 | 0 | 1 |
| 7 | 0 | 0 | 0 | 1 | 1 |
| 8 | 1 | 0 | 0 | 1 | 1 |
| 9 | 0 | 1 | 0 | 1 | 1 |
| 10 | 1 | 1 | 0 | 1 | 1 |
| 11 | 0 | 0 | 1 | 1 | 1 |
| 12 | 1 | 0 | 1 | 1 | 1 |
| 13 | 0 | 1 | 1 | 1 | 1 |
| 14 | 1 | 1 | 1 | 1 | 1 |
| 15 | 0 | 0 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 | 1 |
| 17 | 0 | 0 | 0 | 0 | 1 |
| 18 | 0 | 0 | 0 | 0 | 1 |
| 19 | 0 | 0 | 0 | 1 | 0 |

Pet. 45 (citing Ex. 1004, 2 (annotated)). As discussed above, this table shows the 5 basis sequences $M_{i,0}$ to $M_{i,4}$ for a (20,5) TFCI code extended from a (16,5) TFCI code. Ex. 1004, 2. Petitioner asserts that "Rows 0–18 of this table are identical to what is claimed in the '718 patent." Pet. 45. Petitioner identifies row 19, surrounded by a yellow rectangle, as the only row of Table 1 that is different from the table in claim element 1.6. *Id.*

Petitioner argues that the only difference between the table of base sequences in the Philips46 prior art and the one in the '718 patent is that the last two bits of the last row are flip-flopped. Pet. 2–3. Petitioner illustrates this difference in the figure reproduced below:

16

**Appx16**

IPR2021-00908
Patent 7,319,718 B2



Prior Art                    '718 patent

Pet. 2–3. This figure from the Petition reproduces Table 1 from Philips46 on the left, with the last two bits of the last row being "1,0," and the table from claim 1 of the '718 patent on the right, with the last two bits of the last row being "0,1." *Id.*

According to Petitioner, "Phillips 46 notes that the most significant bit is the final bit of the five information bits ($a_0$, $a_1$, $a_2$, $a_3$, **$a_4$**) and attempts to provide 'significant extra protection to the MSB [most significant bit].'" Pet. 36 (citing Ex. 1002 ¶¶ 78–79; Ex. 1004, 1). Relying on the testimony of Dr. Clark, Petitioner contends that swapping the two bits on the last row of Philips46's Figure 1 "would achieve the stated goal of [Phillips46] of providing extra protection to the most significant bit, at the tradeoff of providing slightly less protection to the second-most significant bit." *Id.* at 36–37 (citing Ex. 1002 ¶ 99). "In effect," according to Petitioner, one of ordinary skill "attempting to maximize the protection for the most significant bit would extend the last bit from the $M_{i,4}$ basis sequence of the (16,5) code of Philips46 through the remainder of the extended base sequence to the 20th bit, as opposed to stopping at the 19th bit." *Id.* at 37

17

(citing Ex. 1002 ¶¶ 108–109). This is because "[i]t was known that by adjusting the position of the '1' in the 16–20th rows of the basis sequence of the code, the bit afforded the protection changes." *Id.* at 37–38 (citing Ex. 1002 ¶ 112). Thus, one of ordinary skill "would have known that the selection of where to place this '1' directly impacts which bit receives protection." *Id.* at 38 (citing Ex. 1002 ¶¶ 111–112). And, Petitioner and Dr. Clark assert, "if protection is desired for the $a_4$ bit, then a 1 will be in the final basis sequence $M_{i,4}$," but "if protection is desired for the $a_3$ bit, then a 1 will be in the second to final basis sequence $M_{i,3}$." Pet. 38; Ex. 1002 ¶ 115.

Patent Owner argues that the "'718 patent is concerned with maximizing the entire system throughput, not minimizing the Root-Mean-Square ('RMS') error of the code, minimizing bit error rate ('BER') of the code, nor maximizing the protection of the MSBs, as disclosed by Philips." PO Resp. 11 (emphasis omitted) (citing Ex. 1001, code (57), 7:40–49; Ex. 2006 ¶¶ 11, 14). "Indeed," according to Patent Owner, "the '718 patent teaches that efforts to minimize RMS error and to minimize BER produce conflicting, incompatible results." *Id.* (emphasis omitted) (citing Ex. 1001, 11:38–12:19; Ex. 2006 ¶ 13). Thus, Patent Owner asserts, "Philip's pursuit of protecting the MSBs would not influence a [person of ordinary skill in the art] to act in a manner that would maximize system throughput." *Id.* at 12.

Patent Owner also asserts that, although "Petitioners have focused on the protection of the MSB," the "amount of protection assigned to each bit using unequal error protection ('UEP') is a coincidental result of optimizing the code for system throughput" as taught by the '718 patent, "not a metric that necessarily optimizes system throughput." PO Resp. 12 (emphasis omitted). "The '718 patent explains," according to Patent Owner, "that only

by simulating system throughput can the correct balance between minimizing RMS error and BER be obtained and the best code that allocates the correct UEP be determined." *Id.* (citing Ex. 1001, 12:8–19; Ex. 2006, 14). Thus, Patent Owner contends, a "desire to optimize BER, RMS error, UEP, or protection of just the MSB of the code" is opposed to the '718 patent's goal of "optimiz[ing] system throughput." *Id.*

Patent Owner also takes issue with Petitioner's argument that one of ordinary skill "could knowingly and reliably create or find an optimum CQI code simply" by "switching two digits in the last row of the Philips table" to "afford[] greater protection to just the MSB of one of the proposed codes." PO Resp. 12 (citing Ex. 2006, 15). To the contrary, Patent Owner contends, "[a] full understanding of the proposed CQI codes and their properties was not available at the time of the '718 patent," and "[a]n understanding of the mathematical relationship between basis sequences in this field, such as those being considered by 3GPP, and the resulting codewords[,] was not demonstrated until a research paper was published in 2016—over a decade after the filing date of the '718 patent." *Id.* at 12–13 (citing Ex. 2006 ¶¶ 15–28).

Additionally, Patent Owner argues that "the 3GPP Temporary Documents ('TDocs') and meeting reports (or minutes) confirm that even experts in mobile communications disagreed on optimal basis sequences even on the eve of the '718 patent's February 16, 2002 priority date." PO Resp. 13. In January 2002, according to Patent Owner, "[t]he members of 3GPP, the world experts in mobile communications, struggled to agree on what constituted the 'best' CQI code." *Id.* at 14.

More specifically, Patent Owner argues, "[i]n their January 2002 meeting in Espoo, 3GPP received five different proposals, including papers from Ericsson, Nokia, Samsung, and Philips." PO Resp. 14 (citing Ex. 2006 ¶ 31). The Ericsson, Nokia, and Samsung papers, Patent Owner asserts, "proposed the introduction of varying levels of protection for different bits, such as the 'four least reliable information bits,' of five data input bits," which "is the practice of Unequal Error Protection discussed above." *Id.* (citing Ex. 2006 ¶ 32). According to Patent Owner, "UEP differed from the prior methods of encoding information such as a channel quality indicator ('CQI')" because "it provided additional protection to bits more likely to be damaged in transmission" rather than "affording equal protection to each bit." *Id.* (citing Ex. 2006 ¶ 33). However, "despite th[is] unequal protection," Patent Owner asserts, "these initial proposals each proposed BER—the ratio of data bits compromised during radio transmission where protection of bits is weighted equally—as the appropriate metric for a CQI code." *Id.* at 14–15 (citing Ex. 2006 ¶ 34).

In contrast, Patent Owner argues, Philips's paper (the Philips46 reference) "recommended a departure from BER as the sole code metric" and proposed an "RMS error formula to better measure code performance in a UEP scheme." PO Resp. 15 (citing Ex. 2006 ¶ 35). According to Patent Owner, Philips "advocated for providing additional protection of the most significant bits ('MSBs') of the input, and proposed a different set of basis sequences (i.e., a different encoding matrix) to achieve protection of the MSBs." *Id.* (citing Ex. 2006 ¶ 36). "Despite pushback from Samsung who did not believe that Philips' proposal provided improvement over the prior

art," Patent Owner contends, "3GPP adopted Philips as part of the relevant 3GPP standard." *Id.* (citing Ex. 2006 ¶ 37).

However, Patent Owner argues, "[d]uring the February 2002 3GPP meeting in Orlando, LGE, the '718 patentee, presented findings that contradicted the Philips proposal." PO Resp. 15 (citing Ex. 2006 ¶ 34). More specifically, Patent Owner asserts, "LGE presented a paper indicating that neither BER nor RMS error, the theories underlying all prior proposals to 3GPP, were the appropriate underlying basis for what constituted an 'optimal' CQI code." *Id.* (citing Ex. 2006 ¶ 39). "Rather," according to Patent Owner, "by unveiling the results of new simulations, LGE argued that the 3GPP should shift its paradigm to that taught by the '718 patent—using system throughput as the appropriate metric to select an optimum CQI coding scheme." *Id.* (emphasis omitted) (citing Ex. 2006 ¶ 40). Patent Owner contends that this was "an entirely new paradigm—an alternative set of basis sequences that were optimized for system throughput that explicitly combined the BER and RMS error metrics." *Id.* at 15–16 (citing Ex. 2006 ¶ 41). LGE also included "the same chart of basis sequences as the '718 patent" in its proposal." *Id.* at 16 (citing Ex. 2006 ¶ 45).

Patent Owner argues that "LGE's simulation" in the February 2002 paper "demonstrated that by including the effects of both BER and RMS error, basis sequences not previously considered by 3GPP yielded unexpected, previously unobtained, results: namely the optimum CQI code for system throughput." PO Resp. 16 (citing Ex. 2006 ¶ 42). According to Patent Owner, these results were "particularly noteworthy" because "prior efforts to optimize both BER and RMS error yielded mutually exclusive results," showing that "maximizing one would be at the cost of the other."

*Id.* (citing Ex. 2006 ¶¶ 42–43). Thus, Patent Owner contends, LGE's simulation results demonstrated that "focus on system throughput, rather than protection of MSBs (as advocated by Philips) yielded the optimum result." *Id.* (citing Ex. 2006 ¶ 44).

"LGE's proposal," Patent Owner argues, "left 3GPP's members divided." PO Resp. 16. According to Patent Owner, Samsung responded by "expressing doubts over the simulation results presented in LGE's paper," while "Philips ultimately supported LGE's conclusions in light of this brand new evidence provided by the LGE experiments, results, and explanation." *Id.* (citing Ex. 2006 ¶ 46). "Subsequent meetings in April and May of 2002," Patent Owner contends, "ultimately led to 3GPP changing the standard from the Philips proposal" in order "to align with LGE's proposal (and the '718 patent)." *Id.* (citing Ex. 2006 ¶ 47).

Based on this 3GPP history, Patent Owner argues, Petitioner's contention that it would have been obvious to simply swap the last two digits in the Philips46 chart "substantially oversimplifies the issues faced by the 3GPP members considering the issues at the time of the invention—let alone the difficulties faced" by a person of ordinary skill. PO Resp. 17. According to Patent Owner, "[t]he very first proposals in January 2002 were significant departures into unknown territory in the field," with "several new types of codes" having been proposed having an "unknown" mathematical relationship. *Id.* (citing Ex. 2006 ¶ 48). Patent Owner argues that "[t]hese new codes were being optimized in new and various different ways," as "UEP, a technique not covered in textbooks at the time, had been introduced as foundational," in contrast to "all prior methods [which] assumed equal

IPR2021-00908
Patent 7,319,718 B2

error protection and relied on BER to provide an accurate measure of CQI code performance." *Id.* (citing Ex. 2006 ¶ 49).

Thus, according to Patent Owner, "[t]o even understand the Philips reference," a person of ordinary skill "would have needed to understand the combination of at least five 3GPPP technical papers that led to Philips'[s] conclusion and proposals," which would have "require[d] a level of skill well beyond that of" a person of ordinary skill in the art. PO Resp. 17–18 (citing Ex. 2006 ¶¶ 50–51). "Even with the disclosures of" Philips46, Patent Owner contends, a person of ordinary skill "would be confronted with the same problem of resolving the mutually exclusive optimizations of BER and RSM faced by the world-experts of 3GPP." *Id.* at 60 (citing Ex. 2006 ¶ 52). Consequently, Patent Owner argues, "[t]he history and adoption of relevant 3GPP standards demonstrates that" the 3GPP members "(1) originally adopted a solution *other* than that taught by the '718 patent, (2) when confronted with the '718 patent's solution, that solution met with disagreement and protest, and (3) only adopted the '718 patent's methods after much debate, uncertainty, [and] requests for more test results from LGE." *Id.* (citing Ex. 2006 ¶ 53).

Petitioner responds that the "near co-extensiveness" between claim 1 of the '718 patent and Philips46 renders claim 1 obvious. Pet. Reply 2–4. Petitioner also argues that, "as of the priority date of the '718 patent[,] there was extensive industry analysis underway evaluating ways to accurately convey CQI representations by providing the requisite level of protection for the various bits representing that CQI," an example of which is found in Philips46. *Id.* at 4 (citing Ex. 1001, 7:33–34; Ex. 1004, 1; Ex. 1002 ¶¶ 96, 99, 114, 182). One of ordinary skill, Petitioner contends, would have

understood that Philips46 provides "significant extra protection" to the MSB by repeating it an additional three times in the resulting codeword, and "a little more robustness to the second most significant bit" by representing it one additional time in the codeword. *Id.* (citing Ex. 1004, 1; Ex. 1002 ¶ 79). According to Petitioner, one of ordinary skill would have been motivated to modify Philips to provide "the most protection to the MSB," because it "would decrease the aggregate magnitude of transmission errors," and thus would have been motivated to switch the last two digits in the last row of the Philips46 table. *Id.* (citing Ex. 1002 ¶¶ 55–56, 91–93, 108; Inst. Dec. 19–20). "The benefits of providing additional protection to the MSB," Petitioner argues, were known to persons of ordinary skill. *Id.* (citing Ex. 1002 ¶¶ 91–92; Ex. 1023, 1:50–53; Ex. 1024, 10–11).

Petitioner also argues that "[t]he '718 patent does not claim or describe any throughput advantages commensurate in scope with the claimed process." Pet. Reply 5. According to Petitioner, "the '718 patent provides no evidence as to what this throughput is, the extent of the difference (if any) of throughput between the '718 patent's basis sequence and the prior art, or linking of throughput to anything in the claims." *Id.* at 5–6. Additionally, Petitioner asserts, "[t]he '718 patent does not describe how its claimed matrix of basis sequences provides any change in throughput," and "provides no evidence that any throughput differences between Philips46 and the claimed basis sequences matters." *Id.* at 7. Indeed, according to Petitioner, "Dr. Smith was unable to explain how the alleged comparisons" of throughput between base sequences "could have been calculated." *Id.* at 8 (citing Ex. 1032, 52:1–13). Thus, Petitioner contends, "little to no weight can be placed on the unclaimed, undescribed,

IPR2021-00908
Patent 7,319,718 B2

and undiscernible 'throughput' argument that [Patent Owner] has put forth."
*Id.*

Additionally, Petitioner asserts, optimizing Philips46's base sequences "is nothing more than modifying a result effective variable to arrive at the optimal arrangement for providing the most protection for the MSB." *Id.* at 5–6 (citing Pet. 37–38). According to Petitioner, one of ordinary skill would have known that the selection of where to place the "1" in the 16th-20th rows of the basis sequence table "directly impacts which bit of the CQI information bits receives protection." *Id.* at 6 n.3. Thus, according to Petitioner, "the '718 patent simply is a modification to a readily optimizable parameter." *Id.* at 7.

Finally, Petitioner argues that Dr. Smith's "throughput" analysis "actually shows that the proposal in Philips46 provides better throughput using Dr. Smith's own metrics." Pet. Reply 9. Petitioner bases its argument on Figure 7 in Section 4.3 of LGE's TSGR1#24-02-0362 submission attached as Exhibit C to Dr. Smith's Supplemental Declaration. *Id.* at 9–11.

Patent Owner responds that Petitioner is mistaken that one of ordinary skill "could knowingly and reliably create or find an optimal CQI code by simply switching two digits in the tables" because "[t]he mathematical relationship between the basis sequences in the tables and their resulting codewords was not demonstrated until ***over a decade*** after the filing of the filing of the '718 patent." PO Sur-reply 4–5 (citing PO Resp. 33 (citing Ex. 2016 ¶ 15–28)). Patent Owner also takes issue with Petitioner's argument that Dr. Smith's analysis shows that Philips46 has better throughput than the LGE proposal embodied in the '718 patent. *Id.* at 5–11.

25

**Appx25**

IPR2021-00908
Patent 7,319,718 B2

   *(2)   Analysis*

   Based on the full trial record, we find that Petitioner has not proven by a preponderance of the evidence that claim 1 would have been obvious over Philips46.  The parties agree that the table in limitation [1.6] is the same as the chart in Philips46 except for the last two bits of the last row, which are flip flopped as shown in Petitioner's figures below.

| I | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| 1 | 0 | 1 | 0 | 0 | 1 |
| 2 | 1 | 1 | 0 | 0 | 1 |
| 3 | 0 | 0 | 1 | 0 | 1 |
| 4 | 1 | 0 | 1 | 0 | 1 |
| 5 | 0 | 1 | 1 | 0 | 1 |
| 6 | 1 | 1 | 1 | 0 | 1 |
| 7 | 0 | 0 | 0 | 1 | 1 |
| 8 | 1 | 0 | 0 | 1 | 1 |
| 9 | 0 | 1 | 0 | 1 | 1 |
| 10 | 1 | 1 | 0 | 1 | 1 |
| 11 | 0 | 0 | 1 | 1 | 1 |
| 12 | 1 | 0 | 1 | 1 | 1 |
| 13 | 0 | 1 | 1 | 1 | 1 |
| 14 | 1 | 1 | 1 | 1 | 1 |
| 15 | 0 | 0 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 | 1 |
| 17 | 0 | 0 | 0 | 0 | 1 |
| 18 | 0 | 0 | 0 | 0 | 1 |
| 19 | 0 | 0 | 0 | **1** | **0** |

| I | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| 1 | 0 | 1 | 0 | 0 | 1 |
| 2 | 1 | 1 | 0 | 0 | 1 |
| 3 | 0 | 0 | 1 | 0 | 1 |
| 4 | 1 | 0 | 1 | 0 | 1 |
| 5 | 0 | 1 | 1 | 0 | 1 |
| 6 | 1 | 1 | 1 | 0 | 1 |
| 7 | 0 | 0 | 0 | 1 | 1 |
| 8 | 1 | 0 | 0 | 1 | 1 |
| 9 | 0 | 1 | 0 | 1 | 1 |
| 10 | 1 | 1 | 0 | 1 | 1 |
| 11 | 0 | 0 | 1 | 1 | 1 |
| 12 | 1 | 0 | 1 | 1 | 1 |
| 13 | 0 | 1 | 1 | 1 | 1 |
| 14 | 1 | 1 | 1 | 1 | 1 |
| 15 | 0 | 0 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 | 1 |
| 17 | 0 | 0 | 0 | 0 | 1 |
| 18 | 0 | 0 | 0 | 0 | 1 |
| 19 | 0 | 0 | 0 | **0** | **1** |

            Prior Art                                 '718 patent

Pet. 2–3; PO Sur-reply 2.  As Patent Owner explains, "[t]here is no—and has not been—any dispute between the parties that the two tables differ only in that the final digits of the rightmost two columns alternate digits."  PO Sur-reply 2.  Rather, "[t]he dispute lies in whether and how a [person of ordinary skill in the art] would have found it obvious to make this alteration."  *Id.*  We discuss below Petitioner's arguments as to why it would have been obvious for one of ordinary skill to make this change, and why we do not find those arguments to be persuasive.

   First, we find that Petitioner has not sufficiently shown that one of ordinary skill would have been motivated to swap the last two bits in the last

IPR2021-00908
Patent 7,319,718 B2

row of the Philips46 table in order to provide more protection to the most significant bit (MSB). Even if we were to agree with Petitioner that one of ordinary skill would have understood that swapping the last two bits would have provided more protection to the MSB, Petitioner has not sufficiently shown that one of ordinary skill would have believed that such a change would be desirable. Patent Owner introduces evidence from Dr. Smith and the '781 patent that there was "a tradeoff between BER and RMS error" and that "efforts to minimize RMS error and to minimize BER produce conflicting and incompatible results." Ex. 1001, 11:38–44; Ex. 2006 ¶¶ 13, 43. These conflicting results are supported by the '718 patent specification's comparison of various codes (represented by C1, C2, embodiment 2, and embodiment 3), which found that the embodiment that had the best BER performance (C1) had the worst RMS error performance, and the embodiment with the best RMS error performance (embodiment 3) had the worst BER performance. Ex. 1001, 11:48–51, 11:58–61. We also find credible Dr. Smith's testimony that "[a]dding all protection to *just* the MSB *removes* protection for *all* other bits," which would be expected to reduce BER performance. Ex. 2006 ¶ 16.

Additionally, we rely on and find credible Dr. Smith's testimony that the early proposals to 3GPP in January 2002 for selecting the optimal CQI coding scheme "were significant departures into unknown territory in the field" with "several new types of codes ha[ving] been proposed, with the mathematical relationship between them being unknown." Ex. 2006 ¶ 48. Dr. Smith's testimony is supported by his explanation that this mathematical relationship remained unknown until 2016, when the paper "Rademacher Functions and Their Applications to 3GPP Mobile Communications

27

IPR2021-00908
Patent 7,319,718 B2

Systems" was published. *Id.* ¶¶ 26, 48, Ex. H. Additionally, Dr. Smith supports his testimony by explaining that "the only coding textbook referenced in the 3GPP T docs with respect to the CQI codes" is a 1983 textbook by Lin and Costello which only discusses Reed-Muller codes (like the basic (20, 5) code) "in passing in half a page," and does not discuss extended codes, unequal error protection, or RMS error as used by the 3GPP. *Id.* ¶ 48.

We also agree with Patent Owner that the nonobviousness of claim 1 is supported by the history of the 3GPP proceedings discussing which CQI coding scheme to use in the standard. This history shows that, prior to the critical date, there existed in the field significant uncertainty and disagreement about what CQI coding scheme would be best and what criteria should be used to evaluate the different schemes. The 3GPP history and various submissions will be discussed further below.

As Dr. Smith testifies, in late 2001 and early 2002, 3GPP received five different proposals, including papers from Ericsson, Nokia, Samsung, and Philips. Ex. 2006 ¶ 31. Specifically, Ericsson submitted a proposal (R1-01-1144) at the November 19–23, 2001, 3GPP meeting in Cheju, Korea, to extend the (16, 5) bi-orthogonal code already used for TFCI coding to a (20, 5) code "with each word extended with the four least reliable information bits" for "the channel-quality-related information." Ex. 1022, 1; Ex. 2006 ¶ 32. This proposal, Ericsson explained, "is designed for optimal minimal distance." Ex. 1002 ¶ 49; Ex. 1022, 1; Ex. 1001, 5:65–6:36. "Distance, often referred to as 'Hamming distance' compares the difference between two resulting codewords," and "[t]he 'minimum distance' is the

28

IPR2021-00908
Patent 7,319,718 B2

minimum value of the Hamming distance, over all possible pairs of codewords." Ex. 1002 ¶ 50.

Samsung submitted a proposal (R1-01-1324) at the November meeting that involved reusing the (32,10) TFCI coding scheme in the current 3GPP specification for CQI, using only the first five bases sequence (resulting in a (32,5) code), and applying a particular puncturing pattern, to arrive at a (20,5) code. Ex. 1013, 1–2. Samsung explained that "reusing the existing code is [more] important than the performance of the coding scheme," but also noted that its proposal optimized performance because "[g]enerally, the performance of the block coding scheme is decided by the minimum distance." *Id.* at 2. Samsung also noted that its proposal had an optimum minimum distance of 9 for each bit size from one to five, unlike Ericsson's proposal, where the minimum distance increased when a code size of fewer than five bits was used. *Id.* at 2–3.

At the next 3GPP meeting from January 8–11, 2002, in Espoo, Finland, Philips made the proposal reflected in Philips46. Ex. 1004. Philips explained that "[a]s well as maximising minimum distance, it is also desirable that if possible the most significant bits of the data are better protected than the least significant bits," which "would reduce the probability that transmission errors would result in large errors in the received channel quality value." *Id.* at 1. Philips46 explains that its proposal "gives significant extra protection to the MSB, and a little more robustness to the next most significant bit." *Id.* Additionally, Philips submitted a graph showing that its proposal had a lower RMS error than the Ericsson and Samsung proposals. *Id.* at 2–3.

IPR2021-00908
Patent 7,319,718 B2

At the January meeting, Samsung presented a paper comparing the Philips proposal to Samsung's proposal. Ex. 2006, Ex. C, R1-02-0164; Ex. 1006, 21. The paper presented a simulation showing that "the BER performance of the [Samsung proposal] is better than that of the [Philips proposal]," and thus "the comparison shown in [the Philips paper] is not fair and hence it is expected that there will be no realistic gain from the [Philips proposal]." R1-02-0164, 1. Accordingly, Samsung recommended that its proposal be adopted. *Id.* The meeting notes state that "Philips seemed to disagree with [Samsung's] proposal." Ex. 1006, 21. Nokia also expressed the view that "[b]ased on the contributions seen so far," Samsung's proposal "looks most promising" and "is proposed to be added into" the standard. Ex. 1021, 2; Ex. 1006, 20.

At the next meeting on February 18–22, 2002, in Orlando, Florida, LGE presented a paper (TSGR1#24-02-0362) proposing the (20,5) coding scheme recited in claim 1 of the '718 patent, which was described as "Case 3." Ex. 2006 ¶¶ 38–42, Ex. C, TSGR1#24-02-0362, 3. The LGE paper compared the Ericsson, Samsung, and Philips proposals "with respect to BER performance, unequal error protection (RMS error reduction)[,] and system throughput." Ex. 2006, Ex. C, TSGR1#24-02-0362, 1. The paper noted that these "coding schemes have tradeoffs between BER and unequal error protection" and, "[i]n order for [a] fair comparison, it seems reasonable to consider the system throughput as one criteria." *Id.* The paper found that the Ericsson and Samsung proposals performed the best with respect to BER, but worst with respect to RMS (unequal error protection) and system throughput. *Id.* at 4–5. The Philips proposal did not perform best on any measure, but was second best at RMS and system throughput. *Id.* The LGE

30

approach that is the subject of claim 1 of the '718 patent (Case 3) performed best on system throughput and unequal error protection, but worst in BER. The paper presented the following graph in Figure 7 comparing the proposals' performance with respect to system throughput:



<Fig 7> System Level Simulation Results of CQI coding schemes

*Id.* at 5.  The paper concluded by noting that "[f]rom [a] performance point of view, there is a trade off between BER and RMS error," but "it could desirable to use the system throughput as one of the criteria in order to select [an] optimum CQI coding scheme."  *Id.*

The minutes from the February 2002 meeting report that LGE's proposal was discussed, and that "Samsung commented that they consider the Samsung proposal [to be] the best proposal" and had "some doubts on the simulation results presented in [LGE's] paper."  Ex. 1007, 23. According to the minutes, "Philips supported this paper."  *Id.*  In the next meeting, from April 9–12 in Paris, LGE and Philips jointly submitted another paper "present[ing] additional simulation results" confirming that the LGE proposal "shows better throughput than any other cases," and

IPR2021-00908
Patent 7,319,718 B2

"propos[ing] that the basis sequence table for [LGE's proposal] be included for CQI coding in in TS." Ex. 2006, Ex. C, TSGR1#25-02-0653, 1, 4. According to Dr. Smith, 3GPP ultimately incorporated LGE's proposal into the standard, which Petitioner does not dispute. Ex. 2006 ¶ 55.

We find credible Dr. Smith's testimony that the 3GPP members who were participating in these discussions were experts in the field whose level of skill was well above the level of the person of ordinary skill in the art that we have adopted in this Decision (a person with a Bachelor's degree in electrical engineering, computer engineering, or a similar discipline with approximately two years of signal processing experience). Ex. 2006 ¶ 48. The 3GPP history shows that these experts had difficulty agreeing on what criteria to use and prioritize in coming up with a CQI coding scheme, with Samsung and Nokia focusing on reusing prior codes and BER, Philips focusing on RMS, and LGE focusing on system throughput. Indeed, even after LGE made its proposal, Samsung expressed doubts as to this proposal and considered its own proposal to be better, which further supports the conclusion that the benefits of LGE's proposal were not immediately obvious even to experts in the field. *See* Ex. 1007, 23.

Furthermore, the 3GPP history shows that the Philips46 proposal, upon which Petitioner focuses, was itself the subject of disagreement, with Samsung stating that Philips's simulation "is not fair" and there "will be no realistic gain" from it, and preferring their own proposal. Ex. 2006, Ex. C, R1-02-0164; Ex. 1006, 21. Nokia agreed with Samsung's approach, and there is no indication that Ericsson or LGE agreed with Philips's proposal. Ex. 1021, 2; Ex. 1006, 20–21. Moreover, even if one were to start with the Philips proposal, we find insufficient evidence that one of ordinary skill

IPR2021-00908
Patent 7,319,718 B2

would have been motivated to modify it to swap the last two bits of the last row of the table as Petitioner proposes, particularly in light of the 3GPP history. Despite Philips's recognition that it is beneficial to "give significant extra protection to the MSB," Philips did not propose doing so by swapping the last two bits of the last row, and there is no evidence that any of the other 3GPP members did so before LGE's proposal. And, as discussed above, credible evidence shows that the relationship between the CQI coding scheme and system performance was not well understood at the time. Ex. 2006 ¶¶ 28, 48–49. Thus, we find insufficient evidence that one of ordinary skill would have understood, prior to LGE's proposal, that swapping the last two digits of Philips46 "would decrease the aggregate magnitude of transmission errors" as Petitioner contends. Pet. Reply 4. We also find insufficient evidence that one of ordinary skill would have understood, at the relevant time, that the bits in the table were "result effective variables" that could be modified with readily predictable results on overall system performance. Pet. 37–38; Pet. Reply 5–6. And, even if Dr. Clark were correct that "there were a limited number of ways to extend the (16,5) TFCI basis sequences in a way that protects the MSBs better than the LSBs (*see* Ex. 1002 ¶¶ 114–115), the 3GPP history indicates that there was no consensus at the relevant time that this was the preferred approach that should be the focus of the 3GPP's efforts.

We also do not agree with Petitioner's argument that Philips46 actually provides better throughput than the '718 patent using Dr. Smith's metrics. Pet. Reply 9. Petitioner relies on Figure 7 in Section 4.3 of LGE's TSGR1#24-02-0362 submission, but Petitioner's argument points only to

IPR2021-00908
Patent 7,319,718 B2

the result at the value of 6 on the x-axis of the figure, as shown by the red box in Petitioner's annotated version of Figure 7 reproduced below.



&lt;Fig 7&gt; System Level Simulation Results of CQI coding schemes

At best, Petitioner's argument shows that the results at the value of 6 on the x-axis are nearly identical between the various approaches. However, Petitioner does not dispute that the LGE approach (Case3) shows an improvement as compared to the other approaches over the values of -3 to 3 on the graph. Pet. Reply 9–11. This is in line with TSGR1#24-02-0362 and TSGR1#25-02-0653 (running additional simulations), which both report that Case3 (the LGE proposal) produces the best throughput results. TSGR1#24-02-0362, 5; TSGR1#25-02-0653, 2–3. The fact that the difference between the approaches diminishes as one approaches a value of 6 on the x-axis does not detract from the evidence showing that, overall, the LGE approach had the best throughput results.

Finally, we are not persuaded by Petitioner's argument that "[t]he '718 patent does not claim or describe any throughput advantages commensurate in scope with the claimed process." Pet. Reply 5. The fact that claim 1 does not expressly mention throughput does not help

34

IPR2021-00908
Patent 7,319,718 B2

Petitioner's case. Philips46 does not disclose the table recited in claim 1 of the '718 patent and, as discussed above, Petitioner has failed to sufficiently show that one of ordinary skill would have been motivated to modify Philips46 to achieve the table in claim 1. Whether claim 1 expressly recites a throughput advantage is not material to this conclusion. As for the disclosures of throughput in the specification, we find that, as discussed above, the '718 specification, Dr. Smith's testimony, and the 3GPP submissions by LGE and LGE and Philips support a conclusion that the table in claim 1 achieves better throughput performance than the table in Philips46.

### g) Summary for Claim 1

Based on the full trial record, Petitioner has not proven by a preponderance of the evidence that claim 1 would have been obvious over Philips46.

### 3. Independent Claims 15 and 19

Petitioner contends that independent claims 15 and 19 would have been obvious for the same reasons as independent claim 1. Pet. 50–51, 52–54. For the reasons discussed in Section II.D.2 above, we find that Petitioner has failed to prove by a preponderance of the evidence that claims 15 and 19 would have been obvious over Philips 46.

### 4. Dependent Claims 2, 4–5, and 16–18, and 20–23

Petitioner contends that dependent claims 2, 4–5, 16–18, and 20–23 would have been obvious over Philips46. Pet. 48–50, 51–52, 54–55. Because Petitioner has failed to prove obvious of independent claims 1, 15, and 19, Petitioner has necessarily failed to prove obviousness of dependent

35

IPR2021-00908
Patent 7,319,718 B2

claims 2, 4–5, 16–18, and 20–23, which depend from those independent claims.

E.  *Ground 2: Obviousness of Claims 6, 7, and 9–13 Based on Philips46 and Nokia*

Petitioner contends that claims 6, 7, and 9–13 would have been obvious over the combination of Philips46 and Nokia.  Pet. 29, 55–62. Patent Owner disagrees.  PO Resp. 21–22.

1.  *Overview of Nokia (Ex. 1021)*

Relying on the testimony of Mr. Bishop, Petitioner asserts that Nokia "is a TDoc titled 'Channel coding and error detection for uplink QI signaling' that was submitted to TSG-RAN WG1#23 for a meeting that took place in Espoo, Finland, on January 8th–11th, 2002."  Pet. 34 (citing Ex. 1015 ¶¶ 87–90; Ex. 1002 ¶¶ 83–84).  According to Petitioner and Mr. Bishop, "[o]n January 4, 2002, Nokia was distributed via the TSG RAN WG1 email list, and on January 6, 2002, it was also uploaded to the 3GPP public file repository."  *Id.* (citing Ex. 1015 ¶¶ 87–90).  Thus, Petitioner contends, Nokia was "publicly available as of January 4 and/or 6, 2002," and "provides evidence that the claimed subject matter was known by others in this country before any invention by the applicant."  *Id.* at 34–35 (citing Ex. 1015 ¶ 90; Ex. 1002 ¶ 84).  Patent Owner does not contest the prior art status of Nokia.  *See* PO Resp.  Based on the evidence of record, Petitioner has sufficiently established that Nokia qualifies as prior art.

Nokia describes a number of proposals for "channel coding and error detection for uplink quality indication (QI) signalling."  Ex. 1021, 1.  In one such proposal, Nokia describes the "[e]xtension of (16,5) TFCI code" "with each code word extended with the four least reliable information bits."  *Id.*

36

**Appx36**

IPR2021-00908
Patent 7,319,718 B2

    2.   *The Philips46-Nokia Combination*

Petitioner argues that Nokia was presented at the same meeting as Philips46 and specifically referenced in Philips 46.  Pet. 55 (citing Ex. 1002 ¶¶ 74, 83, 185; Ex. 1004, 3).  Petitioner contends that one of ordinary skill "would have been interested in the 'Previous contributions' referenced in the first sentence of Philips46 and would have been motivated to look at Nokia as background information, as specifically directed to by Philips46." *Id.* at 56 (citing Ex. 1004, 1; Ex. 1002 ¶ 185).

"In the proposed combination," Petitioner asserts, "the known (16,5) [code] is used to create a 16-bit codeword."  Pet. 57 (citing Ex. 1002 ¶ 91).  According to Petitioner, "Nokia confirms that, when appending additional bits, they are added to the end of the 16 coded bits from the bi-orthogonal (16,5) TFCI coding scheme." *Id.* (citing Ex. 1021, 1).  Petitioner notes that, in Nokia, the appended bits are the four least reliable bits, but Philips46 states that it is "desirable . . . if possible [that] the most significant bits of the data are better protected than the least significant bits." *Id.* (citing Ex. 1021, 1; Ex. 1004, 1).  Petitioner argues that, to accomplish this goal, one of ordinary skill "would have appended the MSB of data ($a_4$) of the information bits four times to provide the most protection possible to the MSB, instead of appending the four bits of Nokia." *Id.*

    3.   *Analysis of Independent Claim 6*

        a)  *[6.1]:  "[a] method of coding channel quality information (CQI), comprising the steps of:"*

Petitioner asserts that, to the extent the preamble of claim 1 is limiting, Nokia discloses this limitation.  Pet. 57.  Petitioner asserts that "Nokia describes the use of a (16,5) TFCI code, which is used to code uplink quality indication information," and one of ordinary skill "would know this

IPR2021-00908
Patent 7,319,718 B2

quality information is channel quality information, or CQI." *Id.* (citing Ex. 1021, 1; Ex. 1002 ¶ 187). Petitioner further argues that "Philips46 confirms that the 3GPP was developing a method of coding channel quality information." *Id.* at 57–58.

Patent Owner does not present arguments regarding the preamble. *See* PO Resp. 22–23; PO Sur-reply 12–14.

We agree with Petitioner that the cited disclosures of Nokia teach a method of coding channel quality information (CQI), as recited in the preamble.

> b) [6.2]: *"providing information bits $a_0$, $a_1$, $a_2$, $a_3$, and $a_4$;"*

Petitioner argues that "Nokia states that four or five information bits are assumed," and that one of ordinary skill "would know that, when a (16,5) code is used, there would be five bits provided." Pet. 58 (citing Ex. 1021, 1; Ex. 1002 ¶ 188). For example, Petitioner argues, "in the '5 bits TFCI case, the default TFCI coding scheme use the only 5 bases, say, $M_{0,i}$, $M_{1,i}$, $M_{2,i}$, $M_{3,i}$, $M_{4,i}$.'" *Id.* (citing Ex. 1021, 1). "Further," Petitioner asserts, "Philips46 confirms five information bits, $a_0$, $a_1$, $a_2$, $a_3$, and $a_4$, were contemplated by 3GPP." *Id.*

Patent Owner does not present arguments regarding this limitation. *See* PO Resp. 22–23; PO Sur-reply 12–14.

We agree with Petitioner that Nokia and Philips46 teach this limitation. Specifically, we agree that these references disclose providing information bits $a_0$, $a_1$, $a_2$, $a_3$, and $a_4$, where $a_0$ is the least significant bit and $a_4$ is the most significant bit.

IPR2021-00908
Patent 7,319,718 B2

c) *[6.3]: "providing five basis sequences $M_{i,n}$ for a (20,5) TFCI code;"*

Petitioner argues that both Philips and Nokia disclose the use of five basis sequences, and that one of ordinary skill would have found it obvious to provide five basis sequences when encoding five information bits. Pet. 58 (citing Ex. 1004, 1; 1021, 1; Ex. 1002 ¶ 189).

Patent Owner does not present arguments regarding this limitation. *See* PO Resp. 22–23; PO Sur-reply 12–14.

We agree with Petitioner that Nokia and Philips46 teach this limitation. Specifically, we agree that these references disclose providing five basis sequences $M_{i,n}$ for a (20,5) TFCI code.

d) *[6.4]: "encoding the information bits by combining the information bits with the basis sequences;"*

Petitioner argues that "Nokia depicts the encoding of n information bits using the (16,5) code" in Nokia's Figure 1, and that this figure "is similar to what is depicted in Figure 4 of the '718 patent." Pet. 59 (citing Ex. 1021, 1, Fig. 1; Ex. 1001, Fig. 4). Petitioner asserts that "Philips46 also confirms that 3GPP was working on encoding CQI information bits using codes comprising basis sequences." *Id.* According to Petitioner, one of ordinary skill "would understand that this combination occurs through a multiplication of the (1,5) vector of information bits by the (16,5) matrix of the code, resulting in 16 coded bits." *Id.* (citing Ex. 1002 ¶¶ 42–47, 90, 190–191).

Patent Owner does not present arguments regarding this limitation. *See* PO Resp. 22–23; PO Sur-reply 12–14.

39

IPR2021-00908
Patent 7,319,718 B2

We agree with Petitioner that Nokia and Philips46 teach this limitation. Specifically, we agree that these references disclose encoding information bits by combining them with the basis sequences.

>    e)    [6.5]: "generating an intermediate codeword;"

Petitioner argues that "Nokia generates a 16-bit codeword (i.e., an intermediate codeword that is subsequently acted upon to form the 20-bit codeword of the next element) from the encoding described above." Pet. 59 (citing Ex. 1021, 1, Fig. 1; Ex. 1002 ¶¶ 192–193).

Patent Owner does not present arguments regarding this limitation. *See* PO Resp. 22–23; PO Sur-reply 12–14.

We agree with Petitioner that Nokia teaches this limitation. Specifically, we agree that Nokia discloses generating an intermediate 16-bit codeword that is subsequently acted on to form a 20-bit codeword.

>    f)    [6.6]: "adding a further bit repeated four times to generate a
>           20-bit codeword."

Petitioner argues that "Nokia states that the created 16-bit intermediate codeword is 'extended with the four least reliable information bits.'" Pet. 60 (citing Ex. 1021, 1). Because "Nokia explicitly states [that] four bits are added to the intermediate codeword," Petitioner asserts, one of ordinary skill in the art "would know that, in at least some instances, these four bits would be the same bit, such that in those instances, a single bit repeated four times would be added." *Id.* (citing Ex. 1002 ¶¶ 63, 194). According to Petitioner, "[t]his element does not specify what bit is added, only that an additional bit is added," which is supported by the fact that "claim 9 requires 'the further bit repeated four times is one of the information bits,' meaning that for this claim, only a bit need be appended,

IPR2021-00908
Patent 7,319,718 B2

not tied to any specific information bit or other origin." *Id.* "Nevertheless," Petitioner contends, "as noted in Nokia, the information bits that are explicitly added are the first four bits from the five information bits." *Id.* (citing Ex. 1021, 1). Dr. Clark further testifies that one of ordinary skill would "understand that extending the intermediate codeword, generated from the (16,5) TFCI code, could be accomplished by repeating row 15 to generate a 20-bit codeword," and that it would have been obvious to do so. Ex. 1002 ¶ 194.

Based on these disclosures, and relying on Dr. Clark, Petitioner argues, one of ordinary skill in the art "would find this element disclosed by Nokia, or at a minimum rendered obvious by Nokia," and thus that this claim would have been obvious based on the combination of Philips46 and Nokia. Pet. 60 (citing Ex. 1002 ¶ 194).

Patent Owner argues that Nokia does not "disclose adding *the same bit*, (i.e., 'a further bit *repeated*,') four times to a codeword, as is disclosed by the '718 patent," but instead discloses that "a codeword is 'extended with the four least reliable *information bits*'" $a_0$, $a_1$, $a_2$, $a_3$, and $a_4$. PO Resp. 21–22 (citing Pet. 60; Ex. 2006 ¶ 57; Ex. 1021, 1). "However," according to Patent Owner, claim 6 discloses "repeating only one of the information bits four times." *Id.* at 22. Thus, Patent Owner asserts, "Nokia does not disclose the claimed bit being 'repeated four times to generate a 20-bit codeword,' but merely extending a codeword by adding 'the four least reliable information bits.'" *Id.* at 22 (citing Ex. 1001, claim 6; Ex. 1021, 1). According to Patent Owner, "Petitioner's assertion that there may be a circumstance where Nokia identifies the four least reliable information bits and those bits happen to be identical misses the mark" because "the methods

41

of Nokia and the '718 patent fundamentally differ," and Petitioner has provided no basis for why one of ordinary skill "would find it obvious to make the leap from Nokia's method of repeating the four least reliable bits to the '718 patent's method of repeating a single information bit four times." *Id.*

Petitioner responds that "the combination, as proposed, is based on the information on the face of Philips46 itself." Pet. Reply 13. Petitioner acknowledges that "[i]n Nokia, the appended bits are the 'four least reliable information bits," but argues that Philips46 discloses that "it is also desirable that if possible the most significant bits of the data are better protected than the least significant bits." *Id.* (citing Ex. 1021, 1; 1004, 1). "To accomplish this stated goal of providing protection to the most significant bits," according to Petitioner, one of ordinary skill "would have appended the MSB of data ($a_4$) of the information bits four times to the resulting codeword of Nokia to provide the most protection possible to the MSB, instead of appending the four bits suggested by Nokia." *Id.* at 13–14. Petitioner asserts that this "results in the same 20 bit codeword that would result from the modification to Philips46" discussed in connection with Ground 1. *Id.* at 14.

Patent Owner responds that Petitioner's arguments for Ground 2 suffer from the same issues as those for Ground 1, namely that one of ordinary skill "at the time of the invention engaging in MSB protection would encounter the very same dilemma encountered by 3GPP: attempts to optimize BER comes at the cost of RMS error metrics and vice versa." PO Sur-reply 12–13 (citing Ex. 2006 ¶ 41).

IPR2021-00908
Patent 7,319,718 B2

At the hearing, Petitioner's counsel acknowledged that, for claim 6, it is raising "the same argument, the same issue as is raised on claim 1." Tr. 23:11–12. As Petitioner's counsel explained, "[c]laim 1 provides you with a specific recitation of what the basis sequences are but the verbal recitation" in claim 6 "adding a further bit repeated four times to generate a 20-bit codeword boils down to that same fact." *Id.* at 23:12–15. "[T]hus," according to Petitioner, "we don't believe that claim 6 is patentable for the same reasons that we believe that claim 1 is unpatentable." *Id.* at 23:23–25.

As Petitioner acknowledged at the hearing, Petitioner's argument for this element of claim 6 hinges on the same arguments Petitioner made for why one of ordinary skill would have been motivated to swap the last two bits of the last row of Philips46. For the reasons discussed in Section II.D.2(f) above, we find that Petitioner has failed to prove by a preponderance of the evidence that one of ordinary skill would have been motivated to modify Philips46 as proposed. We also agree with Patent Owner that Nokia does not disclose repeating one of the information bits four times, as claim 6 requires, but rather discloses that each codeword is "extended with the four least reliable information bits." Ex. 1021, 1. Finally, we agree with Patent Owner that and that Petitioner has not sufficiently shown that one of ordinary skill would have found it obvious to alter Nokia's method of repeating the four least reliable bits in order to achieve the '718 patent's method of repeating a single information bit four times. PO Resp. 22.

IPR2021-00908
Patent 7,319,718 B2

### g) Summary for Claim 6

Based on the full trial record, Petitioner has not proven by a preponderance of the evidence that claim 6 would have been obvious over Philips6 and Nokia.

### 4. Claims 7 and 9–13

Petitioner contends that dependent claims 7 and 9–13 would have been obvious over Philips46 and Nokia. Pet. 61–62. Because Petitioner has failed to prove obvious of independent claim 6, Petitioner has necessarily failed to prove obviousness of dependent claims 7 and 9–13, which depend from independent claim 6.

### III.    CONCLUSION

For the reasons discussed above, Petitioner has not proven, by a preponderance of the evidence, that any of the challenged claims are unpatentable, as summarized in the following table:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 4, 5, 15–23 | 103(a) | Philips46 | | 1, 2, 4, 5, 15–23 |
| 6, 7, 9–13 | 103(a) | Philips46, Nokia | | 6, 7, 9–13 |
| **Overall Outcome** | | | | 1, 2, 4–7, 9–13, 15–23 |

### IV.    ORDER

Accordingly, it is

ORDERED that claims 1, 2, 4–7, 9–13, 15–23 of the '718 patent have not been shown to be unpatentable; and

44

IPR2021-00908
Patent 7,319,718 B2

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2021-00908
Patent 7,319,718 B2


PETITIONER:

Benjamin E. Weed
Erik J. Halverson
Brian Paul Bozzo
K & L GATES LLP
benjamin.weed.PTAB@klgates.com
erik.halverson@klgates.com
brian.bozzo@klgates.com

Meredith Martin Addy
Robert P. Hart
Gregory B. Gulliver
ADDYHART P.C.
meredith@addyhart.com
robert@addyhart.com
gbgulliver@addyhart.com


Amanda Tessar
Daniel T. Keese
David St. John-Larkin
Kourtney Merrill
Roderick O'Dorisio
PERKINS COIE LLP
tessar-ptab@perkinscoie.com
dkeese@perkinscoie.com
dlarkin@perkinscoie.com
merrill-ptab@perkinscoie.com
odorisio-ptab@perkinscoie.com

Jeremy D. Peterson
Bradford A. Cangro
PV Law LLP
jeremy.peterson@pvuslaw.com
bradford.cangro@pvuslaw.com


46

IPR2021-00908
Patent 7,319,718 B2


Jacob K. Baron
Allison M. Lucier
HOLLAND & KNIGHT
jacob.baron@hklaw.com
allison.lucier@hklaw.com

John Hutchins
Chunhsi Mu
Craig Kronenthal
Wesley Jones
Banner Witcoff, Ltd.
jhutchins@bannerwitcoff.com
amu@bannerwitcoff.com
ckronenthal@bannerwitcoff.com
wjones@bannerwitcoff.com

PATENT OWNER:

Timothy Devlin
Devlin Law Firm LLC
tdevlin@devlinlawfirm.com

47



US007319718B2

(12) **United States Patent**
Roh et al.

(10) Patent No.: **US 7,319,718 B2**
(45) **Date of Patent:** **Jan. 15, 2008**

(54) **CQI CODING METHOD FOR HS-DPCCH**

(75) Inventors: **Dong Wook Roh**, Seoul (KR); **Min Seok Oh**, Seoul (KR); **Joon Kui Ahn**, Seoul (KR)

(73) Assignee: **LG Electronics Inc.**, Seoul (KR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1086 days.

(21) Appl. No.: **10/365,498**

(22) Filed: **Feb. 13, 2003**

(65) **Prior Publication Data**

US 2003/0174669 A1    Sep. 18, 2003

(30) **Foreign Application Priority Data**

Feb. 16, 2002    (KR) ...................... 10-2002-0008350

(51) **Int. Cl.**
**H04B 17/00**    (2006.01)

(52) **U.S. Cl.** ...................... **375/224**; 375/240; 375/261; 370/442; 370/491; 370/328; 455/69; 455/452.2; 714/769; 714/755

(58) **Field of Classification Search** ................ 370/442, 370/491, 328; 455/69, 452, 452.2; 375/224, 375/240, 261; 714/769, 755
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2002/0141436 | A1 * | 10/2002 | Toskala | 370/442 |
| 2003/0157900 | A1 * | 8/2003 | Gaal et al. | 455/69 |
| 2003/0185242 | A1 * | 10/2003 | Lee et al. | 370/491 |
| 2004/0058687 | A1 * | 3/2004 | Kim et al. | 455/452.2 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1 248 485 A1 | 10/2002 |
| EP | 1 289 167 A1 | 3/2003 |

| | | |
|---|---|---|
| KR | 1020020039121 | 5/2002 |
| KR | 1020020062471 | 7/2002 |
| KR | 1020030035293 | 5/2003 |
| KR | 1020030035605 | 5/2003 |

OTHER PUBLICATIONS

3GPP TS 25.222; Version 5.3.0 Release 5; Dec. 2002.
3GPP TS 25.212; Version 5.0.0 Release 5; Mar. 2002.
3GPP TS 25.212; Version 2.3.0; Oct. 1999.
Ericsson, "Coding for Channel-Quality-Related Information," 3GPP TSG-RAN #22, Nov. 19-23, 2001, Cheju, Korea , R1-01-1144.
LG Electronics Inc., "Uplink QI Signaling with Error-Detection Capability," TSG-RAN Working Group 1 #22, Nov. 19-23, 2001, Jeju, Korea, Tdoc R1-01-1135.
Samsung, "Coding Scheme for Quality Indicator (rev. 1)," 3GPP TSG-RAN 1 #22, Nov. 22-23, 2001, Jeju, Korea, R1-01-1324.
Philips, "Performance Requirements for Channel Quality Signalling," TSG RAN WG1 #22, Nov. 19-23, 2001, Jeju, South Korea, TSGR1(01)1204.
Philips, "Coding of Channel Quality Information," 3GPP TSG RAN WG1 #23, Jan. 8-11, 2002, Espoo, Finland, Tdoc R1-02-0046.
Japanese Office Action dated Sep. 5, 2006.

* cited by examiner

*Primary Examiner*—Chieh M. Fan
*Assistant Examiner*—Eva Zheng
(74) *Attorney, Agent, or Firm*—KED & Associates, LLP

(57) **ABSTRACT**

In the channel quality information (CQI) coding method of the present invention, first basis sequences for generating sub-codes of 32 bits are created, and second basis sequences for generating codewords of 20 bits are created using the first basis sequences, the second basis sequence maximizing system throughput such that five information bits are coded into CQI code using the second basis sequences. Also, since HSDPA system has been designed in order to increase the system throughput, the CQI coding method of the present invention, which shows the best system throughput in the simulation, can be the optimum CQI coding scheme for HS-DPCCH.

28 Claims, 6 Drawing Sheets



5 bits → (32, 5) expurgated TFCI code → 13 coded bit puncturing & 1 coded bit repetition → 20 coded bits →

IPR2021-00908   Honeywell Exh. 1001 - Page 1 of 16
(Honeywell International, Inc., et al. v. 3G Licensing S.A.)

Appx48

Case: 23-1354    Document: 32    Page: 142    Filed: 07/07/2023

FIG.1

PRIOR ART



IPR2021-00908   Honeywell Exh. 1001  -  Page 2 of 16
(Honeywell International, Inc., et al. v. 3G Licensing S.A.)

**Appx49**

## FIG.2
**PRIOR ART**



## FIG.3a
**PRIOR ART**



## FIG.3b
**PRIOR ART**



IPR2021-00908   Honeywell Exh. 1001  -  Page 3 of 16
(Honeywell International, Inc., et al. v. 3G Licensing S.A.)

FIG.4
PRIOR ART



FIG.5a
PRIOR ART



FIG.5b
PRIOR ART

| Puncturing pattern | Used basis |
|---|---|
| 2, 4, 5, 6, 8, 9. 10, 11, 12, 13, 14, 30 | $M_{0,l}$, $M_{1,l}$, $M_{2,l}$, $M_{3,l}$, $M_{4,l}$ |

IPR2021-00908   Honeywell Exh. 1001  -  Page  4 of 16
(Honeywell International, Inc., et al. v. 3G Licensing S.A.)

FIG.6

PRIOR ART



5 bits → (20,5) CQI code extending (16,5) TFCI code → 20 coded bits

FIG.7a



5 bits → (32, 5) expurgated TFCI code → 13 coded bit puncturing & 1 coded bit repetition → 20 coded bits

FIG.7b

| Puncturing pattern | Repetition pattern | Used basis |
|---|---|---|
| 0, 2, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 30 | 31 | $M_{0,I}$, $M_{1,I}$, $M_{2,I}$, $M_{3,I}$, $M_{4,I}$ |

IPR2021-00908   Honeywell Exh. 1001  -  Page 5 of 16
(Honeywell International, Inc., et al. v. 3G Licensing S.A.)

FIG.8a



FIG.8b

| Puncturing pattern | Repetition pattern | Used basis |
|---|---|---|
| 0, 1, 2, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 30 | 31, 31 | $M_{0,i}$, $M_{1,i}$, $M_{2,i}$, $M_{3,i}$, $M_{4,i}$ |

IPR2021-00908   Honeywell Exh. 1001  -  Page 6 of 16
(Honeywell International, Inc., et al. v. 3G Licensing S.A.)

Appx53

FIG.9a



5 bits → (32, 5) expurgated TFCI code → 16 coded bit puncturing & 1 coded bit four times repetition → 20 coded bits

FIG.9b

| Puncturing pattern | Repetition pattern | Used basis |
|---|---|---|
| 0, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 30 | 31, 31, 31, 31 | $M_{0,i}$, $M_{1,i}$, $M_{2,i}$, $M_{3,i}$, $M_{4,i}$ |

IPR2021-00908   Honeywell Exh. 1001  -  Page 7 of 16
(Honeywell International, Inc., et al. v. 3G Licensing S.A.)

US 7,319,718 B2

1

## CQI CODING METHOD FOR HS-DPCCH

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a wireless communication system and, more particularly, to a reliable uplink channel quality information (CQI) coding method for HS-DPCCH in HSDPA system for 3GPP.

2. Description of the Background Art

The UMTS (Universal Mobile Telecommunications System) is the third generation mobile communication system evolved from a GSM (Global System for Mobile Communications) and a European style mobile communication standard. It is intended to provide improved mobile communication services on the basis of a GSM core network (CN) and a Wideband Code Division Multiple Access (WCDMA) access technology.

For the purpose of making a standard for third generation mobile communication systems (IMT-2000 systems) based on evolved GSM core network and WCDMA radio access technology, a group of standard developing organizations including ETSI of Europe, ARIB/TTC of Japan, T1 of U.S., and TTA of Korea established the Third Generation Partnership Project (3GPP).

For the purpose of efficient management and technological development, five Technical Specification Groups (TSGs) are organized under 3GPP in consideration of network construction factors and their operations.

Each TSG is in charge of approving, developing and managing specifications related to a pertinent area. Among them, RAN (Radio Access Network) group has developed functions, requirements and interface specifications related to UE (User Equipment) and UMTS terrestrial radio access network (UTRAN) in order to set a new radio access network specification to the third generation mobile communication system.

The TSG-RAN group consists of one plenary group and four working groups.

WG1 (Working Group 1) has been developing specifications for a physical layer (Layer 1), and WG2 has been specifying functions of a data link layer (Layer 2) between UE and UTRAN. In addition, WG3 has been developing specifications for interfaces among Node Bs (the Node B is a kind of base station in the wireless communications), Radio Network Controllers (RNCs) and the core network. Lastly, WG4 has been discussing requirements for radio link performance and radio resource management.

FIG. **1** illustrates a structure of the UTRAN defined in 3GPP.

As depicted in FIG. **1**, the UTRAN **110** includes at least one or more radio network sub-systems (RNSs) **120** and **130**, and each RNS includes one RNC and at least one or more Node Bs. For example, Node B **122** is managed by RNC **121**, and receives information transmitted from the physical layer of the UE **150** through an uplink channel and transmits a data to the UE **150** through a downlink channel.

Accordingly, the Node B is considered to work as an access point of the UTRAN from the UE point of view.

The RNCs **121** and **131** perform functions of allocation and management of radio resources of the UMTS and are connected to a suitable core network element depending on types of services provided to users.

For example, the RNCs **121** and **131** are connected to a mobile switching center (MSC) **141** for a circuit-switched communication such as a voice call service, and are con-

2

nected to a SGSN (Serving GPRS Support Node) **142** for a packet switched communication such as a radio Internet service.

The RNC in charge of a direct management of the Node B is called a Control RNC (CRNC) and the CRNC manages common radio resources.

On the other hand, the RNC that manages dedicated radio resources for a specific UE is called a Serving RNC (SRNC). Basically, the CRNC and the SRNC can be co-located in the same physical node. However, if the UE has been moved to an area of a new RNC that is different from SRNC, the CRNC and the SRNC may be located at physically different places.

There is an interface that can operate as a communication path between various network elements. The interface between a Node B and a RNC is called a Iub interface, and an interface between RNC's is called an Iur interface. And an interface between the RNC and the core network is called an Iu.

High Speed Data Packet Access (HSDPA) is standardization work within the 3GPP for realizing high speed, high-quality wireless data packet services. To support HSDPA, various advanced technologies such as Adaptive Modulation and Coding (AMC), Hybrid Automatic Repeat Request (HARQ), Fast Cell Selection (FCS), Multiple Input Multiple Out (MIMO), and etc. are introduced.

Well known are the benefits of adapting the transmission parameters in a wireless system to the changing channel conditions. The process of modifying the transmission parameters to compensate for the variations in channel condition is known as link adaptation (LA) and AMC is one of the link adaptation techniques. The principle of AMC is to change the modulation and coding scheme according to variations in the channel conditions, subject to system restrictions. That channel conditions can be estimated based on feedback from the UE. In a system with AMC, the UEs in favorable positions, i.e., close to the cell site, are typically assigned higher order modulation with higher code rate (e.g. 64 QAM with R=¾ Turbo Code), while UEs in unfavorable positions, i.e., close to the cell boundary, are assigned lower order modulation with lower code rate (e.g. QPSK with R=½ Turbo Code). The main benefits of AMC are the higher data rate available for UEs in favorable positions which in turn increases the average throughput of the cell and the reduced interference variation due to link adaptation based on variations in the modulation/coding scheme instead of variations in transmit power.

In conventional ARQ, ARQ process should be performed along up to the upper layer of the UE and the node B, while in the HSDPA, ARQ process is conducted within the physical layer. The key characteristic of the HARQ is to transmit the un-transmitted portion of the encoded block when the NACK (No Acknowledgement) is received from the receiver, which enables the receiver to combine each portion of received codewords into the new codewords with the lower coding rate so as to obtain much coding gain. Another feature of the n-channel HARQ is that a plurality of packets can be transmitted on n channels even when an ACK/NACK (Acknowledgement/No acknowledgement) is not received unlike in the typically Stop and Wait ARQ which allows the node B to transmit the next packet only when the ACK signal is received from the receiver or to retransmit the previous packet when the NACK signal is received. In other words, the node B of HSDPA can transmit a plurality of next packets successively even if it does not receive the ACK/NACK for the previous transmitted packet, thereby increasing channel usage efficiency. Combining AMC and HARQ

IPR2021-00908   Honeywell Exh. 1001  -  Page 8 of 16
(Honeywell International, Inc., et al. v. 3G Licensing S.A.)

US 7,319,718 B2

**3**

leads to maximize transmission efficiency-AMC provides the coarse data rate selection, while HARQ provides fine data rate adjustment based on channel conditions.

FCS is conceptually similar to Site Selection Diversity Transmission (SSDT). Using FCS, the UE indicates the best cell which should serve it on the downlink, through uplink signaling. Thus while multiple cells may be members of the active set, only one of them transmits at a certain time, potentially decreasing interference and increasing system capacity. Determination of the best cell may not only be based on radio propagation conditions but also available resources such as power and code space for the cells in the active set.

MIMO is one of the diversity techniques based on the use of multiple downlink transmit/receiver antennas. MIMO processing employs multiple antennas at both the base station transmitter and terminal receiver, providing several advantages over transmit diversity techniques with multiple antennas only at the transmitter and over conventional single antenna systems.

Due to the introductions of these new schemes, new control signals are configured between the UE and the node B in HSDPA. HS-DPCCH is a modification to UL DPCCH for supporting HSDPA.

FIG. **2** shows a frame structure for uplink HS-DPCCH associated with HS-DSCH transmission. The HS-DPCCH carries uplink feedback signaling consisted of HARQ-ACK/NACK and channel-quality indicator (CQI). Each subframe of length 2 ms (3×2560 chips) consists of 3 slots, each of length 2560 chips. The HARQ-ACK/NACK is carried in the first slot of the HS-DPCCH subframe and the CQI is carried in the second and third slot of the HS-DPCCH subframe. There is at most one HS-DPCCH on each radio link and the HS-DPCCH can only exist together with an uplink DPCCH.

To support fast link adaptation, the UE is to provide node B with information about the downlink channel quality, i.e., CQI. Regarding the channel coding for HS-DPCCH CQI, a number of uplink CQI coding methods have been proposed and most proposals assume that the CQI is to be coded into 20 channel bits. The CQI coding methods are based on the Transmit Format Combination Indicator (TFCI) coding method of 3GPP specification. FIG. 3*a* shows a (16, 5) TFCI encoder, which is similar to the (32, 10) TFCI encoder in FIG. 3*b* except that five information bits are used so as to generate (16, 5) TFCI codeword. The basis sequences for (16, 5) TFCI code are shown in table 1a and the basis sequences for (32, 10) TFCI code are illustrated in table 1b.

Detailed methods of generating TFCI codeword are revisited below. First, (16, 5) TFCI encoding method is described. In table 1a, let the TFCI information bits $a_0$, $a_1$, $a_2$, $a_3$, $a_4$, and $M_{i,n}$ a basis sequence for n-th TFCI information bit. Then output codeword bits $b_i$ are given by

$$b_i = \sum_{n=0}^{4} (a_n \times M_{i,n}) \bmod 2 \quad \text{where} \quad i = 0,\ 1,\ 2,\ \ldots\ 15$$

The output bits are denoted by $b_i$, i=0, 1, 2, . . . 15.

In a similar manner, the generation of (32, 10) TFCI codeword can be defined. In table 1b, let the TFCI information bits $a_0$, $a_1$, $a_2$, $a_3$, $a_4$, $a_5$, $a_6$, $a_7$, $a_8$, $a_9$ and $M_{i,n}$ a basis sequence for n-th TFCI information bit. Then output codeword bits $b_i$ are given by

**4**

$$b_i = \sum_{n=0}^{9} (a_n \times M_{i,n}) \bmod 2 \quad \text{where} \quad i = 0,\ 1,\ 2,\ \ldots\ 31$$

The output bits are denoted by $b_i$, i=0, 1, 2, . . . 31.

The basis sequences for (16, 5) TFCI in Table 1a are included in the basis sequences for (32, 10) TFCI in Table 1b if the information bits are limited to the first 5 bits and the some 16 output bits are selected from 32 output bits. The common part between two basis sequences is highlighted by shadow in table 1b. The CQI coding method is based on the conventional TFCI coding method. The CQI requires 5 information bits and 20 coded bits, i.e. (20, 5) CQI code. Therefore, the (16, 5) TFCI code and (32, 10) TFCI coding method should be modified to fit the required number of bits for CQI coding. The (16, 5) TFCI code should be extended to (20, 5) CQI code by adding each basis sequence by 4 bits. The (32, 10) TFCI code can be used to generate (20, 5) CQI code through two steps. First, the (32, 10) TFCI code should be expurgated to the (32, 5) modified TFCI code by deleting last 5 basis sequences. Hereinafter the (32, 5) modified TFCI code by deleting last 5 basis sequences is referred to (32, 5) expurgated TFCI code. Secondly, the (32, 5) expurgated TFCI code should be punctured and repeated to meet the (20, 5) CQI code. The basis sequences for the (32, 5) expurgated TFCI code are as follows in table 1c. The common part of basis sequences between (16, 5) TFCI code and (32, 5) expurgated TFCI code is shadowed. The table 1c also include the basis sequences for (16, 5) TFCI code, i.e. table 1a. It means that the generating method based on the (32, 10) TFCI code can be represented by another form of generating method based on the (16, 5) TFCI code, vice versa.

TABLE 1a

| i | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| 1 | 0 | 1 | 0 | 0 | 1 |
| 2 | 1 | 1 | 0 | 0 | 1 |
| 3 | 0 | 0 | 1 | 0 | 1 |
| 4 | 1 | 0 | 1 | 0 | 1 |
| 5 | 0 | 1 | 1 | 0 | 1 |
| 6 | 1 | 1 | 1 | 0 | 1 |
| 7 | 0 | 0 | 0 | 1 | 1 |
| 8 | 1 | 0 | 0 | 1 | 1 |
| 9 | 0 | 1 | 0 | 1 | 1 |
| 10 | 1 | 1 | 0 | 1 | 1 |
| 11 | 0 | 0 | 1 | 1 | 1 |
| 12 | 1 | 0 | 1 | 1 | 1 |
| 13 | 0 | 1 | 1 | 1 | 1 |
| 14 | 1 | 1 | 1 | 1 | 1 |
| 15 | 0 | 0 | 0 | 0 | 1 |

IPR2021-00908   Honeywell Exh. 1001  -  Page 9 of 16
(Honeywell International, Inc., et al. v. 3G Licensing S.A.)

US 7,319,718 B2

5  6

TABLE 1b

| i | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ | $M_{i,5}$ | $M_{i,6}$ | $M_{i,7}$ | $M_{i,8}$ | $M_{i,9}$ |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| 1 | 0 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 |
| 2 | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| 3 | 0 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 1 | 1 |
| 4 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| 5 | 0 | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 0 |
| 6 | 1 | 1 | 1 | 1 | 0 | 1 | 0 | 1 | 0 | 0 |
| 7 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 1 | 0 |
| 8 | 1 | 0 | 0 | 1 | 0 | 1 | 1 | 1 | 1 | 0 |
| 9 | 0 | 1 | 0 | 1 | 0 | 1 | 1 | 0 | 1 | 1 |
| 10 | 1 | 1 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 1 |
| 11 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 1 | 0 |
| 12 | 1 | 0 | 1 | 1 | 0 | 1 | 0 | 1 | 0 | 1 |
| 13 | 0 | 1 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 1 |
| 14 | 1 | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 |
| 15 | 1 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 0 |
| 16 | 0 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 1 |
| 17 | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 1 |
| 18 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 1 | 1 |
| 19 | 1 | 0 | 1 | 0 | 1 | 1 | 0 | 1 | 0 | 1 |
| 20 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 1 | 1 | 1 |
| 21 | 1 | 1 | 1 | 0 | 1 | 1 | 0 | 1 | 1 | 1 |
| 22 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 1 | 0 | 0 |
| 23 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 1 |
| 24 | 0 | 1 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 1 |
| 25 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 | 0 | 0 |
| 26 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 | 1 | 0 |
| 27 | 1 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 |
| 28 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 |
| 29 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| 30 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| 31 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 |

TABLE 1c

| i | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 0 |
| 1 | 0 | 1 | 0 | 0 | 0 |
| 2 | 1 | 1 | 0 | 0 | 0 |
| 3 | 0 | 0 | 1 | 0 | 0 |
| 4 | 1 | 0 | 1 | 0 | 0 |
| 5 | 0 | 1 | 1 | 0 | 0 |
| 6 | 1 | 1 | 1 | 0 | 0 |
| 7 | 0 | 0 | 0 | 1 | 0 |
| 8 | 1 | 0 | 0 | 1 | 0 |
| 9 | 0 | 1 | 0 | 1 | 0 |
| 10 | 1 | 1 | 0 | 1 | 0 |
| 11 | 0 | 0 | 1 | 1 | 0 |
| 12 | 1 | 0 | 1 | 1 | 0 |
| 13 | 0 | 1 | 1 | 1 | 0 |
| 14 | 1 | 1 | 1 | 1 | 0 |
| 15 | 1 | 0 | 0 | 0 | 1 |
| 16 | 0 | 1 | 0 | 0 | 1 |
| 17 | 1 | 1 | 0 | 0 | 1 |
| 18 | 0 | 0 | 1 | 0 | 1 |
| 19 | 1 | 0 | 1 | 0 | 1 |
| 20 | 0 | 1 | 1 | 0 | 1 |
| 21 | 1 | 1 | 1 | 0 | 1 |
| 22 | 0 | 0 | 0 | 1 | 1 |
| 23 | 1 | 0 | 0 | 1 | 1 |
| 24 | 0 | 1 | 0 | 1 | 1 |
| 25 | 1 | 1 | 0 | 1 | 1 |
| 26 | 0 | 0 | 1 | 1 | 1 |
| 27 | 1 | 0 | 1 | 1 | 1 |
| 28 | 0 | 1 | 1 | 1 | 1 |
| 29 | 1 | 1 | 1 | 1 | 1 |
| 30 | 0 | 0 | 0 | 0 | 0 |
| 31 | 0 | 0 | 0 | 0 | 1 |

FIG. 4 illustrates an encoder for generating an extended (16, 5) TFCI code. In FIG. 4, (16, 5) TFCI code, is reused with each codeword extended with the four least reliable information bits for (20, 5) CQI code. This CQI coding scheme is designed so as to have the optimal minimum distance.

FIG. 5a illustrates an encoder for generating punctured (32, 5) expurgated TFCI code. In this CQI coding scheme, (32, 5) expurgated TFCI code with puncturing 12 symbols is proposed. The puncturing pattern and used basis sequences are as in FIG. 5b.

However, (20, 5) CQI coding schemes using the extended (16, 5) TFCI code in FIG. 4 and the punctured (32, 5) expurgated TFCI code in FIG. 5 are equivalent to each other. That is because the resultant basis sequences based on the (16, 5) TFCI code are the same as the resultant punctured basis sequences based on the (32, 5) expurgated TFCI code after puncturing. The only difference is the order of codeword bits. However, since the difference of bit position doesn't have any effect on the coding performances and properties, both coding schemes of FIG. 4 and FIG. 5 are equivalent each other.

Since the (20, 5) CQI coding scheme based on the (16, 5) TFCI code can be expressed as that based on the (32, 5) expurgated TFCI code, vice versa, the extended (16, 5) TFCI code and the punctured (32, 5) expurgated TFCI code are commonly expressed as the basis sequences in table 2. It means that the (20, 5) CQI coding scheme based on both the (16, 5) TFCI and (32, 5) expurgated TFCI code is to decide what the basis sequence pattern is in the blank in table 2. Hereinafter, the basis sequence part which is the same as 3GPP technical specifications will be omitted for convenience.

IPR2021-00908    Honeywell Exh. 1001  -  Page 10 of 16
(Honeywell International, Inc., et al. v. 3G Licensing S.A.)

Appx57

US 7,319,718 B2

**7**

TABLE 2

| i | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| . | . | . | . | . | . |
| . | . | . | . | . | . |
| . | . | . | . | . | . |
| 14 | 1 | 1 | 1 | 1 | 1 |
| 15 | 0 | 0 | 0 | 0 | 1 |
| 16 | To be filled with the extended patterns in the embodiments | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |

FIG. **6** illustrates another encoder for generating extended (16, 5) TFCI code. In order to extend from (16, 5) to (20, 5), the basis sequence is extended and the extended parts are filled as in table 3.

TABLE 3

| i | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| . | . | . | . | . | . |
| . | . | . | . | . | . |
| . | . | . | . | . | . |
| 15 | 0 | 0 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 | 1 |
| 17 | 0 | 0 | 0 | 0 | 1 |
| 18 | 0 | 0 | 0 | 0 | 1 |
| 19 | 0 | 0 | 0 | 1 | 0 |

Here $M_{i,4}$ is the most significant bit (MOB). This arrangement gives significant extra protection to the MOB, and a little more robustness to the next most significant bit.

The conventional CQI coding schemes and their performances are varied according to the extended parts of basis sequence table. In this approach, to select optimum CQI coding scheme means just to find optimum extended part of the basis sequence table.

The above CQI coding schemes are developed in consideration of BER performance and unequal error protection (RMS error reduction) but system throughput. However, the coding schemes have tradeoffs between BER and unequal error protection. In other words, in view of the BER performance the first and second CQI coding schemes are superior to that of the third one. On the other hand, in view of the unequal error protection the third CQI coding scheme is superior to those of the first and second ones.

However, since HSDPA system has been designed in order to increase the system throughput, it is desirable to use the system throughput as one of the criteria in order to select optimum CQI coding scheme.

SUMMARY OF THE INVENTION

The present invention has been made in an effort to solve the above problem.

It is an object of the present invention to provide a method for generating basis sequences for CQI coding capable of maximizing a system throughput.

To achieve the object, in one aspect of the present invention the channel quality information (CQI) coding method comprises (a) creating first basis sequences for generating (32, 5) expurgated TFCI code from (32, 10) TFCI code, (b) puncturing each of the (32, 5) expurgated TFCI codes in a predetermined bit pattern in order to maximize

**8**

system throughput, (c) repeating a predetermined bit of each (32, 5) expurgated TFCI code for predetermined times in order to maximize system throughput, and (d) encoding 5 information bits into CQI codes using a second basis sequences generated through (b) and (c).

Each (32, 5) expurgated TFCI code is punctured as many as 16 bits in order of 0, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 30th bits, and a 31st bit of the (32, 5) expurgated TFCI code is repeated 4 times.

The first basis sequences are already shown in table 1c.

The second basis sequences are as in following table:

| i | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| 1 | 0 | 1 | 0 | 0 | 1 |
| 2 | 1 | 1 | 0 | 0 | 1 |
| 3 | 0 | 0 | 1 | 0 | 1 |
| 4 | 1 | 0 | 1 | 0 | 1 |
| 5 | 0 | 1 | 1 | 0 | 1 |
| 6 | 1 | 1 | 1 | 0 | 1 |
| 7 | 0 | 0 | 0 | 1 | 1 |
| 8 | 1 | 0 | 0 | 1 | 1 |
| 9 | 0 | 1 | 0 | 1 | 1 |
| 10 | 1 | 1 | 0 | 1 | 1 |
| 11 | 0 | 0 | 1 | 1 | 1 |
| 12 | 1 | 0 | 1 | 1 | 1 |
| 13 | 0 | 1 | 1 | 1 | 1 |
| 14 | 1 | 1 | 1 | 1 | 1 |
| 15 | 0 | 0 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 | 1 |
| 17 | 0 | 0 | 0 | 0 | 1 |
| 18 | 0 | 0 | 0 | 0 | 1 |
| 19 | 0 | 0 | 0 | 0 | 1 |

where i=0, . . . , 19.

In other aspect of the present invention the channel quality information (CQI) coding method comprises inputting 5 information bits, generating 32 bit sub-codes with the information bits using a basis sequences, generating 20 bit codewords by puncturing 16 bits from each of the sub-codes in a predetermined bit pattern and repeating a predetermined bit of the sub-code.

The sub-codes are punctured 16 bits in order of 0, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 30th bits and 31st bit is repeated 4 times.

The resultant basis sequences are represented by $M_{i,0}$=10101010101010100000, $M_{i,1}$=01100110011001100000, $M_{i,2}$=000111100001111 00000, $M_{i,3}$=00000001111111100000, and $M_{i,4}$=11111111111111111111, where i=0, . . . , 19.

In other aspect of the present invention the channel quality information (CQI) coding method comprises (a) obtaining first basis sequences from (16, 5) TFCI code, (b) extending basis sequences to (20, 5) CQI code in a predetermined pattern in order to maximize system throughput, (c) encoding 5 information bits into CQI codes using a second basis sequences generated through (a) and (b). The second extended basis sequences are the same as the upper table.

In other aspect of the present invention the channel quality information (CQI) coding method comprises (a) encoding 5 information bits into (16, 5) TFCI codes using (16, 5) TFCI basis sequences (b) repeating the MOB of information bits 4 times in order to maximize system throughput.

IPR2021-00908   Honeywell Exh. 1001  -  Page 11 of 16
(Honeywell International, Inc., et al. v. 3G Licensing S.A.)

**Appx58**

US 7,319,718 B2

9

10

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention will be described in detail with reference to the following drawings in which like reference numerals refer to like elements wherein:

FIG. 1 is a conceptual view showing a structure of the UMTS radio access network (UTRAN);

FIG. 2 is a drawing illustrating a frame structure for uplink HS-DPCCH associated with HS-DSCH transmission;

FIG. 3a is a schematic block diagram illustrating a (16, 5) TFCI encoder;

FIG. 3b is a schematic block diagram illustrating a (32, 10) TFCI encoder;

FIG. 4 is a schematic block diagram illustrating an encoder for generating a conventional (20, 5) CQI code based on the (16, 5) TFCI code;

FIG. 5a is a schematic block diagram illustrating an encoder for generating conventional (20, 5) CQI code based on the expurgated (32, 5) TFCI code;

FIG. 5b is a table showing a puncturing pattern and used basis adapted to the encoder of FIG. 5a;

FIG. 6 is a schematic block diagram illustrating another encoder for generating (20, 5) CQI code by extending (16, 5) TFCI code;

FIG. 7a is a schematic block diagram illustrating an encoder for generating (20, 5) CQI code according to a first embodiment of the present invention;

FIG. 7b is a table showing a puncturing pattern, repetition pattern, and used basis adapted to the encoder of FIG. 7a;

FIG. 8a is a schematic block diagram illustrating an encoder for generating (20, 5) CQI code according to a second embodiment of the present invention;

FIG. 8b is a table showing a puncturing pattern, repetition pattern, and used basis adapted to the encoder of FIG. 8b;

FIG. 9a is a schematic block diagram illustrating an encoder for generating (20, 5) CQI code according to a third embodiment of the present invention; and

FIG. 9b is a table showing a puncturing pattern, repetition pattern, and used basis adapted to the encoder of FIG. 9a.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Preferred embodiments of the present invention will be described with reference to the accompanying drawings hereinafter.

FIG. 7a is a block diagram illustrating an encoder for generating (20, 5) code according to a first embodiment of the present invention and FIG. 7b is a table for illustrating how the encoder of FIG. 7a generate the (20, 5) code.

Referring to FIG. 7a and FIG. 7b, once 5 information bits are inputted, the encoder linearly combines the information bits with basis sequences so as to generate a (32, 5) expurgated TFCI code. The expurgated TFCI code of 32 bit length is punctured by 13 bits in a puncturing pattern (0, 2, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, and 30th bits) and the 31st bit is repeated one time such that the code word of 20 bit length is obtained. The basis sequences are $M_{i,0}$, $M_{i,1}$, $M_{i,2}$, $M_{i,3}$, $M_{i,4}$. The basis sequences generated according to the first embodiment are as following in table 4. In other aspect of the first embodiment is to construct basis sequences by extending from (16, 5) TFCI code to the basis sequence of table 4.

### TABLE 4

| i | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| . | . | . | . | . | . |
| . | . | . | . | . | . |
| . | . | . | . | . | . |
| 15 | 0 | 0 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 | 1 |
| 17 | 0 | 0 | 0 | 1 | 0 |
| 18 | 0 | 0 | 1 | 0 | 0 |
| 19 | 0 | 1 | 0 | 0 | 0 |

Each of the basis sequences according to the first embodiment can be expressed as follows:
$M_{i,0}$=10101010101010100000
$M_{i,1}$=01100110011001100001
$M_{i,2}$=00011110000111100010
$M_{i,3}$=00000001111111100100
$M_{i,4}$=11111111111111111000

FIG. 8a is a block diagram illustrating an encoder for generating (20, 5) code according to a second embodiment of the present invention and FIG. 8b is a table for illustrating how the encoder of FIG. 8a generate the (20, 5) code.

Referring to FIG. 8a and FIG. 8b, the encoder linearly combines 5 inputted information bits with basis sequences so as to generate a (32, 5) expurgated TFCI code. The expurgated TFCI code of 32 bit length is punctured by 14 bits in a puncturing pattern (0, 1, 2, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, and 30th bits) and the 31st bit is repeated two times such that the code word of 20 bit length is obtained. The basis sequences generated according to the second embodiment of the present invention are as following in table 5. In other aspect of the second embodiment is to construct basis sequences by extending from (16, 5) TFCI code to the basis sequence of table 5.

### TABLE 5

| i | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| . | . | . | . | . | . |
| . | . | . | . | . | . |
| . | . | . | . | . | . |
| 15 | 0 | 0 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 | 1 |
| 17 | 0 | 0 | 0 | 1 | 0 |
| 18 | 0 | 0 | 1 | 0 | 0 |
| 19 | 0 | 0 | 1 | 0 | 0 |

Each of the basis sequences according to the second embodiment can be expressed as follows:
$M_{i,0}$=10101010101010100000
$M_{i,1}$=01100110011001100001
$M_{i,2}$=00011110000111100001
$M_{i,3}$=00000001111111100010
$M_{i,4}$=11111111111111111100

FIG. 9a is a block diagram illustrating an encoder for generating (20, 5) code according to a third embodiment of the present invention and FIG. 9b is a table for illustrating how the encoder of FIG. 9a generate the (20, 5) code.

Referring to FIG. 9a and FIG. 9b, the encoder linearly combines 5 inputted information bits with basis sequences so as to generate a (32, 5) expurgated TFCI code. The expurgated TFCI code of 32 bit length is punctured by 16 bits in a puncturing pattern (0, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 30th bits) in order to maximize the system throughput and the 31st bit is repeated 4 times in order to

IPR2021-00908   Honeywell Exh. 1001  -  Page 12 of 16
(Honeywell International, Inc., et al. v. 3G Licensing S.A.)

Appx59

US 7,319,718 B2

11

maximize the system throughput such that the code word of 20 bit length is obtained. The basis sequences generated according to the third embodiment of the present invention are as following in table 6.

TABLE 6

| i | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| . | . | . | . | . | . |
| . | . | . | . | . | . |
| . | . | . | . | . | . |
| 15 | 0 | 0 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 | 1 |
| 17 | 0 | 0 | 0 | 0 | 1 |
| 18 | 0 | 0 | 0 | 0 | 1 |
| 19 | 0 | 0 | 0 | 0 | 1 |

Each of the basis sequences according to the third embodiment can be expressed as follows:

$M_{i,0}$=10101010101010100000
$M_{i,1}$=01100110011001100000
$M_{i,2}$=00011110000111100000
$M_{i,3}$=00000001111111100000
$M_{i,4}$=11111111111111111111

In other aspect of the third embodiment, the channel quality information (CQI) coding method comprises (a) obtaining first basis sequences from (16, 5) TFCI code, (b) extending basis sequences to (20, 5) CQI code in a predetermined pattern in order to maximize system throughput, (c) encoding 5 information bits into CQI codes using a second basis sequences generated through (a) and (b). The second extended basis sequences are the same as table 6.

In other aspect of the third embodiment, the channel quality information (CQI) coding method comprises (a) encoding 5 information bits into (16, 5) TFCI codes using (16, 5) TFCI basis sequences (b) repeating the MOB of information bits 4 times.

To support the superiority of the CQI coding schemes of the present invention to the conventional ones, the CQI coding schemes of the embodiments and the conventional ones were simulated and compared with respect to BER, RMS error, and system throughput for selecting optimum CQI coding scheme. Since there is a trade-off between BER and RMS error, the system throughput is considered as a criterion. For simplification, the conventional CQI coding schemes characterized in table 2 and table 3 are referred as C1 and C2.

In the simulations result, the order of the BER performance as follows.

C1>embodiment 1>embodiment 2>C2>embodiment 3
(←better , , , worse→)

The performance gap between the worst and the best is approximately 0.5 dB at BER $10^{-5}$.

In order to measure the unequal error protection capability, the root-mean-square (RMS) error as the criterion is introduced. The RMS error means the root mean square of difference between transmitted codewords and received codewords. The order of the RMS error reduction performance is as follows.

Embodiment 3>C2>embodiment 2>embodiment 1>C1
(←better , , , worse→)

The performance gap between the worst and the best is approximately 1.5 at −3 dB EbNo/Slot.

The system throughput is calculated using simplified system level simulation. And the conventional analytic system level simulator and uplink CQI coding schemes are joined. With combined system level simulation and uplink

12

CQI coding, the BER and RMS error are considered at the same time. The throughput of BER performance is as follows.

Embodiment 3>C2>embodiment 2>embodiment 1>C1
(←better , , , worse→)

The performance gap between the worst and the best is approximately 79 kbps at 3 dB.

In the present invention, the CQI coding schemes are classified with respect to the extended parts of the basis sequence tables and the system throughput is introduced as a criterion for evaluating the CQI coding schemes because there is a trade-off between BER and RMS error. Moreover, during the system throughput simulation, both BER and RMS error effect are already considered together. Also, since HSDPA system has been designed in order to increase the system throughput, the third embodiment of the present invention, which shows the best system throughput in the simulation, can be the optimum CQI coding scheme for HS-DPCCH.

While this invention has been described in connection with what is presently considered to be the most practical and preferred embodiment, it is to be understood that the invention is not limited to the disclosed embodiments, but, on the contrary, is intended to cover various modifications and equivalent arrangements included within the sprit and scope of the appended claims.

What is claimed is:

1. A method of coding channel quality information (CQI), comprising the steps of:

providing information bits, $a_0$, $a_1$, $a_2$, $a_3$, and $a_4$;
providing five basis sequences $M_{i,n}$ for a (20,5) CQI code;
encoding the information bits by combining the information bits with the basis sequences; and
generating a 20-bit codeword,
wherein the basis sequences $M_{i,n}$ are defined as:

| I | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| 1 | 0 | 1 | 0 | 0 | 1 |
| 2 | 1 | 1 | 0 | 0 | 1 |
| 3 | 0 | 0 | 1 | 0 | 1 |
| 4 | 1 | 0 | 1 | 0 | 1 |
| 5 | 0 | 1 | 1 | 0 | 1 |
| 6 | 1 | 1 | 1 | 0 | 1 |
| 7 | 0 | 0 | 0 | 1 | 1 |
| 8 | 1 | 0 | 0 | 1 | 1 |
| 9 | 0 | 1 | 0 | 1 | 1 |
| 10 | 1 | 1 | 0 | 1 | 1 |
| 11 | 0 | 0 | 1 | 1 | 1 |
| 12 | 1 | 0 | 1 | 1 | 1 |
| 13 | 0 | 1 | 1 | 1 | 1 |
| 14 | 1 | 1 | 1 | 1 | 1 |
| 15 | 0 | 0 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 | 1 |
| 17 | 0 | 0 | 0 | 0 | 1 |
| 18 | 0 | 0 | 0 | 0 | 1 |
| 19 | 0 | 0 | 0 | 0 | 1. |

2. The method of claim 1, wherein the (20,5) CQI code is obtained from a (16,5) TFCI code comprising five 16-bit basis sequences, by extending each 16-bit basis sequence by repeating a respective last basis sequence bit four times.

3. The method of claim 1, wherein the (20,5) CQI code is obtained from a (32,5) expurgated TFCI code comprising five 32-bit basis sequences, by puncturing each 32-bit basis sequence by 16 bits in a predetermined puncturing pattern and repeating a respective last basis sequence bit four times.

IPR2021-00908   Honeywell Exh. 1001  -  Page 13 of 16
(Honeywell International, Inc., et al. v. 3G Licensing S.A.)

US 7,319,718 B2

| 13 | 14 |

**4.** The method of claim **1**, wherein the combination is a linear combination.

**5.** The method of claim **1**, wherein the codeword bits, $b_i$, are given by:

$$b_i = \sum_{n=0}^{4} (a_n \times M_{i,n}) \bmod 2, \text{ where } i = 0, \ldots, 19.$$

**6.** A method of coding channel quality information (CQI), comprising the steps of:
  a) providing information bits, $a_0$, $a_1$, $a_2$, $a_3$, and $a_4$;
  b) providing five basis sequences Mi,n for a TFCI code;
  c) encoding the information bits by combining the information bits with the basis sequences;
  d) generating an intermediate codeword; and
  e) adding a further bit repeated four times to generate a 20-bit codeword.

**7.** The method of claim **6**, wherein the TFCI code is a (16,5) TFCI code and the intermediate codeword comprises 16 bits.

**8.** The method of claim **6**, wherein the TFCI code is a (32,5) expurgated TFCI code and the intermediate codeword comprises 32 bits, the method further comprising the step of puncturing the 32-bit intermediate codeword by 16 bits in a predetermined puncturing pattern prior to sep (e).

**9.** The method of claim **6**, wherein the further bit repeated four times is one of the information bits.

**10.** The method of claim **9**, wherein the further bit is the most significant bit (MOB).

**11.** The method of claim **6**, wherein the further bit repeated four times is a bit from the intermediate codeword.

**12.** The method of claim **11**, wherein the further bit is a last bit of the intermediate codeword.

**13.** The method of claim **6**, wherein the 20-bit codeword is the same as a codeword generated using basis sequences $M_{i,n}$, defined as:

| I | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| 1 | 0 | 1 | 0 | 0 | 1 |
| 2 | 1 | 1 | 0 | 0 | 1 |
| 3 | 0 | 0 | 1 | 0 | 1 |
| 4 | 1 | 0 | 1 | 0 | 1 |
| 5 | 0 | 1 | 1 | 0 | 1 |
| 6 | 1 | 1 | 1 | 0 | 1 |
| 7 | 0 | 0 | 0 | 1 | 1 |
| 8 | 1 | 0 | 0 | 1 | 1 |
| 9 | 0 | 1 | 0 | 1 | 1 |
| 10 | 1 | 1 | 0 | 1 | 1 |
| 11 | 0 | 0 | 1 | 1 | 1 |
| 12 | 1 | 0 | 1 | 1 | 1 |
| 13 | 0 | 1 | 1 | 1 | 1 |
| 14 | 1 | 1 | 1 | 1 | 1 |
| 15 | 0 | 0 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 | 1 |
| 17 | 0 | 0 | 0 | 0 | 1 |
| 18 | 0 | 0 | 0 | 0 | 1 |
| 19 | 0 | 0 | 0 | 0 | 1. |

**14.** A wireless communications system, comprising:
  a user apparatus; and
  a wireless communications network, comprising a base station interface between the user apparatus and the communications network, the user apparatus comprising an encoder arranged to provide channel quality information (CQI) to the base station in the form of a 20-bit codeword, the encoder being arranged to generate the codeword by receiving information bits, $a_0$, $a_1$, $a_2$, $a_3$, and $a_4$, and using five basis sequences, $M_{i,n}$, to encode the information bits by combining the information bits with the basis sequences, wherein the basis sequences $M_{i,n}$ are defined as:

| I | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| 1 | 0 | 1 | 0 | 0 | 1 |
| 2 | 1 | 1 | 0 | 0 | 1 |
| 3 | 0 | 0 | 1 | 0 | 1 |
| 4 | 1 | 0 | 1 | 0 | 1 |
| 5 | 0 | 1 | 1 | 0 | 1 |
| 6 | 1 | 1 | 1 | 0 | 1 |
| 7 | 0 | 0 | 0 | 1 | 1 |
| 8 | 1 | 0 | 0 | 1 | 1 |
| 9 | 0 | 1 | 0 | 1 | 1 |
| 10 | 1 | 1 | 0 | 1 | 1 |
| 11 | 0 | 0 | 1 | 1 | 1 |
| 12 | 1 | 0 | 1 | 1 | 1 |
| 13 | 0 | 1 | 1 | 1 | 1 |
| 14 | 1 | 1 | 1 | 1 | 1 |
| 15 | 1 | 0 | 0 | 0 | 1 |
| 16 | 0 | 1 | 0 | 0 | 1 |
| 17 | 1 | 1 | 0 | 0 | 1 |
| 18 | 0 | 0 | 1 | 0 | 1 |
| 19 | 1 | 0 | 1 | 0 | 1 |
| 20 | 0 | 1 | 1 | 0 | 1 |
| 21 | 1 | 1 | 1 | 0 | 1 |
| 22 | 0 | 0 | 0 | 1 | 1 |
| 23 | 1 | 0 | 0 | 1 | 1 |
| 24 | 0 | 1 | 0 | 1 | 1 |
| 25 | 1 | 1 | 0 | 1 | 1 |
| 26 | 0 | 0 | 1 | 1 | 1 |
| 27 | 1 | 0 | 1 | 1 | 1 |
| 28 | 0 | 1 | 1 | 1 | 1 |
| 29 | 1 | 1 | 1 | 1 | 1 |
| 30 | 0 | 0 | 0 | 0 | 0 |
| 31 | 0 | 0 | 0 | 0 | 1. |

**15.** A method of coding information regarding a channel, comprising:
  providing information bits of $a_0$, $a_1$, $a_2$, $a_3$, and $a_4$;
  encoding the information bits using a (20, 5) code; and
  providing output code words of 20 bits as a result of the encoding step, wherein the (20, 5) code is a prescribed combination of 5 basis sequences $M_{i,n}$ as defined as follows:

| I | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| 1 | 0 | 1 | 0 | 0 | 1 |
| 2 | 1 | 1 | 0 | 0 | 1 |
| 3 | 0 | 0 | 1 | 0 | 1 |
| 4 | 1 | 0 | 1 | 0 | 1 |
| 5 | 0 | 1 | 1 | 0 | 1 |
| 6 | 1 | 1 | 1 | 0 | 1 |
| 7 | 0 | 0 | 0 | 1 | 1 |
| 8 | 1 | 0 | 0 | 1 | 1 |
| 9 | 0 | 1 | 0 | 1 | 1 |
| 10 | 1 | 1 | 0 | 1 | 1 |
| 11 | 0 | 0 | 1 | 1 | 1 |
| 12 | 1 | 0 | 1 | 1 | 1 |
| 13 | 0 | 1 | 1 | 1 | 1 |
| 14 | 1 | 1 | 1 | 1 | 1 |
| 15 | 0 | 0 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 | 1 |
| 17 | 0 | 0 | 0 | 0 | 1 |

IPR2021-00908   Honeywell Exh. 1001  -  Page 14 of 16
(Honeywell International, Inc., et al. v. 3G Licensing S.A.)

US 7,319,718 B2

15

16

-continued

| I | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 18 | 0 | 0 | 0 | 0 | 1 |
| 19 | 0 | 0 | 0 | 0 | 1. |

**16**. The method of claim **15**, wherein output code word bits $b_i$ are based on

$$b_i = \sum_{n=0}^{4} (a_n \times M_{i,n}) \bmod 2$$

where $i = 0, \dots , 19$.

**17**. The method of claim **16**, wherein the prescribed combination is a linear combination.

**18**. The method of claim **15**, wherein the information is channel quality information.

**19**. A method of coding information regarding a channel, comprising:

providing information bits of $a_0$, $a_1$, $a_2$, $a_3$, and $a_4$;

providing five basis sequences Mi,n for a (20, 5) code

encoding the information bits by Linear combination of the information bits with the basis sequences; and

providing output code words of 20 bits as a result of the encoding step, wherein the (20, 5) code is obtained from a (16, 5) TFCI code comprising five 16-bit basis sequences, by extending each 16-bit basis sequence by repeating a further respective basis sequence bit four times.

**20**. The method of claim **19**, wherein the (20, 5) code is as follows:

| I | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| 1 | 0 | 1 | 0 | 0 | 1 |
| 2 | 1 | 1 | 0 | 0 | 1 |
| 3 | 0 | 0 | 1 | 0 | 1 |
| 4 | 1 | 0 | 1 | 0 | 1 |
| 5 | 0 | 1 | 1 | 0 | 1 |
| 6 | 1 | 1 | 1 | 0 | 1 |
| 7 | 0 | 0 | 0 | 1 | 1 |
| 8 | 1 | 0 | 0 | 1 | 1 |
| 9 | 0 | 1 | 0 | 1 | 1 |
| 10 | 1 | 1 | 0 | 1 | 1 |
| 11 | 0 | 0 | 1 | 1 | 1 |
| 12 | 1 | 0 | 1 | 1 | 1 |
| 13 | 0 | 1 | 1 | 1 | 1 |
| 14 | 1 | 1 | 1 | 1 | 1 |
| 15 | 0 | 0 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 | 1 |
| 17 | 0 | 0 | 0 | 0 | 1 |
| 18 | 0 | 0 | 0 | 0 | 1 |
| 19 | 0 | 0 | 0 | 0 | 1. |

**21**. The method of claim **19**, wherein the further respective basis sequence bit is a respective last basis sequence bit.

**22**. The method of claim **19**, wherein the further respective basis sequence bit is a respective most significant sequence bit.

**23**. The method of claim **19**, wherein output code word bits $b_i$ are based on

$$b_i = \sum_{n=0}^{4} (a_n \times M_{i,n}) \bmod 2$$

where $i = 0, \dots , 19$.

**24**. A method of coding information regarding a channel, comprising:

providing information bits of $a_0$, $a_1$, $a_2$, $a_3$, and $a_4$;

providing five basis sequences Mi,n for a (20, 5) code; and

encoding the information bits by linear combination of the information bits with the basis sequences;

wherein the (20, 5) code is obtained from a (32, 5) expurgated TFCI code comprising five 32-bit basis sequences, by puncturing each 32-bit basis sequence by 16 bits in a predetermined puncturing pattern and repeating a further respective basis sequence bit four times.

**25**. The method of claim **24**, wherein the (20, 5) code is as follows:

| i | $M_{i,0}$ | $M_{i,1}$ | $M_{i,2}$ | $M_{i,3}$ | $M_{i,4}$ |
|---|---|---|---|---|---|
| 0 | 1 | 0 | 0 | 0 | 1 |
| 1 | 0 | 1 | 0 | 0 | 1 |
| 2 | 1 | 1 | 0 | 0 | 1 |
| 3 | 0 | 0 | 1 | 0 | 1 |
| 4 | 1 | 0 | 1 | 0 | 1 |
| 5 | 0 | 1 | 1 | 0 | 1 |
| 6 | 1 | 1 | 1 | 0 | 1 |
| 7 | 0 | 0 | 0 | 1 | 1 |
| 8 | 1 | 0 | 0 | 1 | 1 |
| 9 | 0 | 1 | 0 | 1 | 1 |
| 10 | 1 | 1 | 0 | 1 | 1 |
| 11 | 0 | 0 | 1 | 1 | 1 |
| 12 | 1 | 0 | 1 | 1 | 1 |
| 13 | 0 | 1 | 1 | 1 | 1 |
| 14 | 1 | 1 | 1 | 1 | 1 |
| 15 | 0 | 0 | 0 | 0 | 1 |
| 16 | 0 | 0 | 0 | 0 | 1 |
| 17 | 0 | 0 | 0 | 0 | 1 |
| 18 | 0 | 0 | 0 | 0 | 1 |
| 19 | 0 | 0 | 0 | 0 | 1. |

**26**. The method of claim **24**, wherein the further respective basis sequence bit is a respective last basis sequence bit.

**27**. The method of claim **24**, wherein the further respective basis sequence bit is a respective most significant basis sequence bit.

**28**. The method of claim **24**, wherein output code word bits $b_i$ are based on

$$b_i = \sum_{n=0}^{4} (a_n \times M_{i,n}) \bmod 2$$

where $i = 0, \dots , 19$.

* * * * *

IPR2021-00908   Honeywell Exh. 1001  -  Page 15 of 16
(Honeywell International, Inc., et al. v. 3G Licensing S.A.)

**Appx62**

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 7,319,718 B2                    Page 1 of 1
APPLICATION NO. : 10/365498
DATED            : January 15, 2008
INVENTOR(S)      : Dong-Wook Roh, Min-Seok Oh and Joon Kui Ahn

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Correct claim 14, appearing at column 13, line 61 through column 14, line 38 by deleting the following lines from the table.

| $I$ | $M_{s,0}$ | $M_{s,1}$ | $M_{s,2}$ | $M_{s,3}$ | $M_{s,4}$ |
|----|----|----|----|----|----|
| "20 | 0 | 1 | 1 | 0 | 1 |
| 21 | 1 | 1 | 1 | 0 | 1 |
| 22 | 0 | 0 | 0 | 1 | 1 |
| 23 | 1 | 0 | 0 | 1 | 1 |
| 24 | 0 | 1 | 0 | 1 | 1 |
| 25 | 1 | 1 | 0 | 1 | 1 |
| 26 | 0 | 0 | 1 | 1 | 1 |
| 27 | 1 | 0 | 1 | 1 | 1 |
| 28 | 0 | 1 | 1 | 1 | 1 |
| 29 | 1 | 1 | 1 | 1 | 1 |
| 30 | 0 | 0 | 0 | 0 | 0 |
| 31 | 0 | 0 | 0 | 0 | 1" |

Signed and Sealed this

Twenty-seventh Day of October, 2009

*David J. Kappos*

David J. Kappos
*Director of the United States Patent and Trademark Office*

IPR2021-00908   Honeywell Exh. 1001  -  Page 16 of 16
(Honeywell International, Inc., et al. v. 3G Licensing S.A.)

Appx63